Electronically Filed May 18, 2017

Paul M. Basta, P.C. (NY No. 2568046)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
pbasta@kirkland.com

Brett Axelrod (NV No. 5859)
FOX ROTHSCHILD LLP
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone:     (702) 262-6899
Facsimile:     (702) 597-5503
baxelrod@foxrothschild.com

James H.M. Sprayregen, P.C. (IL No. 6190206)
David J. Zott, P.C. (IL No. 6193505 )
William A. Guerrieri (IL No. 6296643)
KIRKLAND & ELLIS LLP
300 North LaSalle St.
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
james.sprayregen@kirkland.com
dzott@kirkland.com
wguerrieri@kirkland.com

Counsel to the PIK Lender Group

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

IN RE:

EB HOLDINGS II, INC.,[1] a Nevada corporation.

  Debtor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. BK-S-17-12642-

CHAPTER 11

**STATEMENT OF THE PIK LENDER GROUP IN SUPPORT OF THEIR INVOLUNTARY CHAPTER 11 PETITION UNDER SECTION 303 OF THE BANKRUPTCY CODE**

Hearing Date:   N/A
Hearing Time:   N/A
Place:       300 Las Vegas Boulevard South
                    Las Vegas, NV 89101

---

[1]   The location of the Debtor's corporate headquarters and the Debtor's service address is 2777 North Stemmons Freeway, Dallas, TX 75207; the Debtor's registered agent is United Corporate Services, Inc., 2520 St. Rose Pkwy, Ste. 319, Henderson, NV 89074.

KE 46182505

TO THE HONORABLE _____, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL PARTIES IN INTEREST:

The ad hoc group (the "*PIK Lender Group*")[1] of lenders to EB Holdings II, Inc. (the "*Debtor*") pursuant to that certain payment-in-kind loan (the "*PIK Loan*," and such holders, the "*PIK Lenders*") due March 31, 2017, hereby makes this statement (the "*Statement*") in support of the involuntary chapter 11 petition (the "*Involuntary Petition*") filed by certain members of the PIK Lender Group and the Administrative Agent[2] (each, a "*Petitioning Creditor*") against the Debtor, a Nevada corporation. The PIK Lender Group respectfully states as follows:

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Nevada (the "*Court*") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 1001(b) of the Local Rules of Bankruptcy Practice for the United States Bankruptcy Court of the District of Nevada (the "*Local Rules*"), amended January 1, 2016.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The PIK Lender Group does consent to the entry of final orders of judgment by the Court if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent  with Article III of the United States Constitution.

## Introduction

3.      For the past several years, various members of the PIK Lender Group have fruitlessly engaged the Debtor and its majority owner, Howard M. Meyers, to address the looming maturity of the PIK Loan, which has now ballooned to approximately €1.8 billion (approximately $2 billion) in principal, accrued interest, and default interest.  Even as the March 31, 2017 maturity date approached, and for over six weeks since, the PIK Lender Group has negotiated with the Debtor and Mr. Meyers hoping to reach an out-of-court restructuring.  But those efforts have come up short as the Debtor and

---

[1]    The PIK Lender Group holds approximately 77% of the principal issue face amount of the PIK Loan, and is comprised of GoldenTree Asset Management LP, Alcentra Limited, Fortress Investment Group/Mount Kellet Capital Management, HIG Capital International Advisors LLP/Bayside Capital, Sound Point Capital Management, LP, and Värde Partners Europe Limited, each of which is, or is an affiliate of, the manager and or advisor of funds and/or accounts who are the beneficial holders of the PIK Loan.

[2]    Capitalized terms used but not defined shall have the meaning given elsewhere in this Statement.

Mr. Meyers continue to disregard their massive obligations and instead focus on the best way to extract value for Mr. Meyers.  The math is straightforward: the Debtor owes approximately €1.8 billion to the PIK Lenders; the Debtor has no other material debt; the Debtor has never paid the PIK Lenders a cent nor offered the PIK Lenders anything more than a fraction of the amount it owes; and the value of the Debtor is significantly less than the value of the existing PIK Loan debt, as is evidenced by the fact that interests in the PIK Loan currently trade at approximately thirty-cents on the dollar.

4.      All the while, the Debtor and Mr. Meyers have engaged in a variety of moves designed to siphon away the Debtor's remaining value to Mr. Meyers.  As described in more detail below, the corporate structure of, and relationships among, the Debtor, its shareholders, its subsidiaries, and various other related entities owned and controlled by Mr. Meyers is designed for that very purpose.  Rather than adhering to traditional corporate formalities, Mr. Meyers has placed himself in various conflicting roles throughout the Debtor's corporate family, which incentivizes him to drive down the Debtor's value to the direct harm of the PIK Lenders.  Mr. Meyers and the Debtor have avoided repayment of the PIK Loan at every turn, including by endless iterations of unworkable proposals and through frivolous counterclaims in pending litigation.  Against this backdrop, the PIK Lender group has no choice but to file this Involuntary Petition to protect the diminishing value of the Debtor's estate and to utilize the processes and oversight available from this Court to arrive at a value maximizing restructuring.

**Statement**

5.      The PIK Lender Group is an ad hoc group of six holders of the Debtor's PIK Loan, which matured on March 31, 2017, and remains outstanding in the amount of approximately €1.8 billion in principal, accrued interest, and default interest (of which the PIK Lender Group holds approximately €1.4 billion, including accrued but unpaid  and default interest).  Collectively, the members of the PIK Lender Group hold approximately 77% of the outstanding principal amount of the PIK Loan.  The Petitioning Creditors each hold claims against the Debtor that are not contingent as to liability or the subject of *bona fide* dispute as to liability or amount, and which claims are each in excess of $15,325 more than the value of any liens securing the PIK Loan, as required by section 303(b)(1) of the Bankruptcy Code.   The Debtor has not paid, and has no ability to satisfy, this obligation.

**A.     The PIK Lenders Have Long Financed the Eco-Bat Enterprise and Mr. Meyers, and are Currently Owed Almost €1.8 Billion.**

6.     The Debtor is a Nevada corporation that is owned 100% by Mr. Meyers, his wife, and his wife's trust.   The Debtor is a "holding company" whose value derives exclusively from its ownership of equity interests in Eco-Bat Technologies Ltd. ("**Eco-Bat Technologies**"), which in turn, directly or indirectly controls several valuable operating subsidiaries engaged in the business of lead production throughout the world (the "**Eco-Bat Subsidiaries**, and, together with Eco-Bat Technologies and its non-operating subsidiaries, the "**Eco-Bat Enterprise**").   The Eco-Bat Enterprise is the largest producer and recycler of lead in Europe and the third-largest lead producer in the United States.   Through the Eco-Bat Enterprise and other affiliated entities, Mr. Meyers and his family own the United Kingdom's largest lead-acid battery production facility and lead scraping and recycling facility, and additional facilities in the United States, Germany, Italy, the Netherlands, and Austria.   The Eco-Bat Enterprise is a complex, international business with assets located throughout the world, and the Debtor is an integrated entity in this corporate structure.

7.     The Debtor was formed in February 2005, and shortly after the Debtor's formation, Mr. Meyers caused the Debtor to issue €250 million worth of notes to investors (the "**February 2005 Offering**").   After accounting for fees and expenses, these notes yielded approximately €242.3 million in proceeds, which were immediately upstreamed to the Debtor's then-parent corporation (owned 100% by Mr. Meyers and his family), and ultimately to Mr. Meyers.   In an effort to raise additional capital, in or about April 2007, Mr. Meyers obtained an additional €600 million in the form of a payment-in-kind loan facility, the PIK Loan, governed by that certain agreement (including Annex I thereto) (the "**PIK Loan Agreement**"), attached hereto as **Exhibit A**, between EB Holdings Inc. as borrower, Credit Suisse International and Citigroup Global Markets Limited as mandated lead arrangers, Credit Suisse International and Citibank N.A., New York Branch as original lenders and bookrunners, and Credit Suisse London Branch ("**Credit Suisse**") as administrative agent.[3]   The issuance of the PIK Loan, which accrued 11% interest semi-annually to be paid, along with the original principal balance, at maturity on

---

[3]     On April 12, 2017, Credit Suisse resigned as administrative agent under the PIK Loan.   After consulting with the Company as required by the PIK Loan Agreement, Credit Suisse selected GLAS USA LLC as successor administrative agent (the "**Administrative Agent**").

March 31, 2017, yielded proceeds of approximately €576 million.  €308 million of these proceeds were used to pay off holders of notes under the February 2005 Offering.  The remaining €268 million were, like the previous proceeds, upstreamed to the Debtor's then-parent for the benefit of Mr. Meyers and his family.  Thus, using borrowings by the Debtor, Mr. Meyers has paid himself and his family hundreds of millions of dollars, plus hundreds of millions more through lucrative (and highly questionable) management and service contracts.

8.    The PIK Loan served as collateral for the sale of notes (the "***Series 97 Notes***") through BOATS Investments (Netherlands) B.V. ("***BOATS***"), a Dutch limited liability company which served as an investment vehicle.  To allow investor participation, Credit Suisse International, the nominal lender under the PIK Loan Agreement,[4] sold a 100% participation in the loan to BOATS, which then issued notes secured by the PIK Loan.  Thus, the holders of the notes issued by BOATS were the true lenders.  In January 2013, this participation structure was collapsed, and Credit Suisse International, the nominal lender under the PIK Loan Agreement, assigned its interests in the PIK Loan directly to BOATS pursuant to that certain transfer certificate, attached hereto as **Exhibit B**.  The assignment, which gave BOATS the "rights and obligations of a Lender", effectively made BOATS the nominal lender under the PIK Loan Agreement, while the holders of the notes issued by BOATS remained the true lenders.

9.    In or about July 2016, as a condition imposed by Mr. Meyers to continuing negotiations regarding an out-of-court resolution, the holders of the Series 97 Notes, including members of the PIK Lender Group, directed BOATS to assign its direct interests in the PIK Loan as nominal lender to them.[5] As of the date of the Involuntary Petition, each member of the PIK Lender Group is a Lender under the PIK Loan, which matured on March 31, 2017.  To date, the Debtor has not paid one cent towards its approximately €1.8 billion obligation to the PIK Lenders.

---

[4]  Citibank N.A., New York Branch was no longer a nominal lender as of this date.

[5]  Certain members of the PIK Lender Group purchased direct interests in the PIK Loan after the "collapse" of the Series 97 Notes into direct interests in the PIK Loan.  The members of the PIK Lender Group who are petitioning creditors have submitted, pursuant to Rule 1003(a) of the Bankruptcy Code, information regarding how each came to hold the PIK Loan [Docket Nos. ● - ●].

**B.    Mr. Meyers' History of Bad Faith Conduct has Led to the Need to File this Involuntary Petition.**

10.    As early as December 2013, individual members of the PIK Lender Group began to engage with Mr. Meyers in anticipation of the March 31, 2017 maturity of the PIK Loan.  For the next two years, certain members of the PIK Lender Group and other investors in the Series 97 Notes exchanged proposals with the Debtor and Mr. Meyers, with an aim to reach a consensual restructuring of the Series 97 Notes and the underlying PIK Loan.  On July 9, 2015, the Debtor submitted an "indicative" proposal to counsel for these investors.  Despite these investors' attempts to engage with the Debtor and Mr. Meyers over the next month through process proposals and the suggestion of a nondisclosure agreement, the July 9, 2015 proposal was withdrawn.  Discussions continued to stall over the next few months, and in December 2015, certain investors holding the Series 97 Notes organized into an ad hoc committee, which became the PIK Lender Group, and engaged a financial advisor at Mr. Meyers' urging.

11.    Efforts to engage with Mr. Meyers regarding the production of due diligence documents and entry into a non-disclosure agreement were met largely with silence or recalcitrance.  Mr. Meyers employed various stalling tactics, including requiring that the Series 97 Notes be collapsed into direct interests in the PIK Loan before he would submit an actual restructuring proposal (which the PIK Lenders obliged, despite Mr. Meyers' refusal to assist in facilitating the collapse).  These stilted negotiations ultimately culminated in a revised proposal in August 2016 from Mr. Meyers by which Mr. Meyers proposed to pay, on account of almost €1.6 billion in principal and accrued interest as of March 31, 2016, a mere €50 million in cash and €500 million of new debt of questionable value in the Debtor, requiring the lenders to finance their own settlement and leaving Mr. Meyers with continued ownership of the Debtor.[6]

12.    During the 2016 negotiations period, the PIK Lenders became aware, notably through public disclosures rather than from the Debtor directly, of significant and troubling actions taken by Mr. Meyers and the Eco-Bat Enterprise's management team.  The PIK Lender Group had requested, as part of its basic diligence, access to earnings information by geographic region and direct contact with

---

[6]    The terms of the proposal, which were published by the Debtor on August 25, 2016, are attached hereto as **Exhibit C**.

managers for the Eco-Bat Enterprise's various business units.  Mr. Meyers refused, claiming the information was proprietary and only allowing the PIK Lenders Group's advisors to speak with him. Even though Eco-Bat Technologies was under investigation for suspected cartel practices related to lead scrap purchases,[7] Eco-Bat Technologies reassured the PIK Lenders that it was cooperating fully with the investigation and minimized the potential impact of the investigation.[8] The PIK Lender Group was unpleasantly surprised, therefore, to discover—through a public press release—that Eco-Bat Technologies would likely face significant fines for price-fixing.[9]

13.    The PIK Lender Group also discovered a spate of related-entity transactions that evidenced a plan to shift valuable assets and required permits away from the Eco-Bat Enterprise to non-Eco-Bat Enterprise entities, thereby leaving the PIK Lenders with claims against an empty shell. Despite requests, the Debtor and Mr. Meyers refused to provide information on these transactions; for instance, the PIK Lender Group requested, but has yet to receive, the details of management contracts between Eco-Bat Technologies and Quexco Incorporated ("*Quexco*"), another entity owned 100% by Mr. Meyers and his family.

14.    In light of their concerns over the actions of Mr. Meyers and his related entities, members of the PIK Lender Group commenced litigation in the State Court of Nevada against the Debtor, Eco-Bat Technologies, Quexco, RSR Corporation ("*RSR*"), another Meyers-affiliated entity, Mr. Meyers, and Mr. Meyers' close friend, Albert P. Lospinoso for fraud, breach of fiduciary duty, breach of contract, racketeering, fraudulent transfer, and alter-ego/corporate veil piercing.  Despite the litigation, the PIK Lender Group continued to try to engage the Debtor and Mr. Meyers to work towards an out-of-court restructuring solution.  On the eve of the maturity of the PIK Loan, Mr. Meyers finally engaged restructuring professionals.  He also finally gave the PIK Lender Group access to some, though

---

[7]    Reuters, *Update 2-EU regulators charge Recylex, 4 others with taking part in cartel*, June 24, 2015, available at http://www.reuters.com/article/eu-cartel-leadbattery-idUSL8N0ZA36C20150624. Although the EU regulators disclosed at this time that certain firms were charged with cartel behavior, Eco-Bat Technologies was not revealed to be one of the suspect firms until months later.

[8]    Eco-Bat Technologies 2015 Year-End Report at 73.

[9]    European Commission Press Release, *Antitrust: Commission sends statement of objections to suspected participants in car battery recycling cartel*, June 24, 2015, available at http://europa.eu/rapid/press-release_IP-15-5254_en.htm.

by no means all, of the materials it had been requesting for over a year, but made reviewing the documents as difficult as possible: he provided thousands of pages of documents in an image-only format that the PIK Lender Group's advisors could not search, download, or print. Nonetheless, advisors to Mr. Meyers and to the PIK Lender Group re-opened conversations, and on April 6, 2017, the PIK Lender Group entered into a standstill agreement with the Debtor and Mr. Meyers (the "*Standstill Agreement*"), hoping that a consensual resolution could finally be reached. Over the course of the following two weeks, the PIK Lender Group attempted to negotiate a workable solution.

15. Unfortunately, another round of negotiations led to another round of excuses. This time, Mr. Meyers pointed to a "recently discovered" tax liability that may be owed by the Debtor under certain restructuring scenarios related to the treatment of so-called "foreign currency gains," *i.e.*, a potential tax liability associated with the fact that the PIK Loan is not denominated in U.S. dollars. The PIK Lender Group estimates, based on public information, that this tax liability may be in excess of $100 million. Amazingly, Mr. Meyers hid behind this potential tax liability during the negotiations despite the fact that the only reason the Debtor may be liable for this tax liability is Mr. Meyers's own act—the revocation of the Debtor's status as a "flow-through" "S"-Corporation to convert the Debtor to a taxable "C"-Corporation—and subsequent failures by Mr. Meyers to mitigate or explain this tax risk. This revocation occurred long after the Debtor's shareholders, namely Mr. Meyers and his family, had received the benefit of years of tax deductions "flowing through" the Debtor for interest deductions on account of the PIK Loan. In the absence of this conversion to a taxable "C"-Corporation, the Debtor's shareholders, not the Debtor, would be liable for any "foreign currency gain" tax that may arise in connection with the restructuring of the PIK Loan. The PIK Lender Group has every intent to protect the Debtor from this tax liability, including by seeking to unwind the revocation of the Debtor's "S"-Corporation election. The Debtor's shareholders benefitted from years of tax deductions related to the PIK Loan. Those shareholders, not the Debtor, must pay for the tax liability that may now arise.

16. Still, the PIK Lender Group persisted in its attempt to engage constructively, and its advisors discussed several alternatives that could have mitigated the impact of Mr. Meyers' actions. But Mr. Meyers refused to take responsibility or make sufficient moves toward a common ground. After being informed by Mr. Meyers' advisors that Mr. Meyers had reached his final negotiating position,

which advisors to the PIK Lenders had long made clear was woefully insufficient both in form and substance, the PIK Lender Group exercised its right to terminate the Standstill Agreement. After two weeks of silence, the Debtor attempted to stall once again by promising a revised proposal, which it finally delivered on May 12, 2017. The PIK Lender Group once again attempted to create a construct that would afford the Debtor an opportunity to develop an out-of-court solution, and the Debtor once again responded with a re-hash of the same unworkable solution. Yet this proposal merely retread issues that the PIK Lender Group had long made clear were unacceptable. It is clear that the Debtor and Mr. Meyers will forever attempt to postpone the inevitable bankruptcy proceeding that is now long overdue.

### C.  A Bankruptcy Court's Oversight Is Necessary To Correct the Lack of Corporate Governance and Pervasive Conflicts of Interest.

17.    As a holding company, the Debtor's primary asset is its stock in Eco-Bat Technologies, and its principal stakeholders are the PIK Lenders. To the PIK Lender Group's knowledge, there are no material creditors of the Debtor other than the PIK Lenders; and, given the outstanding debt and the underlying value of the stock of Eco-Bat Technologies, the Debtor is insolvent, thus making the PIK Lenders the primary beneficiaries of any increase in value in the Debtor. Notwithstanding that the Debtor's board of directors and management should be acting to maximize the value of the Debtor, their pervasive conflicts of interests incentivize them to *depress* rather than enhance the value of the Debtor. Based on information available to the PIK Lender Group there is not, and has never been, an independent board or management of the Debtor. Mr. Meyers and his close friend, Mr. Lospinoso, currently are the only directors of the Debtor—there are no independent directors on the board of the Debtor. Mr. Meyers is also the Debtor's President, Secretary, and Treasurer; to the PIK Lender Group's knowledge, there are no other employees or managers of the Debtor. Mr. Meyers and his family own 100% of the stock of the Debtor. So Mr. Meyers, either personally or through his friends and family, is all things to the Debtor: controlling shareholder, board of directors, and management. But he has consistently acted in ways benefiting not the Debtor, but either himself or other entities under his control. There is no one "watching the shop."

18.     As previously described, Mr. Meyers and his family, in their capacities as shareholders of the Debtor, converted the Debtor from an "S"-Corporation to a "C"-Corporation in 2013, saddling the Debtor with a significant tax liability after having taken advantage of years of tax benefits flowing through the Debtor on account of the PIK Loan.  Mr. Meyers has given no indication that there was any process in place to determine the potential impact this would have on the Debtor, or that any investigation was done when the potential for a massive tax liability began to emerge, perhaps because requiring the Debtor's shareholders to bear the tax burden after receiving years of tax benefit would have meant Mr. Meyers putting the Debtor's interests above his own as a shareholder.

19.     In addition, Mr. Meyers has structured the Eco-Bat Enterprise to depend on entities outside its control, but under the control of Mr. Meyers.  He has bifurcated his empire, with himself and his family at the top, as illustrated by the organizational chart below:



20.     Mr. Meyers and his family own 100% of QXH II, Inc. ("**QXH**").  QXH and its subsidiaries, including RSR and Quexco.  Mr. Meyers is the Chairman and Chief Executive Officer of Quexco, which wholly owns RSR, and Mr. Lospinoso is a member of the board of directors of Quexco. Key environmental permits and intellectual property licenses required to run Eco-Bat Technologies' U.S. operations are not owned by Eco-Bat Technologies but instead are held by RSR or its subsidiaries. In fact, Mr. Meyers has over the past year failed to renew an environmental permit necessary for the operations of the Eco-Bat Enterprise, instead causing a company outside the Eco-Bat Enterprise to renew the permits as the sole permittee.

21.     Until September 2015, both Quemetco West, LLC, an Eco-Bat Technologies subsidiary, and Quemetco, an RSR subsidiary, jointly held a required permit for one of Eco-Bat Technologies' California-based lead facilities, allowing both to operate the facility.  In March 2015, in anticipation of the September 2015 expiration of the permit, Quemetco submitted a permit renewal in Quemetco's name alone, omitting the name of the Eco-Bat Technologies subsidiary from the permit.[10]  Other U.S. facilities owned by subsidiaries of Eco-Bat Technologies similarly operate under permits owned not by the Eco-Bat Technologies subsidiary itself, but by either Quemetco or other RSR subsidiaries. Similarly, significant and material patents necessary to operate the Eco-Bat Enterprise are in the name of various RSR subsidiaries.  For example, U.S. Patent number 8,790,444 for "wet electrostatic precipitator and related methods," a permit which has been identified as key technology and has been implemented in two of Eco-Bat Technologies' facilities, is owned by RSR Technologies Inc., an RSR subsidiary.[11]

22.     In addition, Eco-Bat Technologies has multiple service agreements, facility management agreements, and research and development agreements with QXH and its subsidiaries, pursuant to which Eco-Bat Technologies has made payments of at least €175 million.[12]  Eco-Bat Technologies also pays a "service fee" to RSR of 5% of Eco-Bat Technologies' earnings before taxes, totaling tens of millions of euros, and substantial fees to RSR subsidiaries under facilities management agreements, including

---

[10]    Public Notice of Permit Renewal Application from Quemetco, Inc., June 2015.

[11]    U.S. Patent No. 8,790,444.

[12]    Eco-Bat Technologies Year-End Reports, 2007-2015.

payments of approximately €22.55 million in 2015 alone.[13]  This bifurcated structure, with Mr. Meyers on either side of many essential transactions, has endangered the value of the Debtor; without oversight, Mr. Meyers has the ability and incentive to deplete the value of the Eco-Bat Enterprise.  If successful, this strategy would allow Mr. Meyers to eliminate the obligations PIK Loan at a lower price and thereby maintain control of his empire with greater ease.

23.    A bankruptcy process will allow the PIK Lenders to ensure that the Debtor (including Mr. Meyers in his capacity as director to the Debtor) will act as a fiduciary to all parties in interest—or be replaced—thereby ensuring that his, and the Debtor's, incentives are properly aligned.  Any prospect of recovery for the PIK Lenders depends upon maximizing the value of the Eco-Bat Enterprise in its entirety, including the value of the directly or indirectly controlled subsidiaries of the Debtor.  A chapter 11 case will pressure-test the Debtor's efforts to satisfy the PIK Loan to ensure they are fair and reasonable.  Access to the information provided by the Debtor in the context of a bankruptcy proceeding will be crucial to ensure that any restructuring transaction put forward would accurately reflect the true value of the Debtor and the value of the Debtor's litigation claims against its officers and directors.  And, a bankruptcy proceeding will allow the Debtor and parties-in-interest access to certain value-maximizing tools, such as potential avoidance actions, appointment of a trustee or examiner, substantive consolidation, and/or a court supervised sale of the Debtor's assets.

24.    Simply put, no value-maximizing restructuring is possible without the participation of the PIK Lender Group.  As all out-of-court restructuring options have failed, a bankruptcy process is necessary.  Indeed, the recent round of unsuccessful negotiations followed the PIK Lender Group reaching out to the Debtor to discuss a potential in-court (or out-of-court) restructuring.[14]  The PIK Lender Group anticipated that the Debtor would agree and petition for a voluntary chapter 11 filing on or shortly before maturity.  Instead, the Debtor, apparently at the direction of Mr. Meyers, has continued its pattern of recalcitrance and refused to commence a voluntary bankruptcy filing despite having no ability to meet its obligations and the passage of more than six weeks since the PIK Loan's final maturity date.

---

[13]   Eco-Bat Technologies 2015 Year-End Report at 71-2.

[14]   See letter from P. Basta to G. Garman, dated February 21, 2017, attached hereto as **Exhibit F**.

25.     Moreover, the Debtor and Mr. Meyers have threatened the PIK Lender Group at every turn, including assertions that they would seek to dismiss any involuntary petition and seek a finding of bad faith.  The PIK Lender Group anticipates that the Debtor may argue that it has somehow, without a legally cognizable theory, been entirely excused of its obligations under the PIK Loan based on frivolous arguments that it currently presses in a counterclaim and in a separate, independent complaint in Nevada state court.  In short, the Debtor alleges that certain PIK Lenders' actions to enforce payment of the Debtor's obligation were breaches of the PIK Loan Agreement that completely excuse the Debtor's performance.  Even if there were breaches here (which there were not), they would not be material breaches sufficient to excuse performance.  Further, the PIK Loan Agreement makes clear that all payments made by the Debtor under the PIK Loan Agreement must be made without setoff or counterclaim.  There is no objective basis to dispute the validity of the debt as the Debtor has put forth no legal theory that would lead to cancellation of a €1.8 billion debt as the remedy.  The Debtor's and Mr. Meyers' threats to turn litigation filed against them for their misdeeds into a grounds to avoid their obligations all together is a desperate attempt to escape a maturity they have long seen coming (and long known they could not satisfy).  Unfortunately, this is consistent with their past practices and highlights the need for this Court's supervision.

26.     The Petitioning Creditors do not file this petition lightly—rather years of failed opportunities for the Debtor and its insiders to negotiate an out-of-court resolution mandate this path.  The need for a restructuring of the PIK Loan has been apparent for quite some time, and the PIK Lender Group long ago engaged advisors and have been willing to participate in substantive restructuring conversations.  Only at the eleventh hour did any meaningful discussions begin, but the continued recalcitrance of the Debtors and its insiders has prevented resolution.  The PIK Lender Group have now let maturity pass by more than six weeks in a final attempt to resolve matters out-of-court.  Spending more time attempting to explore a consensual out-of-court restructuring without the supervision of the bankruptcy court will only lead to delay and threaten the PIK Lender Group's recovery given the conflicts of interest of, and value-destructive actions by, Debtor's management and related entities.  The Petitioning Creditors now seek the structure and process of this bankruptcy proceeding to ensure this saga can come to a fair, complete, and value maximizing resolution under this Court's supervision and

with the protection of the Bankruptcy Code.  The time has come, now ten years after the issuance of the PIK Loan, for the Debtor to satisfy its obligation.

<u>Conclusion</u>

27.    The road to the filing of this Involuntary Petition has been long and winding—the PIK Loan was issued over ten years ago, and discussions between the PIK Lenders, the Debtor, and Mr. Meyers have borne little fruit.  The maturity date has come and gone, and the Debtor has yet to satisfy a penny of its €1.8 billion obligation.  Accordingly, the Petitioning Creditors have filed this Involuntary Petition to ensure that the Debtor will act as a fiduciary to its creditors, and to obtain the oversight of this Court over the Debtor and these proceedings to ensure a fair and orderly disposition of the Debtor's estate for the benefit of its creditors.  The Petitioning Creditors respectfully submit this Statement in support of their Involuntary Petition, and asks the Court to order relief against the Debtor as set forth in section 303(h) of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

Respectfully,

*Dated*:  May 18, 2017

*/s/ Brett Axelrod*
Brett Axelrod (NV No. 5859)
FOX ROTHSCHILD LLP
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone:    (702) 262-6899
Facsimile:    (702)597-5503
baxelrod@foxrothschild.com

-and-

Paul M. Basta, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

James H.M. Sprayregen, P.C
David J. Zott, P.C.
William A. Guerrieri
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the PIK Lender Group*

## Exhibit A

**PIK Loan Agreement**

PIK LOAN AGREEMENT

€600,000,000

PIK LOAN FACILITY

FOR

EB HOLDINGS, INC.

ARRANGED BY

CREDIT SUISSE INTERNATIONAL

CITIGROUP GLOBAL MARKETS LIMITED

AS MANDATED LEAD ARRANGERS

WITH

CREDIT SUISSE INTERNATIONAL

CITIBANK N.A., NEW YORK BRANCH

AS BOOKRUNNERS

WITH

CREDIT SUISSE, LONDON BRANCH
AS ADMINISTRATIVE AGENT

# LATHAM&WATKINS

London
99 Bishopsgate
London EC2M 3XF
+44 (0)20 7710 1000 (Tel)
+44 (0)20 7374 4460 (Fax)

# CONTENTS

**Section**                                                                                                        **Page**

1.      Interpretation ..................................................................................................................1
2.      Facility..........................................................................................................................11
3.      Purpose.........................................................................................................................12
4.      Conditions precedent ...................................................................................................13
5.      Utilisation.....................................................................................................................13
6.      Repayment....................................................................................................................14
7.      Prepayment and cancellation........................................................................................14
8.      Interest..........................................................................................................................16
9.      Interest Periods ............................................................................................................18
10.     Taxes ............................................................................................................................18
11.     Mitigation and Conduct of Business ............................................................................21
12.     Payments ......................................................................................................................21
13.     Representations and warranties....................................................................................23
14.     Covenants.....................................................................................................................29
15.     Default..........................................................................................................................30
16.     The Administrative Parties...........................................................................................30
17.     Evidence and calculations............................................................................................36
18.     Fees ..............................................................................................................................36
19.     Indemnities...................................................................................................................37
20.     Expenses.......................................................................................................................38
21.     Amendments and waivers ............................................................................................38
22.     Changes to the Parties ..................................................................................................39
23.     Disclosure of information.............................................................................................45
24.     Set-off...........................................................................................................................46
25.     Pro rata sharing............................................................................................................46
26.     Severability...................................................................................................................47
27.     Counterparts .................................................................................................................47
28.     Notices..........................................................................................................................47
29.     Language ......................................................................................................................50
30.     Governing law ..............................................................................................................50
31.     Enforcement .................................................................................................................50

SCHEDULE 1 - Original Lenders.............................................................................................52
SCHEDULE 2 - Conditions Precedent Documents ..................................................................53
SCHEDULE 3 - Form of Request .............................................................................................55
SCHEDULE 4 - Transfer Certificate ........................................................................................56
SCHEDULE 5 - Form of Accession Agreement .......................................................................59
SCHEDULE 6 - Summary Terms and Conditions of Exchange Notes ......................................60
ANNEX I - Undertakings..........................................................................................................63
SIGNATORIES..........................................................................................................................64

**THIS AGREEMENT** is dated as of March 23, 2007

**BETWEEN:**

(1)    **EB HOLDINGS, INC.**, a Delaware corporation (the "**Company**");

(2)    **CREDIT SUISSE INTERNATIONAL**, and **CITIGROUP GLOBAL MARKETS LIMITED** as mandated lead arrangers (in this capacity, the "**Arrangers**");

(3)    **CREDIT SUISSE INTERNATIONAL**, and **CITIBANK N.A., NEW YORK BRANCH** as bookrunners;

(3)    **THE PERSONS** listed in Schedule 1 (*Original Parties*) as original lenders (the "**Original Lenders**"); and

(4)    **CREDIT SUISSE, LONDON BRANCH** as administrative agent (in this capacity, the "**Administrative Agent**").

**IT IS AGREED** as follows:

1.    **INTERPRETATION**

1.1    **Definitions**

In this Agreement and in the Schedules hereto, terms defined in Annex I (*Undertakings*) have the meanings given to such terms in Annex I (*Undertakings*), and the following terms have the following meanings:

"**10% Senior PIK Notes due 2015**" means the 10% senior PIK Notes due 2015 issued by the Company on February 18, 2005.

"**Accession Agreement**" means an agreement substantially in the form of Schedule 5 (*Form of Accession Agreement*) with such amendments as the Administrative Agent and the Company may agree.

"**Accounting Principles**" means GAAP.

"**Administrative Party**" means the Arrangers or the Administrative Agent.

"**Affiliate**" of any specified person means any other person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agency Fee Letter**" means the agency fee letter between the Administrative Agent and the Company dated March 23, 2007.

"**Applicable Lenders**" has the meaning given to such term in Section 16.6(e) (*Majority Lenders' instructions*).

"**Applicable Premium**" means, with respect to the Loans or the portion of the Loans (as applicable) to be repaid ("**Repaid Loans**") on any Redemption Date:

(a)    if there is an Interest Period ending after the Redemption Date but prior to 31 January 2008 ("**Redemption Interest Period Payment**") then the Applicable Premium shall be calculated as (x) the sum of the present values as at the Redemption Date of (i) interest due on the Repaid Loans at the date of the Redemption Interest Period Payment, discounted from the date of the Redemption Interest Period Payment, and (ii) imputed interest on the principal amount of the Repaid Loans for the period from the date of the Redemption Interest Period Payment through 31 January 2008, discounted from 31 January 2008, and (iii) the principal amount of the Repaid Loans, discounted from 31 January 2008, all such present values to be calculated using a discount rate equal to the Bund Rate plus 75 basis points, less (y) the principal amount of Repaid Loans and (z) interest accrued on the Repaid Loans up to the Redemption Date; or

(b)    if there is no Interest Period ending after the Redemption Date but prior to 31 January 2008 then the Applicable Premium shall be calculated as (x) the present value of the principal amount of Repaid Loans plus imputed interest on the principal amount of the Repaid Loans for the period from the Redemption Date through 31 January 2008, discounted from 31 January 2008 at a rate equal to the Bund Rate plus 75 basis points, less (y) the principal amount of Repaid Loans and (z) interest accrued thereon up to the Redemption Date.

"**Authorization**" means an authorization, consent, approval, resolution, license, exemption, filing, notarization or registration.

"**Availability Period**" means the period from and including the date of this Agreement to and including the date falling ten Business Days after the date of this Agreement or such later date as may be agreed between the Company and the Administrative Agent (acting on the instructions of all of the Lenders).

"**Base Case Model**" means the financial model including profit and loss, balance sheet and cash flow projections included in the Information Memorandum.

"**Base Financial Statements**" means:

(a)    the consolidated audited financial statements of Eco-Bat Technologies Limited for the financial years 2003, 2004 and 2005 ending on December 31 (the "**Base Audited Financial Statements**");and

(b)    the consolidated unaudited financial statements of Eco-Bat Technologies Limited for the nine months ended on September 30 for 2005 and 2006 (the "**Base Unaudited Financial Statements**").

"**Break Costs**" means the amount (if any) by which:

(a)    the Interest which a Lender should have received for the period from the date of receipt of all or any part of its participation in the Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the principal amount or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)    the amount which that Lender would be able to obtain by placing an amount equal to the principal amount or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Bund Rate**" means the yield to maturity at the time of computation of direct obligations of the Federal Republic of Germany (*Bunds* or *Bundesanleihen*) with a constant maturity (as officially compiled and published in the most recent financial statistics that has become publicly available at least two Business Days (but not more than five Business Days) prior to the Redemption Date (or, if such financial statistics are not so published or available, any publicly available source of similar market date as selected by the Company in good faith)) most nearly equal to the period from the Redemption Date to January 31, 2008; provided, however, that if the period from the Redemption Date to January 31, 2008 is not equal to the constant maturity of a direct obligation of the Federal Republic of Germany for which a weekly average yield is given, the Bund Rate shall be the weekly average yield on actually traded direct obligations of the Federal Republic of Germany adjusted to a constant maturity of one year.

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in London and New York and, if on that day a payment in or a purchase of Euro is to be made, that is also a TARGET Day.

"**Commitment**" means:

(a) for an Original Lender, the amount set opposite its name in Schedule 1 (*Original Lenders*) under the heading Commitments and the amount of any other Commitment transferred to it under this Agreement; and

(b) for any other Lender, the amount of any other Commitment transferred to it under this Agreement,

in each case to the extent not cancelled, transferred or reduced under this Agreement.

"**Compliance Certificate**" means an Officer's Certificate delivered in accordance with Section 2.04 (*Compliance Certificate*) of Annex I (*Undertakings*).

"**Default**" means an Event of Default or any event or circumstance specified in Section 4.01 (*Events of Default*) of Annex I (*Undertakings*) which would (with the expiry of a grace period, or the giving of notice in each case under Section 4.01 (*Events of Default*) of Annex I (*Undertakings*) or any combination of any of the foregoing) be an Event of Default.

"**Designated Website**" has the meaning given to such term in Section 28.5(a) (*Use of websites*).

"**Environmental Claim**" means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

"**Environmental Law**" means any rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, which relates:

(a) the pollution or protection of the environment;

(b) harm to or the protection of human health; or

(c) any emission or substance capable of causing harm to any living organism or the environment.

"**Euro**" or "**€**" means the single currency of the Participating Member States.

"**Event of Default**" means an event specified as such in Section 4.01 (*Events of Default*) of Annex I (*Undertakings*).

"**Exemption Certificate**" has the meaning given to such term in Section 10.1(a) (*Tax gross-up*) and substantially in the same form as Schedule 7.

"**Existing Lender**" has the meaning given to such term in Section 22.2(a) (*Requirements for assignment by Lenders*).

"**Facility**" means the payment in kind loan facility made available under this Agreement as described in Section 2.1 (*Facility*).

"**Facility Office**" means:

(a)    in respect of a Lender, the office(s) notified by a Lender to the Administrative Agent:

  (i)    on or before the date it becomes a Lender; or

  (ii)    by not less than five Business Days' notice,

  as the office(s) through which it will perform its obligations, and to which payments for its account should be made, under this Agreement; and

(b)    in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

"**Final Maturity Date**" means March 31, 2017.

"**Finance Document**" means:

(a)    this Agreement;

(b)    any Mandate Letter, Agency Fee Letter, Compliance Certificate, or Request; or

(c)    any other document or agreement designated as such by the Company and the Administrative Agent.

"**Finance Party**" means an Administrative Party or a Lender.

"**Funding Date**" means the date of drawdown of the Facility.

"**GAAP**" means generally accepted accounting standards in the U.K. as in effect on the Funding Date. Except as otherwise expressly provided in this Agreement, all ratios and calculations based on GAAP contained in this Agreement shall be computed in accordance with GAAP.  At any time after the Funding Date, the Company may elect to apply International Financial Reporting Standards (formerly International Accounting Standards) ("**IFRS**") in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS as in effect (except as otherwise provided in this Agreement) on the date of such election; provided that any such election, once made, shall be irrevocable.  The Company shall give notice of any such election to the Administrative Agent.

"**Group**" means the Company and its Subsidiaries.

"**Group Company**" means a member of the Group.

LO\347428.9

"**Group Structure Chart**" means the group structure chart included in the Information Memorandum.

"**Holding Company**" of any other person, means a person in respect of which that other person is a Subsidiary.

"**Increased Cost Lender**" has the meaning given to such term in Section 22.9(g)(i) (*Replacement of Lenders*).

"**Information Memorandum**" means the document in form approved by the Company concerning the Group which, at the request of the Company, was prepared in relation to this transaction, approved by the Company and distributed by the Arrangers prior to the date hereof in connection with the syndication of the Facility.

"**Intellectual Property**" means:

(a)     any patents, trade marks, service marks, designs, business names, copyrights, design rights, inventions, confidential information, know-how and other intellectual property rights and interests, whether registered or unregistered; and

(b)     the benefit of all applications and rights to use such assets of each member of the Group.

"**Interest**" has the meaning given such term in Section 8.1(a) (*PIK Interest*).

"**Interest Period**" means, in relation to the Loans, each period determined in accordance with Section 9 (*Interest Periods*).

"**Legal Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to bankruptcy, moratorium, insolvency, reorganization and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under applicable statutes of limitation, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of stamp duty may be void and defenses of set-off or counterclaim;

(c)     similar principles, rights and defenses under the laws of any Relevant Jurisdiction; and

(d)     any other matters which are set out as qualifications or reservations as to matters of law or set forth in the legal opinion delivered to the Administrative Agent under Section 4.1(a) (*Conditions Precedent Documents*).

"**Lender**" means:

(a)     an Original Lender; and

(b)     any bank, financial institution or other entity which is regularly engaged in or established for the purposes of making, purchasing or investing in loans, securities or other financial assets, which becomes a Lender after the date of, and in accordance with the terms of, this Agreement,

but only for so long as it has any outstanding Commitment or participation in the Loan or any amount is owed to it (whether actually or contingently) in its capacity as Lender.

5

"**Loan**" means the principal amount of the borrowing under this Agreement as at the Funding Date as increased by any amount of interest accrued and capitalized pursuant to the provisions of Section 8 (*Interest*) or the principal amount outstanding of that borrowing.

"**Majority Lenders**" means, at any time, Lenders:

(a)    the aggregate of whose participations in the outstanding Loan then represents 50.1% or more of the aggregate of all the outstanding Loan;

(b)    if there is no Loan then outstanding, whose undrawn Commitment then aggregates 50.1% or more of the Total Commitments; or

(c)    if there is no Loan then outstanding and the Total Commitments have been reduced to zero, whose Commitments aggregated 50.1% or more of the Total Commitments immediately before the reduction.

"**Mandate Letter**" means the mandate letter between the Arrangers and the Company dated March 23, 2007.

"**Material Adverse Effect**" means any effect which is, or is reasonably expected to be, materially adverse to:

(a)    the ability of the Company to perform any of the payment obligations under any of the Finance Documents;

(b)    the consolidated business, assets or consolidated financial condition of the Group taken as a whole; or

(c)    the validity or enforceability of the Finance Documents in a manner which would be materially prejudicial to the interests of the Lenders and, if capable of remedy such that there will be no material prejudice to the interests of the Lenders, is not remedied (to the point that it no longer materially prejudices the Lenders' interests) within ten Business Days of the Company becoming aware of the issue and effect or being given notice of the issue and effect by the Administrative Agent provided that the equivalent remedy period in Article 4 (*Defaults and Remedies*) of Annex I (*Undertakings*) will run concurrently.

"**Material Subsidiary**" means any Subsidiary of the Company which meets any of the following conditions:

(a)    the Subsidiary represents at least fifteen per cent. of Eco-Bat Technologies Limited's total consolidated assets as of the end of the most recently completed financial year; or

(b)    the Subsidiary represents at least ten per cent. of Eco-Bat Technologies Limited's consolidated profits before tax and exceptional items as of the end of the most recently completed financial year,

in each case, calculated by reference to the consolidated financial statements of Eco-Bat Technologies Limited for the financial year 2005 ending on December 31.

"**New Lender**" has the meaning given to such term in Section 22.2(a) (*Requirements for assignment by Lenders*).

"**Non-Consenting Lender**" has the meaning given to such term in Section 22.9(g) (*Replacement of Lenders*).

"**Non-Domestic Finance Party**" means any Finance Party that is not a "United States person", as defined under 7701(a)(30) of the United States Internal Revenue Code.

"**Non-Excluded Taxes**" means any Taxes other than (a) income or franchise Taxes imposed on (or measured by) the overall net income of a Finance Party (or alternative minimum Tax or other Taxes imposed in lieu of net income taxes) by the jurisdiction under the laws of which such Finance Party is organized or in which its principal office is located or, in the case of any Lender, in which its Facility Office is located, (b) any branch profits Taxes imposed by jurisdiction as a result of a present or former connection between such jurisdiction and the Finance Party (other than any such connection arising solely from such Finance Party having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement, and (c) any United States withholding Tax or back-up withholding Tax that is imposed on amounts payable to such Finance Party at the time such Finance Party becomes a party to this Agreement (or designates a new Facility Office unless this occurs pursuant to Section 11.1 (*Mitigation*)), except to the extent that such Finance Party (or its assignor, if any) was entitled, at the time of designation of a new Finance Office (or assignment), to receive additional amounts from the Company with respect to such withholding Tax pursuant to Section 10.1.

"**Non-Funding Lender**" has the meaning given to such term in Section 22.9(g) (*Replacement of Lenders*).

"**Notice Period**" has the meaning given to such term in Section 16.6(e) (*Majority Lenders' instructions*).

"**Other Taxes**" means any and all stamp or documentary or substantially similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment made or required to be made under any Finance Document or from the execution, delivery, registration, recording or enforcement of any Finance Document.

"**Paper Form Lender**" has the meaning given to such term in Section 28.5(a) (*Use of websites*).

"**Participating Member State**" means a member state of the European Community that adopts or has adopted the Euro as its lawful currency under the legislation of the European Community for Economic Monetary Union.

"**Party**" means a party to this Agreement.

"**Pro Rata Share**" means the proportion which a Lender's Commitment bears to the Total Commitments at that time.

"**Redemption Date**" has the meaning given to such term in Section 7.1(a) (*Voluntary prepayment*).

"**Register**" has the meaning given to such term in Section 22.5 (*Maintenance of Register*).

"**Regulation S**" means Regulation S promulgated under the U.S. Securities Act as the same may be amended or supplemented from time to time.

"**Related Funds**" has the meaning given to such term in Section 22.2(b) (*Requirements for assignment by Lenders*).

"**Relevant Interbank Market**" means the European interbank market.

"**Relevant Jurisdiction**" means, in relation to a Group Company, its jurisdiction of incorporation.

"**Repeating Representations**" means each of the representations set out in Section 13.2 (*Status*), Section 13.11 (*Financial Statements*), Section 13.16 (*Ranking*) and Section 13.20 (*Centre of Main Interests*).

"**Request**" means a request for the Loan, substantially in the form of Schedule 3 (*Form of Request*).

"**Security Interest**" means any mortgage, pledge, lien, charge (fixed or floating), assignment, hypothecation, set-off or trust arrangement for the purpose of creating such a security interest or any other agreement or arrangement having a substantially similar effect.

"**Subsidiary**" has the meaning given to such term in Section 1.01 (*Definitions*) of Annex I (*Undertakings*).

"**Syndication Date**" means the date on which the Arrangers confirm that primary syndication of the Facility has been completed (which date shall be no later than 120 days after the Funding Date or if earlier the date on which the Arrangers inform the Company that primary syndication of the Facility is completed in accordance with the terms of the Mandate Letter).

"**TARGET Day**" means a day on which the Trans-European Automated Real-time Gross Settlement Express Transfer payment system is open for the settlement of payments in Euro.

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any related penalty or interest).

"**Tax Payment**" means a payment made by the Company to a Finance Party in any way relating to a Tax gross-up or under any indemnity given by the Company in respect of Tax under any Finance Document.

"**Total Commitments**" means the aggregate of the Commitments of all the Lenders.

"**Transfer Certificate**" means an assignment and assumption agreement substantially in the form of Part 1 of Schedule 4 (*Transfer Certificate*) with such amendments as the Administrative Agent and the Company may agree in writing.

"**Transfer Date**" means, in respect of a Transfer Certificate, the later of:

(a)     the proposed Transfer Date specified in that Transfer Certificate; and

(b)     the date on which the Administrative Agent executes that Transfer Certificate.

"**U.K.**" means the United Kingdom of Great Britain and Northern Ireland.

"**U.S. Securities Act**" has the meaning specified in Section 1.01 (*Definitions*) of Annex I (*Undertakings*).

"**Unpaid Sum**" means any sum due and payable but unpaid by the Company under the Finance Documents.

"**Website Lender**" has the meaning given to such term in Section 28.5(a) (*Use of websites*).

## 1.2    Construction

(a)    In this Agreement, unless the contrary intention appears, a reference to:

(i)    a document being in the "**agreed form**" means that such document is in a form previously agreed and initialed by or on behalf of the Company and the Administrative Agent;

(ii)    an "**amendment**" includes an amendment, supplement, novation, re-enactment, replacement, restatement or variation and "**amend**" will be construed accordingly;

(iii)    "**assets**" (for purposes of this Agreement other than Annex I (*Undertakings*)) includes businesses, undertakings, securities, properties, revenues or rights of every description and whether present or future;

(iv)    an "**authorization**" includes an authorization, consent, approval, permit, license, exemption, filing, registration or notarization;

(v)    a requirement to consult the Company does not require the approval of the Company to the matter on which it is being consulted;

(vi)    "**incorporation**" includes the formation or establishment of a partnership or any other person and "**incorporate**" will be construed accordingly;

(vii)    "**jurisdiction of incorporation**" includes any jurisdiction under the laws of which a person is incorporated;

(viii)    "**know your customer requirements**" are the checks that a Finance Party requests in order to meet its obligations under applicable money laundering regulations to identify a person who is (or is to become) its customer;

(ix)    a "**person**" includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, fund, joint venture or consortium), government, state, agency, organization or other entity whether or not having separate legal personality;

(x)    a "**regulation**" includes any regulation, rule, order, official directive, request or guideline (in each case, whether or not having the force of law but, if not having the force of law, being of a type with which any person such as the relevant person to which it applies is accustomed to comply) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other similar authority or organization;

(xi)    "**repay**" includes any repayment or prepayment and "**repaid**" will be construed accordingly;

(xii)    a currency is a reference to the lawful currency for the time being of the relevant country;

(xiii)    a Default or an Event of Default being "**outstanding**" means that it has not been remedied or expressly waived in writing in accordance with this Agreement;

(xiv)    a provision of law is a reference to that provision as extended, applied, amended or re-enacted;

(xv)    a Section, a Subsection or a Schedule is a reference to a section or subsection of, or a schedule to, this Agreement;

(xvi)    a Party or any other person includes its successors in title, permitted assigns and permitted transferees;

(xvii)    words imparting the singular include the plural and vice versa;

(xviii)    a Finance Document or other document includes (without prejudice to any prohibition on amendments) all amendments (however fundamental) to that Finance Document or other document, including any amendment providing for any increase (however great) in the amount of a Facility or any additional facility (however great); and

(xix)    a time of day is a reference to London time.

(b)    Unless the contrary intention appears, a reference to a "**month**" or "**months**" is a reference to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month or the calendar month in which it is to end, except that:

(i)    if the numerically corresponding day is not a Business Day, the period will end on the next Business Day in that month (if there is one) or the preceding Business Day (if there is not);

(ii)    if there is no numerically corresponding day in that month, that period will end on the last Business Day in that month; and

(iii)    notwithstanding subparagraph (i) above, a period which commences on the last Business Day of a month will end on the last Business Day in the next month or the calendar month in which it is to end, as appropriate.

(c)    Unless the contrary intention appears:

(i)    a reference to a Party will not include that party if it has ceased to be a party under this Agreement;

(ii)    a word or expression used in any other Finance Document or in any notice given in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement; and

(iii)    if there is an inconsistency between this Agreement and another Finance Document, this Agreement will prevail.

(d)    No part of this Agreement is intended to or shall create a registrable Security Interest.

(e)    The index to and headings in this Agreement do not affect its interpretation.

(f)    No waiver of any Event of Default under (and as defined in) the 10% Senior PIK Notes due 2015 will be, or will be deemed to be, a waiver of any Event of Default under this Agreement.

## 2.    FACILITY

### 2.1    Facility

Subject to the terms of this Agreement, the Lenders make available to the Company a Euro term loan facility in an aggregate principal amount (excluding for the avoidance of doubt, any compounded and capitalized Interest pursuant to Section 8 (*Interest*)) equal to the Total Commitments (being €600 million at the date of this Agreement).

### 2.2    Exchange of Loans for Exchange Notes

(a)    At the written request of any Lender or Lenders (the "**Requesting Lenders**"), given at any time from the day that is the one-year anniversary of the Funding Date until the date that is ten days after the one-year anniversary of the Funding Date (both dates inclusive), and subject to (i) the Requesting Lenders requesting to exchange on the date of such request (the "**Exchange Request Date**") a minimum aggregate principal amount representing at least 50% of the then outstanding principal amount (including any capitalized interest to and including the Exchange Request Date) of the Loan (such minimum aggregate principal amount of the Loan being the "**Exchange Amount**") and (ii) each Requesting Lender being eligible to purchase in a Regulation S offering, the Company shall, within 120 days after the Exchange Request Date, exchange the Exchange Amount, which is at the Exchange Date (as defined below), then outstanding and held by such Requesting Lenders for senior PIK unsecured exchange notes (such notes, the "**Exchange Notes**", such exchange, the "**Exchange**", the holders of Exchange Notes, "**Noteholders**", and the date of such exchange, the "**Exchange Date**") having a principal amount (denominated in euros) equal to the portion of the Loan exchanged by such Requesting Lender and issued pursuant to an indenture (the "**Exchange Note Indenture**") with terms substantially consistent with those set forth in Schedule 6 attached hereto, provided, however, that if a Default as defined in Section 1.01 (*Definitions*) of Annex I (*Undertakings*) shall have occurred and be continuing on the Exchange Date, any notices given or cure periods commenced while the Loan was outstanding shall be deemed given or commenced (as of the actual dates thereof) for all purposes with respect to the Exchange Notes (with the same effect as if the Exchange Notes had been outstanding as of the actual dates thereof).

(b)    The Company will, on or prior to the Exchange Date, prepare an offering memorandum relating to the Exchange Notes; prepare audited historical financial statements for Eco-Bat Technologies Limited; satisfy customary closing conditions and other requirements for such bond offerings; prepare and participate in appropriate rating agency presentations; list the Exchange Notes on a recognized European stock exchange (the "**Exchange Note Listing**"); deposit the Exchange Notes with a depositary for clearance and trading through Euroclear or Clearstream; prepare and participate in a "road show" and meetings with research analysts; and enter into a customary agreement for issuances of this type, in each case, as the Administrative Agent deems reasonably necessary and to the extent customary for issuances of securities such as the Exchange Notes in the European Market.

Notwithstanding anything to the contrary provided herein, if the Company fails to comply with any provision of this Section 2.2, such failure shall not constitute a Default or Event of Default.

(c)    Accrued but unpaid interest in relation to the Loan shall be deemed to be accrued but unpaid interest on the corresponding Exchange Notes; provided that accrued and unpaid interest on such Loan and which has not been capitalized or compounded

11

pursuant to Section 8 (*Interest*) shall not be capitalized until the first interest payment date in respect of the relevant Exchange Notes (which, for the avoidance of doubt, shall be the same as the interest payment date of the Loan) following the Exchange Date.

(d)     If the Exchange is not made by the 120th day after the Exchange Request Date, then the Company will pay liquidated damages to the Requesting Lenders in the form of increased interest of 25 basis points per annum (increasing by an additional 25 basis points after each subsequent 90-day period, up to a maximum of 100 basis points) (the "**Exchange Margin**") payable to but excluding the date the Exchange is made (such damages to be payable in the form of additional Loans).

## 2.3     Limitations

The Commitments may only be drawn down on the Funding Date by the Company.

## 2.4     Nature of a Finance Party's rights and obligations

Unless all the Finance Parties agree otherwise:

(a)     the obligations of a Finance Party under the Finance Documents are several;

(b)     failure by a Finance Party to perform its obligations does not affect the obligations of any other Party under the Finance Documents;

(c)     no Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents;

(d)     the rights of a Finance Party under the Finance Documents are separate and independent rights;

(e)     a Finance Party may, except as otherwise stated in the Finance Documents, separately enforce those rights; and

(f)     a debt arising under the Finance Documents to a Finance Party is a separate and independent debt.

## 3.     PURPOSE

## 3.1     The Loan

The Loan may only be applied, directly or indirectly, in or towards:  (i) the repayment of all amounts outstanding under and pursuant to the 10% Senior PIK Notes due 2015 (including any associated early repayment premium, accrued interest and any other fees outstanding thereunder), (ii) a distribution or dividend payment by the Company to one or more of its shareholders and (iii) payment of fees, costs and expenses incurred or to be incurred in connection with the transactions referred to above, relating to the Facility and the Finance Documents.

## 3.2     No obligation to monitor

No Finance Party is bound to monitor or verify the utilization of the Facility and no Finance Party will be responsible for, or for the consequences of, such utilization.

LO\347428.9

4.      **CONDITIONS PRECEDENT**

4.1     **Conditions precedent documents**

    (a)    Subject to paragraph (b) below, the Loan may not be made until the Administrative Agent has received (except to the extent it has waived the same):

        (i)    the Exchange Note Indenture that is in form and substance satisfactory to the Arrangers (acting reasonably); provided, however, that the Arrangers shall promptly notify the Administrative Agent that such event has occurred; and

        (ii)    all of the documents and other evidence set out in Schedule 2 (*Conditions precedent documents*) in form and substance satisfactory to the Administrative Agent (acting reasonably).

    (b)    The Administrative Agent (acting reasonably) must promptly notify the Company and the Lenders upon its determining that it has received such documents and evidence in form and substance satisfactory to it.

4.2     **Further Conditions Precedent**

The obligations of each Lender to participate in the Loan are subject to the further conditions precedent that on both the date of a Request and the Funding Date for the Loan:

    (a)    all of the representations and warranties set out in Section 13 (*Representations and Warranties*) are true and correct in all material respects; and

    (b)    no Default or Event of Default has occurred, is outstanding or would result from making the Loan.

4.3     **Maximum number**

Unless the Administrative Agent agrees, a Request may not be given if, as a result of making the utilization requested, there would be more than one Loan outstanding.

5.      **UTILISATION**

5.1     **Giving of Requests**

    (a)    The Company may borrow the Loan or a portion of the Loan by giving to the Administrative Agent a duly completed Request.

    (b)    Unless the Administrative Agent otherwise agrees, the latest time for receipt by the Administrative Agent of a duly completed Request is 11.00 a.m. three Business Days before the requested Funding Date in respect of the proposed Loan.

    (c)    Each Request is irrevocable, except that a Request for an amount in excess of the amount that constitutes "Permitted Refinancing Indebtedness" under the indenture governing the 10% Senior PIK Notes due 2015 in respect of such notes shall be conditioned upon the making of an irrevocable notice of redemption with respect to the 10% Senior PIK Notes due 2015.

5.2     **Completion of Requests**

A Request for the Loan will not be duly made unless:

(a)     the requested Funding Date is a Business Day falling within the Availability Period;

(b)     the proposed currency, amount and Interest Period comply with this Agreement; and

(c)     only one Loan may be requested in a Request.

**5.3     Currency and amount**

(a)     The currency specified in a Request must be Euro.

(b)     The amount of the proposed utilization in a Request must be an amount not exceeding €600,000,000.

**5.4     Advance of Loan**

(a)     The Administrative Agent must promptly notify each Lender of the details of the requested Loan and the amount of its participation in that Loan.

(b)     The amount of each Lender's participation in the Loan will be equal to its Pro Rata Share of the Loan on the Funding Date.

(c)     If the conditions set out in this Agreement have been met, each Lender must make its participation in the Loan available to the Administrative Agent for the Company through its Facility Office prior to or on the Funding Date.

**6.     REPAYMENT**

The Company shall repay the Loan in full on the Final Maturity Date (together with any accrued and unpaid interest payable thereon).

**7.     PREPAYMENT AND CANCELLATION**

**7.1     Voluntary prepayment**

(a)     At any time on or prior to January 31, 2008, the Company may, by giving not less than three Business Days (or such shorter period as the Majority Lenders may agree) notice to the Administrative Agent, pre-repay (or procure pre-repayment of) the Loan, in whole or in part, at a price equal to 100% of the principal amount of the Loan plus the Applicable Premium and any accrued and unpaid interest to the date of redemption thereof (the "**Redemption Date**").

(b)     At any time on or after February 1, 2008, the Company may, by giving not less than three Business Days or such shorter period as the Majority Lenders may agree) notice to the Administrative Agent, pre-repay (or procure pre-repayment of) the Loan, in whole or in part, at the redemption prices (expressed as percentages of principal amount) set forth below:

14

| Redemption Period: | Price: |
|---|---|
| On or after February 1, 2008 through January 31, 2009 | 100.0% |
| On or after February 1, 2009 through January 31, 2010 | 102.0% |
| On or after February 1, 2010 through January 31, 2011 | 101.0% |
| Thereafter | 100.0% |

Each applicable period set forth above commences on the first day of such period and ends on the last day of such period (both dates inclusive).

(c) A prepayment of part of the Loan must be in a minimum amount of €5,000,000 and an integral multiple of €1,000,000 or such lesser amount as may be outstanding or such other amount as may be agreed by the Administrative Agent (acting on the instructions of the Majority Lenders).

(d) At any time prior to the Final Maturity Date, in the event that there is a change in the relevant tax laws, which would impose withholding taxes on amounts accruing on the Loans, the Company may, by giving not less than three Business Days' notice to the Administrative Agent repay (or procure repayment of) the Loan in whole, but not in part, at a price equal to 100% of the principal amount of the Loan plus accrued and unpaid interest thereon to the Redemption Date.

## 7.2 Automatic cancellation

The undrawn Commitment of each Lender under the Facility will be automatically cancelled at the close of business in London on the last day of the Availability Period.

## 7.3 Voluntary cancellation

(a) The Company may, by giving not less than three Business Days' prior notice, or such shorter period as the Majority Lenders may agree, to the Administrative Agent, cancel the unutilized amount of the Total Commitments in whole or in part.

(b) Partial cancellation of the Commitments under the Facility pursuant to this Subsection must be in a minimum amount of €5,000,000 and an integral multiple of €1,000,000.

(c) Any voluntary cancellation in part of the Commitments under the Facility by the Company pursuant to this Subsection will be applied against the Commitment of each Lender *pro rata*.

## 7.4 Involuntary prepayment and cancellation

(a) If the Company is, or will be, required to pay to a Lender a Tax Payment, the Company may, while the requirement continues, give notice to the Administrative Agent requesting prepayment of that Lender's share of the affected Loan utilized by the Company and cancellation of the corresponding Commitments of that Lender.

(b) After notification under paragraph (a) above:

(i) the Company must repay or prepay that Lender's share in the affected Loan utilized by it on the date specified in paragraph (c) below; and

15

(ii)    those Commitments of that Lender will be immediately cancelled.

(c)    The date for repayment or prepayment of a Lender's share in the Loan will be:

    (i)    the last day of the current Interest Period for the Loan; or

    (ii)    if earlier, the date specified by the Company in its notification.

(d)    Where there is a mandatory or involuntary prepayment of the Loan, the relevant Commitments will, at the same time, be permanently reduced by the Euro amount prepaid.

## 7.5    Miscellaneous provisions

(a)    Any notice of prepayment and/or cancellation under this Agreement is irrevocable. The Administrative Agent must notify the Lenders promptly of receipt of any such notice.

(b)    All prepayments under this Agreement must be made with accrued and unpaid interest on the amount prepaid. Subject to Section 7.1 (*Voluntary prepayment*) and Section 2.15 (*Change of Control*) of Annex I (*Undertakings*), no premium or penalty is payable in respect of any prepayment.

(c)    The Majority Lenders may agree a shorter notice period for a voluntary prepayment or a voluntary cancellation.

(d)    To the extent that an Exchange occurs pursuant to Section 2.2 (*Exchange of Loans for Exchange Notes*), Exchange Notes shall be subscribed by each Requesting Lender by way of set-off against the portion of the Loan held by the relevant Requesting Lender immediately prior to Exchange that will have been converted into Exchange Notes and the corresponding portion of the Loan held by the relevant Requesting Lender immediately prior to Exchange that were so converted into Exchange Notes shall be deemed to have been repaid and no longer outstanding. For the avoidance of doubt following any such Exchange, all of the Company's obligations under the Exchange Notes will continue and be outstanding until the principal amount outstanding thereunder (including any capitalized interest) is repaid in full by the Company in accordance with the Exchange Note Indenture.

(e)    No prepayment or cancellation is allowed except in accordance with the express terms of this Agreement.

(f)    No amount of the Total Commitments cancelled under this Agreement may subsequently be reinstated.

(g)    No amount of the Loan repaid or prepaid under this Agreement may subsequently be re-borrowed.

## 8.    INTEREST

### 8.1    PIK Interest

(a)    Interest on the Loan shall accrue for each Interest Period at eleven per cent. (11%) per annum calculated on the basis of a year of 360 days and actual days elapsed ("**Interest**") and, unless the Company elects to pay such accrued Interest in cash at the end of such Interest Period by giving the Administrative Agent not less than three

Business Days notice of such election (which notice shall be irrevocable for such Interest Period), such interest shall be compounded in accordance with paragraph (c) below.

(b)     If the Company makes the election referred to in paragraph (a) above in relation to the Interest for an Interest Period in respect of the Loan, the Company shall pay such Interest in cash in respect of the Loan on the last day of such Interest Period.

(c)     At the end of each Interest Period, unless such Interest is paid in cash pursuant to paragraph (b) above, the Interest accrued on the Loan from time to time during that Interest Period shall be automatically capitalized and added to the amount of the Loan.  Any such accrued Interest shall, after being so capitalized, be treated as part of the principal amount of the Loan and shall bear interest in accordance with this Section 8 (*Interest*), shall be payable in accordance with the provisions of this Agreement and treated as having been paid and satisfied in full in respect of the relevant Interest Period by the Company pursuant to the terms of this Agreement.  If the Company elects to pay accrued interest in cash, then it shall deliver to the Administrative Agent no later than three Business Days prior to such payment date, a written notice setting forth that such interest payment will be made in the form of cash.  For the avoidance of doubt, all amounts of capitalized interest must, except as provided in Section 7 (*Prepayment and cancellation*), be repaid in full on the Final Maturity Date.

(d)     If all or part of the Loan is prepaid prior to the end of an Interest Period, any accrued and unpaid interest on such portion of the Loan that is prepaid that has not been so capitalized will be payable in cash on the date of such prepayment.

## 8.2     Interest on overdue amounts

(a)     If the Company fails to pay any amount payable by it under the Finance Documents on its due date, it must immediately on demand by the Administrative Agent pay interest on the overdue amount from its due date up to the date of actual payment, both before, on and after judgment.

(b)     Interest on an overdue amount is payable at a rate determined by the Administrative Agent to be one per cent. per annum above the rate which would have been payable if the overdue amount had, during the period of non-payment, constituted a Loan having the same designation and in the same currency as the Loan to which the overdue amount is in the reasonable opinion of the Administrative Agent referable.

(c)     Notwithstanding paragraph (b) above, if the overdue amount is a principal amount of all or part of the Loan and becomes due and payable on a day which was not the last day of an Interest Period relating to the Loan, then:

(i)      the first Interest Period for that overdue amount shall have a duration equal to the unexpired portion of the current Interest Period relating to the Loan; and

(ii)     the rate of interest on the overdue amount for that first Interest Period will be one per cent. per annum above the rate then payable on the Loan.

After the expiry of the first Interest Period for that overdue amount, the rate on the overdue amount will be calculated in accordance with paragraph (b) above.

(d)    Interest (if unpaid) on an overdue amount will be compounded with that overdue amount at the end of each Interest Period applicable to that overdue amount but will remain immediately due and payable.

### 8.3    Notification of rates of interest

The Administrative Agent must promptly notify each relevant Party of the determination of a rate of interest under this Agreement.

### 9.    INTEREST PERIODS

### 9.1    Duration of Interest Periods

Each Interest Period for a Loan shall be a six month period starting on (i) the first day following the last day of the immediately preceding Interest Period for the Loan or (ii) if such Interest Period is the first Interest Period for the Loan, the Funding Date; provided that the first Interest Period shall end 30 September 2007.

### 9.2    No overrunning the Final Maturity Date

An Interest Period for the Loan shall not extend beyond the Final Maturity Date.

### 9.3    Other adjustments

The Administrative Agent and the Company may enter into such other arrangements as they may agree for the adjustment of the Interest Periods.

### 9.4    Notification

The Administrative Agent shall notify each relevant Party of the duration of each Interest Period promptly after ascertaining its duration.

### 10.    TAXES

### 10.1    Tax gross-up

(a)    Any and all payments under each Finance Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes, except to the extent any Taxes are required to be withheld or deducted by law.  In the event that any Taxes are required by law to be deducted or withheld from any payment required to be made by the Company or the Administrative Agent to or on behalf of any Finance Party under any Finance Document, then:

    (i)    subject to clause (f), if such Taxes are Non-Excluded Taxes, the amount of such payment shall be increased as may be necessary for such payment to be made, after withholding or deduction for or on account of such Non-Excluded Taxes, in an amount that is not less than the amount provided for in such Finance Document (and for the avoidance of doubt, it shall be the sole responsibility of the Company to pay such increased amounts without regard to whether such Taxes are imposed on the Company or another party); and

    (ii)    the Company or the Administrative Agent, as the case may be, shall withhold the full amount of such Non-Excluded Taxes from such payment (as increased pursuant to clause (a)(i), if applicable) and shall pay or cause to be paid such amount to the governmental authority imposing such Non-Excluded Taxes in accordance with applicable law.

18

(b)     The Company shall pay any and all Other Taxes in accordance with applicable law.

(c)     As promptly as practicable after the payment of any Non-Excluded Taxes or Other Taxes, and in any event within forty-five (45) days of any such payment, the Company shall furnish to the Administrative Agent a copy of an official receipt (or a certified copy thereof) or if obtaining such receipt or copy is impractical, other documentation reasonably satisfactory to the Administrative Agent evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)     Subject to clause (f), the Company shall indemnify or cause to be indemnified any Finance Party for any Non-Excluded Taxes and Other Taxes paid by or on behalf of such Finance Party excluding any penalties and interest imposed in connection with such Non-Excluded Taxes and Other Taxes that arise from the gross negligence or willful misconduct on the part of such Finance Party.  In addition, the Company shall indemnify or cause to be indemnified any Finance Party for any incremental Non-Excluded Taxes that are paid or payable by such Finance Party as a result of any failure of the Company to pay any Non-Excluded Taxes as required by clause (a) when due to the appropriate governmental authority.  With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by any Finance Party or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within thirty (30) days after the date such Finance Party makes written demand therefor.

(e)     Each Lender shall deliver documentation prescribed by applicable law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether such Lender is subject to withholding, back-up withholding or information reporting requirements.  Without limiting the generality of the foregoing, each Lender other than a Non-Domestic Finance Party shall deliver, on or prior to the date which such Lender becomes a Lender under or with respect to this Agreement (and promptly from time to time thereafter if any form previously delivered becomes inaccurate or upon the request of the Company or the Administrative Agent), a properly completed United States Internal Revenue Service Form W-9 to the Company and the Administrative Agent certifying that such Lender is exempt from United States back-up withholding tax on payments made under the Finance Documents; additionally, each Non-Domestic Finance Party, on or prior to the date on which such Non-Domestic Finance Party becomes a Lender hereunder (and promptly from time to time thereafter upon the request of the Company or the Administrative Agent, but only for so long as such Non-Domestic Finance Party is legally entitled to do so), shall deliver to the Company and the Administrative Agent either:

    (i)     two properly completed and duly executed copies of United States Internal Revenue Service Form W-8BEN (claiming eligibility for treaty benefits), W-8ECI and/or W-8IMY (with any required attachments) or an applicable successor form; or

    (ii)     (x) a certificate in form and substance reasonably satisfactory to the Company and the Administrative Agent of a duly authorized officer of such Non-Domestic Finance Party to the effect that such Non-Domestic Finance Party is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Company within the meaning of Section 871(h)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 864(d)(4) of the Code (such certificate, an "**Exemption Certificate**")

substantially in the form attached hereto as Schedule 7 and (y) two properly completed and duly executed copies of United States Internal Revenue Service Form W-8BEN and/or W-8IMY or applicable successor form, in each case certifying that such Non-Domestic Finance Party is entitled to receive payments under this Agreement and the Exchange Notes without deduction or withholding of any Non-Excluded Taxes.

Each Finance Party further agrees to deliver to each of the Company and the Administrative Agent additional copies of such foregoing and any other relevant forms on or before the date any such form is due, expires or becomes obsolete or after the occurrence of any event (including a change in Facility Office) requiring a change in the most recent forms so delivered by it. Each Finance Party shall promptly notify the Company and the Administrative Agent of any changes in circumstances that would modify or render invalid any claimed exemption or reduction.

(f)     The Company shall not be obligated to gross up any payments to any Lender pursuant to clause (a)(i), or to indemnify any Lender pursuant to clause (d), in respect of Taxes to the extent imposed as a result of (i) the failure of such Lender to deliver to the Company the form or forms and/or an Exemption Certificate, as applicable to such Lender, pursuant to clause (e); (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding Tax or the information or certifications made therein by the Lender being untrue or inaccurate in any material respect; provided, however, that the Company shall be obligated to gross up any payments to any such Lender pursuant to clause (a)(i), and to indemnify any such Lender pursuant to clause (d), in respect of United States federal withholding Taxes if (A) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding Tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date on which such Lender became a Lender hereunder (a "Change in Law"), which change rendered such Lender no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding Tax, or rendered the information or certifications made in such form or forms or Exemption Certificate untrue or inaccurate in a material respect or (B) the obligation to gross up payments to any such Lender pursuant to clause (a)(i) or to indemnify any such Lender pursuant to clause (d) is with respect to an assignee Lender as a result of an assignment made at the request of the Company; or (iii) the Lender designating a successor Facility Office at which it maintains its Loans, which has the effect of causing such Lender to become obligated for tax payments in excess of those in effect immediately prior to such designation. Each Finance Party shall promptly notify the Company and the Administrative Agent if it becomes aware that a Change in Law has caused a form (or forms) that it has previously delivered pursuant to clause (e) to be inaccurate.

## 10.2     Tax refund

If a Lender or any other Person determines, in its sole, reasonable discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Company or with respect to which the Company has paid additional amounts pursuant to this Section 10.1 (*Tax gross-up*), it shall pay to the Company an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Company under this Section 10.1(*Tax gross-up*) with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Lender or other Person, as the case may be, and without interest (other than any interest paid

by the relevant Governmental Authority with respect to such refund). This paragraph shall not be construed to require the Lender or other Person to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Company or any other Person.

## 11. MITIGATION AND CONDUCT OF BUSINESS

### 11.1 Mitigation

(a) Each Finance Party shall, in consultation with and at the request of the Company, take all reasonable steps to mitigate any circumstances which arise and which result or would result in any Tax Payment being payable to that Finance Party including (but not limited to) transferring its rights and obligations under the Finance Documents to an Affiliate or changing its Facility Office.

(b) Paragraph (a) above does not in any way limit the obligations of the Company under the Finance Documents.

(c) The Company must indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of any step taken by it under this Section 11.1 (*Mitigation*).

(d) A Finance Party is not obliged to take any step under this Section if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

### 11.2 Conduct of business by a Finance Party

No term of the Finance Documents will:

(a) interfere with the right of any Finance Party to arrange its affairs (Tax or otherwise) in whatever manner it thinks fit;

(b) oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it in respect of Tax or the extent, order and manner of any claim; or

(c) oblige any Finance Party to disclose any information relating to its affairs (Tax or otherwise) or any computation in respect of Tax.

## 12. PAYMENTS

### 12.1 Place

Unless a Finance Document specifies that payments under it are to be made in another manner, all cash payments by a Party (other than the Administrative Agent) under the Finance Documents must be made to the Administrative Agent by wire transfer of immediately available funds to its account at such office or bank in London as it may notify to that Party for this purpose by not less than five Business Days' prior notice.

### 12.2 Funds

Payments under the Finance Documents must (unless otherwise expressly provided) be made to the Administrative Agent for value on the due date at such times and in such funds as the Administrative Agent may specify to the Party concerned as being customary at the time for the settlement of transactions in the relevant currency in the place for payment.

**12.3    Distribution**

(a)    Each cash payment received by the Administrative Agent under the Finance Documents for another Party must, except as provided below, be made available by the Administrative Agent to that Party by payment (as soon as practicable after receipt) to its account with such office or bank in London as it may notify to the Administrative Agent for this purpose by not less than five Business Days' prior notice.

(b)    The Administrative Agent may apply any amount received by it for the Company in or towards payment (as soon as practicable after receipt) of any amount due from the Company under the Finance Documents or in or towards the purchase of any amount of any currency to be so applied.

(c)    Where a sum is paid to the Administrative Agent under this Agreement for another Party, the Administrative Agent is not obliged to pay that sum to that Party until it has established that it has actually received it.  However, the Administrative Agent may assume that the sum has been paid to it, and, in reliance on that assumption, make available to that Party a corresponding amount.  If it transpires that the sum has not been received by the Administrative Agent, that Party must immediately on demand by the Administrative Agent refund any corresponding amount made available to it together with interest on that amount from the date of payment to the date of receipt by the Administrative Agent at a rate calculated by the Administrative Agent to reflect its cost of funds.

**12.4    Currency**

(a)    Interest is payable in Euro.

(b)    Amounts payable in respect of Taxes, fees, costs and expenses are payable in the currency in which they are incurred.

(c)    Each other amount payable under the Finance Documents is payable in Euro.

**12.5    No set-off or counterclaim**

Subject to Section 7.5(d), all payments made by the Company under the Finance Documents must be made without set-off or counterclaim.

**12.6    Business Days**

(a)    If a payment under the Finance Documents is due on a day which is not a Business Day, the due date for that payment will instead be the next Business Day.

(b)    During any extension of the due date for payment of any principal under this Agreement interest is payable on that principal at the rate payable on the original due date.

**12.7    Partial payments**

(a)    If the Administrative Agent receives a payment insufficient to discharge all the amounts then due and payable by the Company under the Finance Documents, the Administrative Agent must apply that payment towards the obligations of the Company under this Agreement in the following order:

(i) **first**, in or towards payment pro rata of any unpaid fees, costs and expenses of the Administrative Agent;

(ii) **second**, in or towards payment pro rata of any accrued interest or fees due but unpaid under the Finance Documents;

(iii) **third**, in or towards payment pro rata of any principal amount due but unpaid under the Finance Documents; and

(iv) **fourth**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

(b) The Administrative Agent must, if so directed by all the Lenders, vary the order set out in subparagraphs (a)(ii) to (a)(iv) above.

(c) This Subsection will override any appropriation made by the Company.

## 12.8    Timing of payment

If a Finance Document does not provide for when a particular payment is due, that payment will be due within five Business Days of demand by the relevant Finance Party.

## 13.    REPRESENTATIONS AND WARRANTIES

### 13.1    General

The Company makes the representations and warranties set out in this Section 13 to each Finance Party.

### 13.2    Status

(a) It and each of its Material Subsidiaries is a limited liability company, corporation or other body corporate, duly incorporated or duly organized (as applicable) and validly existing under the laws of its jurisdiction of incorporation.

(b) It and each of its Material Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

### 13.3    Binding Obligations

Subject to the Legal Reservations, the obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations.

### 13.4    Non-Conflict with Other Obligations

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not and will not conflict in any material respect with:

(a) any material law or regulation applicable to it;

(b) the constitutional documents of any Material Subsidiary; or

(c) any agreement or instrument binding upon it or any Material Subsidiary or any of its or any Material Subsidiary's assets or constitute a default or termination event (however described) under any such agreement or instrument in each case in a manner which would reasonably be expected to have a Material Adverse Effect.

23

**13.5    Power and Authority**

It has the corporate capacity to enter into, perform and deliver, and has taken all necessary corporate action to authorize its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

**13.6    Validity and Admissibility in Evidence**

(a)    All Authorizations required:

(i)    to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party; and

(ii)   to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been or will be by the time required obtained or effected and are in full force and effect.

(b)    All Authorizations necessary for the conduct of the business, trade and ordinary activities of Material Subsidiaries have been (or will on the Funding Date be) obtained or effected and are (or will on the Funding Date be) in full force and effect where failure to obtain or effect those Authorizations would reasonably be expected to have a Material Adverse Effect.

**13.7    Insolvency**

No:

(a)    corporate action, legal proceeding or other procedure or step described in Section 4.01(g) of Annex I (*Undertakings*); or

(b)    judgments set forth in Section 4.01(f) of Annex I (*Undertakings*),

has been taken or, to the knowledge of the Company, threatened in relation to any Group Company.

**13.8    No Default**

(a)    No Event of Default is continuing and, on the date of this Agreement and the Funding Date, no Default is continuing will result from the making of the Loan or the entry into, the performance of, or any transaction contemplated by, any Finance Document. None of the circumstances described in Section 4.01(e) of Annex I (*Undertakings*) applies to any Group Company.

(b)    To the best of the knowledge and belief of the Company, no other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which its (or any of its Subsidiaries') assets are subject which has or would reasonably be expected to have a Material Adverse Effect.

LO\347428.9

**13.9    Base Case Model**

The Base Case Model has been prepared by the Company after due and careful consideration and the Company:

(a)    is not aware of any material inaccuracy as to factual matters relating to the Group (which excludes the Company) contained in the Base Case Model taken as a whole;

(b)    believes the assumptions upon which the forecasts and projections contained in the Base Case Model are based to be fair and reasonable in all material respects; and

(c)    is not aware of any facts or matters (in each case, relating to the Group (which excludes the Company)) not stated in the Base Case Model or the Base Financial Statements, the omission of which make the statements contained therein taken as a whole misleading in any material respect.

**13.10    Information Memorandum**

(a)    All material factual information about the Group provided by or on behalf of, the Group contained in the Information Memorandum, is:  (a) true, accurate and complete in all material respects, (b) has been prepared with reasonable care, and (c) in relation to any estimates or other types of forward looking information, all underlying assumptions are reasonable, have been prepared in good faith and arrived at after careful consideration (as at the date of the Information Memorandum).

(b)    To the best of the knowledge and belief of the Company, no event or circumstance had occurred or arisen and no information had been omitted from the Information Memorandum and no information had been given or withheld that resulted in the information, opinions, intentions, forecasts or projections contained in the Information Memorandum being untrue or misleading in any material respect as of its stated date.

**13.11    Financial Statements**

The Base Financial Statements of the Group:

(a)    in the case of the Base Audited Financial Statements, were prepared in accordance with the Accounting Principles consistently applied and give a true and fair view of the consolidated financial condition of the Group as at the end of, and the consolidated results of operations of the Group for, the financial year to which they relate; and

(b)    in the case of the Base Unaudited Financial Statements, were prepared in accordance with the Accounting Principles consistently applied and fairly present the consolidated financial condition of the Group as at the end of, and the consolidated results of operations of the Group for, the period to which they relate.

**13.12    No Proceedings Pending or Threatened**

(a)    No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which would reasonably be expected to be adversely determined and if adversely determined, would reasonably be expected to have a Material Adverse Effect, have (to the best of its knowledge and belief having made due and careful enquiry) been started or threatened against it or any of its Subsidiaries.

(b)     There is no labor dispute current or, to the best of its knowledge and belief having made due and careful enquiry, pending involving any Material Subsidiary which would reasonably be expected to be adversely determined and if adversely determined would reasonably be expected to have a Material Adverse Effect.

**13.13    No Breach of Laws**

It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or would reasonably be expected to have a Material Adverse Effect.

**13.14    Environmental Laws**

(a)     Each Material Subsidiary is in compliance in all material respects with all Environmental Laws applicable to it and to the best of its knowledge and belief (having made due and careful enquiry) no circumstances have occurred which would prevent such compliance in a manner or to an extent which has or would reasonably be expected to have a Material Adverse Effect.

(b)     No Environmental Claim has been commenced or (to the best of its knowledge and belief (having made due and careful enquiry)) is threatened against any Material Subsidiary where that claim has or would reasonably be expected to have a Material Adverse Effect.

**13.15    Taxation**

(a)     It is not (and none of its Material Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Material Subsidiaries is) overdue in the payment of any amount in respect of Tax in each case in a manner or to an extent which has or would reasonably be expected to have a Material Adverse Effect.

(b)     No claims or investigations are being, or (to the best of its knowledge and belief having made due and careful enquiry) are reasonably likely to be, made or conducted against it (or any of its Material Subsidiaries) with respect to Taxes such that a liability of, or claim against, any Material Subsidiary is reasonably likely to arise which would reasonably be expected to have a Material Adverse Effect taking into account reserves.

**13.16    Ranking**

The claims of the Finance Parties under the Finance Documents rank at least *pari passu* in right and priority of payment with the claims of all its other present and future unsecured and unsubordinated creditors (actual or contingent) except those whose claims are preferred solely by operation of law.

**13.17    Good Title to Assets**

Except as disclosed in the Information Memorandum, it and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licenses of, and all appropriate Authorizations to use, the assets to the extent material and necessary to carry on its business (as a whole) as presently conducted where failure to do so would reasonably be expected to have a Material Adverse Effect.

**13.18   Intellectual Property**

To the best of its knowledge and belief (having made due and careful enquiry), it and each of its Material Subsidiaries:

(a)     is the sole legal and beneficial owner of or has licensed to it all the Intellectual Property which is required by it in order to carry on its business as it is being conducted and as contemplated in the Base Case Model where failure to be so would reasonably be expected to have a Material Adverse Effect;

(b)     does not (nor does any of its Material Subsidiaries), in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or would reasonably be expected to have a Material Adverse Effect; and

(c)     has taken all formal or procedural actions (including payment of fees) required to maintain any Intellectual Property owned by it where failure to do so has or would reasonably be expected to have a Material Adverse Effect.

**13.19   Group Structure Chart**

To the best of its knowledge and belief (having made due and careful enquiry), the Group Structure Chart is true, complete and accurate in all material respects.

**13.20   Centre of Main Interests**

(a)     It has its "centre of main interests" as that term is used in Article 3(1) of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the "**Regulation**") in its jurisdiction of incorporation.

(b)     It has no "establishment" as that term is used in Article 2(h) of the Regulation.

**13.21   United States Laws**

(a)     In this Section 13.21:

(i)     "***Anti-Terrorism Law***" means each of:

(A)     Executive Order No. 13224 of September 23, 2001 - Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the "***Executive Order***");

(B)     the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (commonly known as the USA Patriot Act);

(C)     the Money Laundering Control Act of 1986, Public Law 99-570; and

(D)     any similar law enacted in the United States of America subsequent to the date of this Agreement.

(ii)     "***Restricted Party***" means any person listed:

(A)     in the Annex to the Executive Order;

(B)     on the "Specially Designated Nationals and Blocked Persons" list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury; or

(C)     in any successor list to either of the foregoing.

(b)     It is not:

(i)     a public utility or subject to regulation under the United States Federal Power Act of 1920;

(ii)     required to be registered as an investment company or subject to regulation under the United States Investment Company Act of 1940; or

(iii)     subject to regulation under any United States federal or state law or regulation that limits its ability to incur or guarantee indebtedness under the Finance Documents.

(c)     To the best of its knowledge, neither it nor any of its Affiliates:

(i)     is, or is controlled by, a Restricted Party;

(ii)     has received funds or other property from a Restricted Party; or

(iii)     is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law.

(d)     It and each of its Affiliates have taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

## 13.22   U.S. Foreign Corrupt Practices Act

Neither the Company nor, to the best of the Company's knowledge, any of its Subsidiaries nor any director, officer, agent, employee or other person acting with specific instruction from the Company or any of its subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds, (iii) caused the Company or any of its subsidiaries to be in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or other national or local law regulating the payments of bribes to government officials or employees, or (iv) made any bribe or other unlawful payment.

## 13.23   No Violation of Regulations of Board of Governors of Federal Reserve System

None of the Company or any of its Subsidiaries has taken any action reasonably likely to cause the transactions contemplated by the Finance Documents (including without limitation the use of the proceeds from the Loan) to violate or result in a violation of any rule or regulation issued pursuant thereto, including, without limitation, Regulations T, U and X of the Board of Governors of the Federal Reserve System.

## 13.24   Times when Representations Made

(a)     All the representations and warranties in this Section 13 are made by the Company on the date of this Agreement except for the representations and warranties set out in

Sections 13.9 (*Base Case Model*) and 13.10 (*Information Memorandum*) which are deemed to be made by the Company:

    (i)    with respect to the Information Memorandum, on the date the Information Memorandum is approved by the Company; and

    (ii)    with respect to the Base Case Model, on the date of this Agreement and on the Funding Date.

(b)    All the representations and warranties in this Section 13 are deemed to be made by the Company on the Funding Date.

(c)    The Repeating Representations are deemed to be made by the Company on the date of the Request and on the Funding Date.

(d)    Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

## 14.    COVENANTS

**14.1**    The Company covenants and agrees with each Lender as set forth in Annex I (*Undertakings*) for so long as any amount is outstanding under the Finance Documents or any Commitment in force.

**14.2    Know your customer requirements**

(a)    If:

    (i)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

    (ii)    any change in the status of the Company after the date of this Agreement; or

    (iii)    a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Administrative Agent or any Lender (or, in the case of paragraph (iii) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Administrative Agent or any Lender supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Lender) or any Lender (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Lender) in order for the Administrative Agent, such Lender or, in the case of the event described in paragraph (iii) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)    Each Lender shall promptly upon the request of the Administrative Agent supply, or procure the supply of, such documentation and other evidence as is reasonably

requested by the Administrative Agent (for itself) in order for the Administrative Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

## 15.  DEFAULT

The Events of Default and remedies are set forth in Article IV (*Defaults and Remedies*) of Annex I (*Undertakings*).

## 16.  THE ADMINISTRATIVE PARTIES

### 16.1  Appointment and duties of the Administrative Agent

(a)  Each Finance Party (other than such Administrative Agent) irrevocably appoints the Administrative Agent to act as its Administrative Agent under the Finance Documents.

(b)  Each Finance Party irrevocably authorizes the Administrative Agent to:

   (i)  perform the duties and to exercise the rights, powers and discretions that are specifically given to it under the Finance Documents, together with any other incidental rights, powers and discretions; and

   (ii)  execute each Finance Document expressed to be executed by the Administrative Agent on its behalf.

(c)  The Administrative Agent has only those duties which are expressly specified in the Finance Documents.  Those duties are solely of a mechanical and administrative nature.

(d)  Each Finance Party confirms that:

   (i)  any Administrative Party has authority to accept on its behalf the terms of any reliance letter or mandate letter relating to any reports or letters provided in connection with the Finance Documents or the transactions contemplated by the Finance Documents, to bind it in respect of the reports or letters and to sign that reliance letter or mandate letter on its behalf and to the extent that reliance letter or mandate letter has already been entered into ratifies those actions; and

   (ii)  it accepts the terms and qualifications set out in that reliance letter or mandate letter.

### 16.2  Role of the Arrangers

Except as specifically provided in the Finance Documents, the Arrangers have no obligation of any kind to any other Party in connection with any Finance Document.

### 16.3  No fiduciary duties

Except as specifically provided in a Finance Document:

(a)  nothing in the Finance Documents makes an Administrative Party a trustee or fiduciary for any other Party or any other person; and

LO\347428.9

(b)    no Administrative Party need hold in trust any moneys paid to or recovered by it for a Party pursuant to the Finance Documents or be liable to account for interest on those moneys.

### 16.4    Individual position of an Administrative Party

(a)    If it is also a Lender, each Administrative Party has the same rights and powers under the Finance Documents as any other Lender and may exercise those rights and powers as though it were not an Administrative Party.

(b)    Each Administrative Party may:

(i)    carry on any business with the Company or its related entities (including acting as an agent or a trustee for any other financing); and

(ii)    retain any profits or remuneration it receives under the Finance Documents or in relation to any other business it carries on with the Company or its related entities.

### 16.5    Reliance

The Administrative Agent may:

(a)    rely on any notice or document believed by it to be genuine and correct and to have been signed by, or with the authority of, the proper person;

(b)    rely on any statement made by any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify;

(c)    engage, pay for and rely on professional advisers selected by it (including those representing a Party other than that Administrative Agent); and

(d)    act under the Finance Documents through its personnel and agents.

### 16.6    Majority Lenders' instructions

(a)    The Administrative Agent is fully protected if it acts on the instructions of the Majority Lenders in the exercise of any right, power or discretion or any matter not expressly provided for in the Finance Documents.  Any such instructions given by the Majority Lenders will be binding on all the Lenders.  In the absence of instructions, the Administrative Agent may act or refrain from acting as it considers to be in the best interests of all the Lenders.

(b)    The Administrative Agent may assume that unless it has received notice to the contrary, any right, power, authority or discretion vested in any Party or the Majority Lenders has not been exercised.

(c)    The Administrative Agent is not authorized to act on behalf of a Lender (without first obtaining that Lender's consent) in any legal or arbitration proceedings in connection with any Finance Document.

(d)    The Administrative Agent may require the receipt of security satisfactory to it, whether by way of payment in advance or otherwise, against any liability or loss which it may incur in complying with the instructions of the Majority Lenders.

(e)    In the event:

(i) the Administrative Agent sends a written notice to the Lenders requesting consent from the Majority Lenders in respect of any amendment or waiver that may be made with the consent of the Majority Lenders under the terms of this Agreement;

(ii) the notice sent by the Administrative Agent requests instructions are provided to it by the Lenders within a period of at least ten Business Days from the date of the notice (the "**Notice Period**"); and

(iii) the Administrative Agent has not received instructions from all the Lenders at the end of the Notice Period and the instructions it has received from those Lenders who have responded (the "**Applicable Lenders**") do not constitute instructions from the Majority Lenders in either the affirmative or the negative,

then at the close of business on the last day of the Notice Period, the Administrative Agent shall determine (acting reasonably):

(A) if there is no Loan then outstanding, the proportion of Commitments of the Applicable Lenders who have given consent to the Total Commitments of all Applicable Lenders; and

(B) at any other time, the proportion of the participations in the Loan then outstanding of the Applicable Lenders who have given consent to the amount of all the participations in the Loan then outstanding.

If such calculations show that consent has been received from 50.1% or more of the Total Commitments or, as the case may be, participation in outstanding the Loan of all Applicable Lenders then the Administrative Agent shall be deemed to have received consent from the Majority Lenders for all purposes under this Agreement.

**16.7    Responsibility**

(a) No Administrative Party is responsible to any other Finance Party for the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

(i) any Finance Document or any other document;

(ii) any statement or information (whether written or oral) made in or supplied in connection with any Finance Document; or

(iii) any observance by the Company of its obligations under any Finance Document or any other document.

(b) Without affecting the responsibility of the Company for information supplied by it or on its behalf in connection with any Finance Document, each Lender confirms that it:

(i) has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets); and

(ii) has not relied exclusively on any information provided to it by any Administrative Party in connection with any Finance Document.

32

**16.8    Exclusion of liability**

    (a)    The Administrative Agent is not liable or responsible to any other Finance Party for any action taken or not taken by it in connection with any Finance Document, unless directly caused by its gross negligence or willful misconduct.

    (b)    No Party (other than the Administrative Agent) may take any proceedings against any officer, employee or agent of the Administrative Agent in respect of any claim it might have against the Administrative Agent or in respect of any act or omission of any kind by that officer, employee or agent in connection with any Finance Document.

    (c)    The Administrative Agent is not liable for any delay (or any related consequences) in crediting an account with an amount required under the Finance Documents to be paid by the Administrative Agent if the Administrative Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognized clearing or settlement system used by the Administrative Agent for that purpose.

    (d)    Nothing in this Agreement will oblige any Administrative Party to satisfy any "know your customer" requirement in relation to the identity of any person on behalf of any Finance Party.

    (e)    Each Finance Party confirms to each Administrative Party that it is solely responsible for any "know your customer" requirement it is required to carry out and that it may not rely on any statement in relation to those requirements made by any other person.

**16.9    Default**

    (a)    The Administrative Agent is not obliged to monitor or enquire whether a Default has occurred.  The Administrative Agent is not deemed to have knowledge of the occurrence of a Default.

    (b)    If the Administrative Agent:

        (i)    receives notice from a Party referring to this Agreement, describing a Default and stating that the event is a Default; or

        (ii)    is aware of the non-payment of any principal, interest or fee payable to a Lender under any Finance Document,

    it must promptly notify the Lenders.

**16.10    Information**

    (a)    The  Administrative Agent must promptly forward to the person concerned the original or a copy of any document which is delivered to that Administrative Agent by a Party for that person.

    (b)    Except where a Finance Document specifically provides otherwise, the Administrative Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

    (c)    Except as provided above, the Administrative Agent has no duty:

(i)      either initially or on a continuing basis to provide any Lender with any credit or other information concerning the risks arising under or in connection with the Finance Documents (including any information relating to the financial condition or affairs of the Company or its related entities or the nature or extent of recourse against any Party or its assets) whether coming into its possession before, on or after the date of this Agreement; or

(ii)      unless specifically requested to do so by a Lender in accordance with a Finance Document, to request any certificate or other document from the Company.

(d)      In acting as a Administrative Agent, the Administrative Agent shall be treated as acting through its agency division which shall be treated as a separate entity from its other divisions and departments. Any information received or acquired by the Administrative Agent which, in its opinion, is received or acquired by some other division or department or otherwise than in its capacity as a Administrative Agent may be treated as confidential by the Administrative Agent and will not be treated as information possessed by the Administrative Agent in its capacity as such.

(e)      The Administrative Agent is not obliged to disclose to any person any confidential information supplied to it by or on behalf of the Company solely for the purpose of evaluating whether any waiver or amendment is required in respect of any term of the Finance Documents.

(f)      The Company irrevocably authorizes the Administrative Agent to disclose to the other Finance Parties any information which, in the Administrative Agent's opinion, is received by it in its capacity as a Administrative Agent.

## 16.11    Indemnities

(a)      Without limiting the liability of the Company under the Finance Documents, each Lender must indemnify the Administrative Agent for that Lender's proportion of any loss or liability incurred by that Administrative Agent in acting as a Administrative Agent, except to the extent that the loss or liability is caused by the Administrative Agent's gross negligence or willful misconduct.

(b)      A Lender's proportion of the liability or loss set out in paragraph (a) above is the proportion which its participation in the Loan bears to the entire Loan on the date of the demand.  If, however, there is no Loan outstanding on the date of demand, then the proportion will be the proportion which its aggregate Commitments bear to the Total Commitments at the date of demand or, if the Total Commitments have been cancelled, bore to the Total Commitments immediately before being cancelled.

(c)      The Administrative Agent may deduct from any amount received by it for a Lender any amount due to it from that Lender under a Finance Document but unpaid.

(d)      Without limiting the foregoing, to the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the United States Internal Revenue Service or any other governmental authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administration Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective), such Lender shall

indemnify the Administration Agent fully for all amounts paid, directly or indirectly, by the Administration Agent as tax or otherwise, including any penalties or interest and together with any all expenses incurred.

## 16.12 Compliance

Each Administrative Party may refrain from doing anything (including disclosing any information) which might, in its opinion, constitute a breach of any law or regulation or be otherwise actionable at the suit of any person, and may do anything which, in its opinion, is necessary or desirable to comply with any law or regulation.

## 16.13 Resignation

(a) The Administrative Agent may resign and appoint any of its Affiliates as successor Administrative Agent to it by giving notice to the other Finance Parties and the Company.

(b) Alternatively, the Administrative Agent may resign by giving notice to the Finance Parties and the Company, in which case the Majority Lenders may, upon the written consent of the Company as to the identity of such successor, appoint a successor Administrative Agent to it.

(c) If no successor Administrative Agent has been appointed under paragraph (b) above within 30 days after notice of resignation was given, the retiring Administrative Agent may appoint a successor Administrative Agent to it.

(d) The person(s) appointing a successor Administrative Agent must consult with the Company prior to the appointment.

(e) The resignation of the Administrative Agent and the appointment of a successor Administrative Agent will both become effective only when:

    (i) the successor Administrative Agent notifies all the Parties that it accepts its appointment and executes and delivers to the Administrative Agent a duly completed Accession Agreement; and

    (ii) on giving the notification, the successor Administrative Agent will succeed to the position of the retiring Administrative Agent and the term Administrative Agent will mean the successor Administrative Agent.

(f) The retiring Administrative Agent must, at its own cost, make available to the successor Administrative Agent such documents and records and provide such assistance as the successor Administrative Agent may reasonably request for the purposes of performing its functions as Administrative Agent under the Finance Documents.

(g) Upon its resignation becoming effective, this Section will continue to benefit a retiring Administrative Agent in respect of any action taken or not taken by it in connection with the Finance Documents while it was an Administrative Agent, and, subject to paragraph (f) above, it will have no further obligations under any Finance Document.

(h) The Majority Lenders may, by notice to any Administrative Agent, require it to resign under paragraph (b) above.

LO\347428.9

**16.14    Relationship with Lenders**

(a)    The Administrative Agent may treat each Lender as a Lender, entitled to payments under this Agreement and as acting through its Facility Office(s) until it has received not less than five Business Days' prior notice from that Lender to the contrary.

(b)    The Administrative Agent may at any time, and must if requested to do so by the Majority Lenders, convene a meeting of the Lenders.

**16.15    Notice period**

Where this Agreement specifies a minimum period of notice to be given to the Administrative Agent, the Administrative Agent may, at its discretion, accept a shorter notice period.

## 17.    EVIDENCE AND CALCULATIONS

**17.1    Accounts**

Accounts maintained by a Finance Party in connection with this Agreement are prima facie evidence of the matters to which they relate for the purpose of any litigation or arbitration proceedings.

**17.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under the Finance Documents will, in the absence of manifest error, be conclusive evidence of the matters to which it relates.

**17.3    Calculations**

Any interest or fee accruing under this Agreement accrues from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days.

## 18.    FEES

**18.1    Administrative Agent's fees**

Subject to Section 18.3 (*Payment of Fees*), the Company must pay (or procure that there is paid) to the Administrative Agent for its own account an agency fee in the amount and in the manner agreed in the Agency Fee Letter between the Administrative Agent and the Company.

**18.2    Arrangement fee**

Subject to Section 18.3 (*Payment of Fees*), the Company must pay (or procure that there is paid) to the Administrative Agent on behalf of the Arrangers an arrangement fee in the amount and in the manner agreed in the Mandate Letter between the Arrangers and the Company.

**18.3    Payment of Fees**

The fees referred to in Section 18 (*Fees*) shall only become due and payable on the Funding Date and shall be paid from the proceeds of the drawdown on such date.

## 19.    INDEMNITIES

### 19.1    Currency indemnity

(a)    The Company must, as an independent obligation, within five Business Days of written demand, indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

    (i)    that Finance Party receiving an amount in respect of the Company's liability under the Finance Documents; or

    (ii)    that liability being converted into a claim, proof, judgment or order,

in a currency other than the currency in which the amount is expressed to be payable under the relevant Finance Document.

(b)    Unless otherwise required by law, the Company waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency other than that in which it is expressed to be payable.

### 19.2    Other indemnities

(a)    The Company must, within five Business Days of written demand, indemnify each Finance Party against any loss or liability which that Finance Party incurs as a consequence of:

    (i)    (other than by reason of gross negligence or willful default by a Finance Party) the Loan not being drawn down by the Company after a Request has been delivered for the Loan; or

    (ii)    the Loan (or part of the Loan) not being prepaid in accordance with Section 7 (*Prepayment and cancellation*) of this Agreement.

(b)    The Company shall promptly upon, and in any event within five Business Days of, demand (which demand must be accompanied by reasonable calculations or details of the amount demanded) indemnify the Administrative Agent against any reasonable third party cost, loss or liability incurred by the Administrative Agent (acting reasonably) as a result of:

    (i)    the Administrative Agent or its representatives investigating any event or matter which the Administrative Agent reasonably believes is a Default or might reasonably be expected to be a Default or an Event of Default, provided that if after doing so it is established that the event or matter is not a Default or an Event of Default, such cost, loss of liability of investigation shall be for the account of the Lenders; or

    (ii)    acting or relying on any notice, request or instruction from the Company which the Administrative Agent reasonably believes to be genuine, correct and appropriately authorized.

37

**20.    EXPENSES**

**20.1    Transaction Expenses**

Subject to the terms and conditions of the Mandate Letter, the Company shall within five Business Days of demand, pay the Administrative Agent and the Arrangers the amount of all reasonable costs and expenses (including legal fees) incurred by any of them, in connection with the negotiation, preparation, printing, execution, syndication and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Finance Documents; and

(b)    any other Finance Documents executed after the date of this Agreement.

**20.2    Amendment Costs**

If (a) the Company requests an amendment, waiver or consent or (b) an amendment is required pursuant to Section 21.2 (*Change of currency*), the Company shall, within one month of demand, reimburse (or procure reimbursement of) the Administrative Agent for the amount of all reasonable documented third party costs and expenses (including reasonable legal fees and notarial costs) reasonably incurred by the Administrative Agent in responding to, evaluating, negotiating or complying with that request or requirement.

**20.3    Enforcement and Preservation Costs**

The Company shall, within five Business Days of demand, pay to the Arrangers and each other Finance Party the amount of all costs and expenses (including legal fees) reasonably incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and any proceedings instituted by or against the Administrative Agent as a consequence of enforcing these rights.

**20.4    Transfer costs and expenses**

Notwithstanding any other term of the Finance Documents, if a Finance Party assigns or transfers any of its rights, benefits or obligations under the Finance Documents, no member of the Group shall be required to pay any fees, costs, expenses or other amounts relating to or arising in connection with that assignment or transfer.

**21.    AMENDMENTS AND WAIVERS**

**21.1    Any term** of the Finance Documents may be amended or waived in accordance with the provisions as set forth in Article 5 (*Amendments*) of Annex I (*Undertakings*).

**21.2    Change of currency**

If a change in any currency of a country occurs (including where there is more than one currency or currency unit recognized at the same time as the lawful currency of a country), the Finance Documents will be amended to the extent the Administrative Agent (acting reasonably and after consultation with the Company) determines is necessary to reflect the change.

**21.3    Waivers and remedies cumulative**

The rights of each Finance Party under the Finance Documents:

(a)    may be exercised as often as necessary;

38

(b)      are cumulative and not exclusive of its rights under the general law; and

(c)      may be waived only in writing.

Delay in exercising or non-exercise of any right is not a waiver of that right.

## 22.    CHANGES TO THE PARTIES

### 22.1    Assignments and transfers

The Company may not, other than in accordance with a transaction permitted under Article III (*Successors*) of Annex I (*Undertakings*), assign, transfer or delegate any of its rights or obligations under the Finance Documents without the prior consent of all the Lenders, and any purported assignment, transfer or delegation in violation of this provision shall be void and of no effect.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns.

### 22.2    Requirements for assignments by Lenders

(a)      A Lender (the "**Existing Lender**") may, subject to the following provisions of this Subsection, at any time assign, transfer or delegate any of its rights and obligations under this Agreement to any other bank, financial institution or other entity which is regularly engaged in or established for the purposes of making, purchasing or investing in loans, securities or other financial assets, (the "**New Lender**"), provided that, prior to the Funding Date the Lenders may assign, transfer or delegate any of its rights and obligations under this Agreement to any person after consultation with the Company, except that any such Lender may freely assign, transfer or delegate any of its rights and obligations under this Agreement to a Related Fund without consultation with the Company.

(b)      Unless the Company and the Administrative Agent otherwise agree an assignment of part of a Commitment (and a pro rata portion of the Loan) or part of its rights and obligations under this Agreement by the Existing Lender must be in a minimum amount of €1,000,000 PROVIDED THAT for the purposes of this subparagraph:

(i)      if an Existing Lender is a fund, it may transfer to another fund that is either an Existing Lender or a Related Fund of a fund that is an Existing Lender in any amount;

(ii)     in the case of concurrent transfers by an Existing Lender to two or more Related Funds, all such concurrent transfers shall be aggregated;

(iii)    if the Existing Lender is transferring all of its Commitment or all of its rights and obligations under this Agreement it may do so notwithstanding that its Commitment or (as the case may be) rights and obligations are less than €1,000,000 in amount;

(iv)     if on the same date two or more Existing Lenders are transferring part of their Commitments or the rights and obligations under this Agreement to the same transferee the minimum amount so transferred by any Existing Lender to such transferee may be less than €1,000,000 provided that the aggregate amount transferred to such transferee on such date is €1,000,000 or more.

For the purposes of this paragraph, funds are "**Related Funds**" if they are managed or advised by the same investment manager or advisor or, if managed by different

investment managers or advisors, such investment advisors or managers are Affiliates.

(c)    Each partial assignment must be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under the Agreement.

(d)    An Existing Lender must, unless there is an outstanding Event of Default, notify the Company prior to making an assignment or transfer to a New Lender which is not another Lender or an Affiliate of a Lender.

(e)    An assignment will only be effective if the New Lender confirms to the Administrative Agent and the Company in form and substance satisfactory to the Administrative Agent that, it is bound by obligations to the other Finance Parties under this Agreement equivalent to those it would have been under if it were an Original Lender.

(f)    No assignment or transfer under this Section will be effective until the Administrative Agent has completed all know your customer requirements relating to any person that it is required to carry out in relation to such assignment or transfer.  The Administrative Agent is not obliged to execute a Transfer Certificate until it has completed all know your customer requirements to its satisfaction.

(g)    A transfer of obligations will be effective only if rights are assigned, corresponding obligations are released and equivalent obligations are acceded to in accordance with the provisions of Section 22.3 (*Procedure for assignments by Lenders*).

(h)    Unless the Administrative Agent otherwise agrees, the New Lender must pay to the Administrative Agent for its own account, on or before the date any assignment or transfer occurs, a fee of €3,000.

(i)    Any reference in this Agreement to a Lender includes a New Lender but excludes a Lender if no amount is or may be owed to or by it under this Agreement.

(j)    A Lender may sub-participate or sub-contract its obligations under this Agreement without limitation.

(k)    Without prejudice to Section 22.7 (*Costs resulting from a change of Lender or Facility Office*) or any other provision of this Agreement relating to transfer or assignment by any Lender of its rights and obligations under this Agreement, each Lender may, without consulting with or obtaining consent from the Company, at any time create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

  (i)    any Security Interest to secure obligations to a federal reserve or central bank; and

  (ii)    in the case of any Lender which is a Fund, any Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

  except that no such Security Interest shall:

40

(i)    release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant Security Interest for the Lender as a party to any of the Finance Documents; or

(ii)    require any payments to be made by the Company or grant to any person any more extensive rights than those required to be made by or granted to the relevant Lender under the Finance Documents.

## 22.3 Procedure for assignments by Lenders

(a)    An assignment is effected if:

    (i)    the Existing Lender and the New Lender execute and deliver to the Administrative Agent a duly completed Transfer Certificate; and

    (ii)    the Administrative Agent executes it.

    The Administrative Agent must execute as soon as reasonably practicable a Transfer Certificate delivered to it and which appears on its face to be in order.

(b)    Each Party (other than the Existing Lender and the New Lender) irrevocably authorizes the Administrative Agent to execute any duly completed Transfer Certificate on its behalf.

(c)    As of the Transfer Date:

    (i)    the New Lender will assume the rights and obligations of the Existing Lender assigned in the Transfer Certificate in substitution for the Existing Lender;

    (ii)    the Existing Lender will be released from those obligations and cease to have those rights; and

    (iii)    any reference in this Agreement to Lender will include the New Lender.

(d)    The Administrative Agent must, as soon as reasonably practicable after it has executed a Transfer Certificate, send to the Company a copy of that Transfer Certificate.

## 22.4 Transfer of Exchange Notes

Each Lender shall acknowledge that none of the Exchange Notes will be registered under the U.S. Securities Act, and represents and shall agree that it may only acquire Exchange Notes for its own account and that it will not, directly or indirectly, transfer, sell, assign, pledge or otherwise dispose of the Exchange Notes (or any interest therein) unless such transfer, sale, assignment, pledge or other disposition is made pursuant to an available exemption from registration under, and otherwise in compliance with, the U.S. Securities Act. Each Lender shall acknowledge that the Exchange Notes will bear a legend restricting the transfer thereof in accordance with the U.S. Securities Act.

## 22.5 Maintenance of Register

(a)    The Administrative Agent must keep a register of all the Parties and the Company designates the Administrative Agent to act as the Company's agent to maintain solely for the purposes of this Section 22.4 (*Maintenance of Register*) a register (the **"Register"**) on which it will record the Commitments of and the outstanding amount

41

of the Loan owing to each Lender.  The Register will include each Lender's Facility Office(s) and contact details for the purposes of this Agreement.

(b) Any failure to make or update the Register, or any error in the Register, will not affect the Company's obligations in respect of the Loan.

(c) Notwithstanding any other provision of this Section 22 (*Changes to Parties*):

    (i) the transfer of any Commitment or Loan or any other right or obligation under the Finance Documents will not be effective until that transfer is recorded on the Register maintained by the Administrative Agent; and

    (ii) before its recording, all amounts owing by the Company under the Finance Documents to the transferor with respect to those Commitments and Loan will remain owing to the transferor.

(d) The Administrative Agent will promptly update the Register upon the relevant Transfer Date.

(e) The Administrative Agent will provide a copy of the Register to any Party on request and will in any event provide a copy to the Company at six monthly intervals from the Funding Date.

## 22.6 Limitation of responsibility of Existing Lender

(a) Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

    (i) the financial condition of the Company;

    (ii) the legality, validity, effectiveness, enforceability, adequacy, accuracy, completeness or performance of:

        (A) any Finance Document or any other document;

        (B) any statement or information (whether written or oral) made in or supplied in connection with any Finance Document; or

        (C) any observance by the Company of its obligations under any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b) Each New Lender confirms to, and agrees with, the Existing Lender and the other Finance Parties that it:

    (i) has made, and will continue to make, its own independent appraisal of all risks arising under or in connection with the Finance Documents (including the financial condition and affairs of the Company and its related entities and the nature and extent of any recourse against any Party or its assets) in connection with its participation in this Agreement;

    (ii) has not relied exclusively on any information supplied to it by the Existing Lender in connection with any Finance Document; and

LO\347428.9

(iii)    is a person whose ordinary business includes participation in syndicated facilities of this type.

(c)    Nothing in any Finance Document requires an Existing Lender to:

(i)    accept a re-transfer from a New Lender of any of the rights and obligations assigned or transferred under this Section; or

(ii)    support any losses incurred by the New Lender by reason of the non-performance by the Company of its obligations under any Finance Document or otherwise.

## 22.7    Costs resulting from change of Lender or Facility Office

If:

(a)    a Lender assigns or transfers any of its rights and obligations under the Finance Documents or changes its Facility Office; and

(b)    as a result of circumstances existing at the date the assignment, transfer or change occurs and as a result of the assignment, transfer or change, the Company would be or become obliged to pay a Tax Payment,

then, unless the assignment, transfer or change is made by a Lender in order to mitigate at the request and with the consent of the Company any circumstances giving rise to the Tax Payment, the Company need only pay that Tax Payment to the same extent that it would have been obliged to if no assignment, transfer or change had occurred.

## 22.8    Affiliates of Lenders

(a)    Each Lender may fulfill its obligations in respect of the Loan through an Affiliate if the relevant Affiliate is specified in this Agreement as a Lender or becomes a Lender by means of a Transfer Certificate in accordance with this Agreement.  In this event, the Lender and the Affiliate will participate in the Loan in the manner provided for in a notice given by that Lender to the Administrative Agent and the Company.

(b)    If paragraph (a) applies, the Lender and its Affiliate will be treated as having a single Commitment and a single vote, but, for all other purposes, will be treated as separate Lenders.

## 22.9    Replacement of Lenders

(a)    If at any time:

(i)    any Lender becomes an Increased Cost Lender;

(ii)    any Lender becomes insolvent and its assets become subject to a receiver, liquidator, trustee, custodian or other person having similar powers or any winding-up, dissolution or administration;

(iii)    any Lender becomes a Non-Consenting Lender; or

(iv)    any Lender becomes a Non-Funding Lender,

then the Company may, on no less than seven Business Days' prior written notice to the Administrative Agent and that Lender, replace that Lender by causing it to (and

43

that Lender shall) transfer pursuant to this Section 22 all of its rights and obligations under this Agreement at par to a Lender or other person selected by the Company and acceptable to the Administrative Agent (acting reasonably) for a purchase price equal to the outstanding principal amount of such Lender's participation in the outstanding Loans and all accrued interest and fees and other amounts (but excluding for the avoidance of doubt any prepayment premiums) payable under this Agreement. If the effective date for transfer is not the last day of an Interest Period in relation to any participation in a Loan being transferred, then the Company shall, on the transfer date, indemnify the Non-Consenting Lender against any Break Cost which it incurs as a result.

(b)     The Company shall have no right to replace the Arrangers or the Administrative Agent and neither of the foregoing nor any Lender shall have any obligation to the Company to find a replacement Lender or other such entity. No member of the Group may make any payment or assume any obligation (whether by way of fees, expenses or otherwise) to or on behalf of the replacement Lender as an inducement for the replacement Lender to become a Lender.

(c)     The Company may only replace a Non-Consenting Lender if that replacement takes place no later than 180 days after

(i)      the date the Non-Consenting Lender becomes a Non-Consenting Lender or

(ii)     the date the Increased Cost Lender demands payment of the relevant additional amounts.

(d)     No Lender replaced under this Section 22.9 may be required to pay or surrender to that replacement Lender or other entity any of the fees received by it.

(e)     In the case of a replacement of an Increased Cost Lender, the Company shall pay the relevant additional amounts to that Increased Cost Lender prior to it being replaced and the payment of those additional amounts shall be a condition to replacement.

(f)     The Company's right to replace a Non-Funding Lender under this Section 22.9 is, and shall be, in addition to and not in lieu of, all other rights and remedies available to the Company against such Non-Funding Lender under this Agreement, at law, in equity or by statute.

(g)     For the purposes of this Section 22.9

(i)      an **"Increased Cost Lender"** is a Lender to whom the Company becomes obligated to pay additional amounts described in Section 10.1 (*Tax gross-up*).

(ii)     a **"Non-Consenting Lender"** is a Lender who does not agree to a consent or amendment where:

(A)     the Company or the Administrative Agent has requested the Lenders to consent to a departure from or waiver of any provision of the Finance Documents or to agree to any amendment thereto;

(B)     the consent or amendment in question requires the agreement of all Lenders;

(C)     a period of not less than ten Business Days has elapsed from the date the consent or amendment was requested;

(D)     Lenders whose Commitments aggregate more than 85 per cent. of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregate more than 85 per cent. of the Total Commitments immediately prior to that reduction) have agreed to such consent or amendment; and

(E)     the Company has notified the Lender it will treat it as a Non-Consenting Lender.

(iii)     a "**Non-Funding Lender**" is:

(A)     any Lender which has failed to make or participate in the Loan; or

(B)     any Lender which has given notice to the Company or the Administrative Agent that it does not intend to make or participate in the Loan in accordance with the requirements of this Agreement or has repudiated its obligations to do so.

## 23.    DISCLOSURE OF INFORMATION

(a)     Each Finance Party must keep confidential any information supplied to it by or on behalf of the Company in connection with the Finance Documents. However, a Finance Party is entitled to disclose information:

(i)     which is publicly available, other than as a result of a breach by that Finance Party of this Section;

(ii)     if required in connection with any legal or arbitration proceedings;

(iii)     if required to do so under any law or regulation;

(iv)     if required by a governmental, banking, taxation or other regulatory authority;

(v)     to its professional advisers (on a confidential basis);

(vi)     to any member of the Group or any Affiliate of the Company;

(vii)     to the extent allowed under paragraph (b) below; or

(viii)     with the written agreement of the Company.

(b)     A Finance Party may disclose to an Affiliate or any person with whom it may enter, or has entered into, any kind of transfer or participation in relation to this Agreement (a "**participant**"):

(i)     a copy of any Finance Document; and

(ii)     any information which that Finance Party has acquired under or in connection with any Finance Document,

provided that such participant agrees with the relevant Finance Party (for the benefit of the Company) to comply with the first paragraph of clause 23 (a) with respect to confidential information as if such participant were a Finance Party for the purposes of this Agreement.

(c)     This Section supersedes any previous confidentiality undertaking given by a Finance Party in connection with this Agreement prior to it becoming a Party.

## 24.     SET-OFF

If an Event of Default is outstanding, a Finance Party may set off any matured obligation owed to it by the Company under the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to the Company, regardless of the place of payment, booking branch or currency of either obligation.  If the obligations are in different currencies, the Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.  A Finance Party may also at any time after the occurrence of an Event of Default is outstanding combine or consolidate accounts held with it by the Company.

## 25.     PRO RATA SHARING

### 25.1     Redistribution

If any amount owing by the Company under any of the Finance Documents to a Lender (the "**recovering Lender**") is discharged by payment, set-off or any other manner other than through the Administrative Agent under this Agreement (a "**recovery**"), then:

(a)     the recovering Lender must, within three Business Days, supply details of the recovery to the Administrative Agent;

(b)     the Administrative Agent must calculate whether the recovery is in excess of the amount which the recovering Lender would have received if the recovery had been received by the Administrative Agent under this Agreement; and

(c)     the recovering Lender must pay to the Administrative Agent an amount equal to any such excess (the "**redistribution**") within five Business Days of demand by the Administrative Agent.

### 25.2     Effect of redistribution

(a)     The Administrative Agent must treat a redistribution as if it were a payment by the Company under this Agreement and distribute it among the Lenders, other than the recovering Lender, accordingly.

(b)     When the Administrative Agent makes a distribution under paragraph (a) above, the recovering Lender will be subrogated to the rights of the Finance Parties which have shared in that redistribution.

(c)     If and to the extent that the recovering Lender is not able to rely on any rights of subrogation under paragraph (b) above, the Company will owe the recovering Lender a debt which is equal to the redistribution, immediately payable and of the type originally discharged.

    (i)     If:

    (ii)     a recovering Lender must subsequently return a recovery, or an amount measured by reference to a recovery, to the Company; and

    (iii)     the recovering Lender has paid a redistribution in relation to that recovery,

each Finance Party must reimburse the recovering Lender all or the appropriate portion of the redistribution paid to that Finance Party, together with interest for the period while it held the redistribution. In this event, the subrogation in paragraph (b) above will operate in reverse to the extent of the reimbursement.

### 25.3 Exceptions

Notwithstanding any other term of this Section, a recovering Lender need not pay a redistribution to the extent that:

(a) it would not, after the payment, have a valid claim against the Company in the amount of the redistribution; or

(b) it would be sharing with another Finance Party any amount which the recovering Lender has received or recovered as a result of legal or arbitration proceedings, where:

    (i) the recovering Lender notified the Administrative Agent of those proceedings; and

    (ii) the other Finance Party had an opportunity to participate in those proceedings but did not do so or did not take separate legal or arbitration proceedings as soon as reasonably practicable after receiving notice of them.

## 26. SEVERABILITY

If a term of a Finance Document is or becomes illegal, invalid or unenforceable in any jurisdiction in relation to any party to such Finance Document, that will not affect:

(a) in respect of such party the legality, validity or enforceability in that jurisdiction of any other term of the Finance Documents;

(b) in respect of any other party to such Finance Document the legality, validity or enforceability in that jurisdiction of that or any other term of the Finance Documents; or

(c) in respect of any party to such Finance Document the legality, validity or enforceability in other jurisdictions of that or any other term of the Finance Documents.

## 27. COUNTERPARTS

Each Finance Document may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 28. NOTICES

### 28.1 In writing

(a) Any communication in connection with a Finance Document must be in writing and, unless otherwise stated, may be given:

    (i) in person, by post or fax; or

    (ii) if between the Administrative Agent and a Lender and the Administrative Agent and the Lender agree, by e-mail or other electronic communication.

(b)    For the purpose of the Finance Documents, an electronic communication will be treated as being in writing and a document.

(c)    Unless it is agreed to the contrary, any consent or agreement required under a Finance Document must be given in writing.

## 28.2    Contact details

(a)    Except as provided below, the contact details of each Party for all communications in connection with the Finance Documents are those notified by that Party for this purpose to the Administrative Agent on or before the date it becomes a Party.

(b)    In the case of the Company, Administrative Agent and Original Lender, the address and fax number (and the department or officer, if any, for whose attention the communication is to be made) is identified with its name on the signature pages below.

(c)    Any Party may change its contact details by giving five Business Days' written notice to the Administrative Agent or (in the case of the Administrative Agent) to the other Parties.

(d)    Where a Party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

## 28.3    Effectiveness

(a)    Except as provided below, any communication in connection with a Finance Document will be deemed to be given as follows:

  (i)    if delivered in person, at the time of delivery;

  (ii)   if posted, five days after being deposited in the post, postage prepaid, in a correctly addressed envelope;

  (iii)  if by fax, when received in legible form;

  (iv)   if by e-mail or any other electronic communication, when received in legible form; and

  (v)    if by posting to an electronic website, at the time of posting or (if the relevant recipient did not at such time have access to such website) the time at which such recipient is given access.

(b)    A communication given under paragraph (a) above but received on a non-working day or after business hours in the place of receipt will only be deemed to be given on the next working day in that place.

(c)    A communication to the Administrative Agent will only be effective on actual receipt by it.

## 28.4    Personal Liability

(a)    If an individual signs a certificate on behalf of any Party and the certificate proves to be incorrect, the individual will incur no personal liability as a result, unless the

48

individual acted fraudulently or recklessly in giving the certificate.  In this case any liability of the individual will be determined in accordance with applicable law.

(b)   No past, present or future director, officer, employee, incorporator, or stockholder of the Company or of any of its Subsidiaries or Affiliates, as such, shall have any liability for any obligations of the Company under the Loan, this Agreement, the Exchange Notes, or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Lender by accepting the Loan and each holder by accepting the Exchange Notes waives and releases all such liability.  The waiver and release are part of the consideration for the issuance of the Loan.

## 28.5   Use of websites

(a)   The Company may satisfy its obligation under this Agreement to deliver any information in relation to those Lenders (the "**Website Lenders**") who accept this method of communication by posting this information onto an electronic website designated by the Company and the Administrative Agent (the "**Designated Website**") if:

   (i)   the Administrative Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of the information by this method;

   (ii)   both the Company and the Administrative Agent are aware of the address of and any relevant password specifications for the Designated Website; and

   (iii)   the information is in a format previously agreed between the Company and the Administrative Agent.

   If any Lender (a "**Paper Form Lender**") does not agree to the delivery of information electronically then the Administrative Agent shall notify the Company accordingly and the Company shall supply the information to the Administrative Agent (in sufficient copies for each Paper Form Lender) in paper form.  In any event the Company shall supply the Administrative Agent with at least one copy in paper form of any information required to be provided by it.

(b)   The Administrative Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Company and the Administrative Agent.

(c)   The Company shall promptly upon becoming aware of its occurrence notify the Administrative Agent if:

   (i)   the Designated Website cannot be accessed due to technical failure;

   (ii)   the password specifications for the Designated Website change;

   (iii)   any new information which is required to be provided under this Agreement is posted onto the Designated Website;

   (iv)   any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

49

(v)    the Company becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

If the Company notifies the Administrative Agent under paragraph (c)(i) or paragraph (c)(v) above, all information to be provided by the Company under this Agreement after the date of that notice shall be supplied in paper form unless and until the Administrative Agent and each Website Lender is satisfied that the circumstances giving rise to the notification are no longer continuing.

(d)    Any Website Lender may request, through the Administrative Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Company shall comply with any such request promptly.

## 29.    LANGUAGE

(a)    Any notice given in connection with a Finance Document must be in English.

(b)    Any other document provided in connection with a Finance Document must be:

(i)    in English; or

(ii)    (unless the Administrative Agent otherwise agrees) accompanied by a certified English translation. In this case, the English translation prevails unless the document is a statutory or other official document.

## 30.    GOVERNING LAW

This Agreement is governed by the law of the State of New York.

## 31.    ENFORCEMENT

### 31.1    Jurisdiction

(a)    To the fullest extent permitted by law, the Company and each of the Lenders hereby irrevocably and unconditionally (i) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Finance Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof and (ii) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

(b)    To the extent allowed by law, a Party may take:

(i)    proceedings in any other court; and

(ii)    concurrent proceedings in any number of jurisdictions.

**31.2    Service of process**

(a)    On or before the Funding Date, the Company shall irrevocably appoint Eco-Bat New York, LLC as its agent under the Finance Documents for service of process in any proceedings, and the Finance Parties agree that service of process in accordance with Section 28 (*Notices*) shall be effective service of process in any proceedings, before the courts to the jurisdiction of which the Parties submit pursuant to Section 31.1 (*Jurisdiction*) above.

(b)    The delivery of any notice or communication to the Company pursuant to Section 28 (*Notice*) or Section 31.2 (*Service of Process*) shall be copied to the persons identified next to the entity's name in the signature pages below.

(c)    If any person appointed as process agent is unable for any reason to act as Administrative Agent for service of process, the Company must immediately (and in any event within ten days of such event taking place) appoint another agent on terms acceptable to the Administrative Agent.  Failing this, the Administrative Agent may appoint another agent for this purpose.

(d)    The Company agrees that failure by a process agent to notify it of any process will not invalidate the relevant proceedings.

(e)    This Subsection does not affect any other method of service allowed by law.

**31.3    Waiver of immunity**

The Company irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought by a Finance Party against it in relation to a Finance Document and to ensure that no such claim is made on its behalf;

(b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)    waives all rights of immunity in respect of it or its assets.

**31.4    Waiver of trial by jury**

EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM ANY FINANCE DOCUMENT OR ANY TRANSACTION CONTEMPLATED BY ANY FINANCE DOCUMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

## SCHEDULE 1

## ORIGINAL LENDERS

| Name of Original Lender | Commitments (€) |
|---|---|
| Credit Suisse International | **€300,000,000** |
| Citibank N.A., New York Branch | **€300,000,000** |
| **Total** | **€600,000,000** |

## SCHEDULE 2

## CONDITIONS PRECEDENT DOCUMENTS

### To be Delivered on or Before the Funding Date

**Company**

1.  A certified copy of the constitutional documents of the Company conferring on the Company the corporate capacity required to enter into and effect the transactions contemplated by the Finance Documents.

2.  A copy of a resolution of the board of directors of the Company approving the terms of, the transactions contemplated by, the execution and delivery by the Company of its obligations under the Finance Documents.

3.  A specimen of the signature of each person authorized on behalf of the Company to execute the Finance Documents or all documents and notices to be executed and/or dispatched by it under or in connection with the Finance Documents.

4.  A certificate of an authorized signatory of the Company confirming that utilization of the Total Commitments would not breach any limit binding on it as at the Funding Date.

5.  A certificate of an authorized signatory of the Company confirming that all representations and warranties contained in this Agreement are true and correct in all material respects as of the Funding Date.

6.  A certificate of an authorized signatory of the Company confirming that there shall not exist any Default or Event of Default under this Agreement as of the Funding Date.

7.  A certificate of an authorized signatory of the Company certifying that each copy document specified in paragraphs 1 and 2 of this Schedule 2 (other than those specified under "Legal opinions" below) is correct and complete and that the original of each of those documents is in full force and effect and has not been amended or superseded, except as expressly permitted by this Agreement, as at a date no earlier than the date of Funding Date.

8.  A certificate of incorporation of the Company certified by the Secretary of State of the State of Delaware.

**Legal opinions**

9.  A legal opinion of Skadden, Arps, Slate, Meagher & Flom LLP, legal advisers as to matters of New York law to the Company, addressed to the Original Lenders and initial syndicate members as of the Funding Date.

**Other documents and evidence**

10. Evidence that all fees then due and payable by the Company to the Arrangers and the Administrative Agent under this Agreement have been or will be paid on or before the Funding Date.

11. A duly executed original of this Agreement and the Mandate Letter.

12. Receipt of such information and documents as may be requested by the Administrative Agent prior to the Funding Date and required by regulatory authorities under applicable "know your

LO\347428.9

customer" laws and regulations and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

13.    Evidence that the Company's agent for service of process in New York has accepted its appointment.

14.    A copy of the notice to be provided of the repayment to the holders of the 10% Senior PIK Notes due 2015.

## SCHEDULE 3

## FORM OF REQUEST

To:      Administrative Agent

From:  **EB Holdings, Inc.**

Date:   [     ]

### EB Holdings, Inc.- €600,000,000 PIK Loan Agreement
### dated March 23, 2007 (the "Agreement")

1.      We refer to the Agreement.  This is a Request.  Terms defined in the Agreement have the same meaning in this Request unless given a different meaning in this Request.

2.      We wish to borrow the Loan on the following terms:

     (a)      Funding Date: [                    ]

     (b)      Amount: [                  ]

     (c)      Interest Period: Six (6) months.

3.      Our [payment/delivery] instructions are: [                    ].

4.      We confirm that each condition precedent specified in Section 4.2 (*Further Conditions Precedent*) will be satisfied on the Funding Date.

5.      This Request is irrevocable.

By:

**EB Holdings, Inc.**

## SCHEDULE 4

### TRANSFER CERTIFICATE

### IN THE FORM OF AN ASSIGNMENT AND ASSUMPTION AGREEMENT

### EB Holdings, Inc. €600,000,000 PIK Loan Agreement dated March 23, 2007 (as amended from time to time, the "Agreement")

This Transfer Certificate in the form of an assignment and assumption agreement (this "**Assignment**") is entered into on [●] 2007

BETWEEN:

1.      [    ] (the "Assignor"); and

2.      [    ] (the "Assignee").

The Assignor and the assignee agree as follows:

3.      Unless otherwise defined in this Assignment, terms defined in the Agreement are used in this Assignment with the same meanings given to them in the Agreement, and the rules of construction of the Agreement apply to this Assignment.

4.      The Assignor sells and assigns, without recourse, to the Assignee, and the Assignee purchases and assumes, without recourse, from the Assignor, effective as of the Transfer Date set forth below, the interests described below (collectively, the "**Assigned Interest**") in the Assignor's rights and obligations under the Agreement, including the interests set forth below in the Commitment of the Assignor on the Transfer Date, the Loans owing to the Assignor which are outstanding on the Transfer Date. To the extent that the Assigned Interest is not all of a particular Commitment or Loan, the Assigned Interest is a pro rata interest in all of the Assignor's Commitments or Loans which are subject to this Assignment.

5.      The Assignee acknowledges receipt of a copy of the Agreement and the other Finance Documents.

6.      From and after the Transfer Date:

(a)      the Assignee shall be a party to and be bound by the provisions of the Agreement and, to the extent of the Assigned Interest, have the rights and obligations of a Lender; and

(b)      the Assignor shall, to the extent of the Assigned Interest, relinquish its rights and be released from its obligations under the Agreement.

7.      The Assignee represents, warrants, covenants and agrees to and with the Assignor that it is not a U.S. person (and is not acting or acquiring the Loans for the account or benefit of a U.S. person) and is making the Loans in an offshore transaction pursuant to Regulation S of the U.S. Securities Act, as amended.

8.      The Assignee represents, warrants, covenants and agrees to and with the Assignor that:

(a)      It is:

(1)      (i) a person in a member state of the European Economic Area and who is a "qualified investor" within the meaning of Article 21(1)(e) of the Prospectus Directive (Directive 2003/71/EC) and (ii) if the Assignee is in the United

Kingdom, it is a qualified investor within the meaning of Section 86(7) of the Financial Services and Markets Act 2000 (the "FSMA") or, otherwise, is acquiring the Loans in circumstances which do not require a prospectus to be made available to the public in the United Kingdom within the meaning of section 85(1) of the FSMA; or

(2)     it is not a person in a member state of the European Economic Area;

(c)     if the Assignee is in the United Kingdom, it acknowledges that any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) in connection with, or relating to, the Loans may only be communicated or caused to be communicated in circumstances in which Section 21(1) of the FSMA does not apply to the Company; and

(d)     if the Assignee is in the United Kingdom, it confirms that it is aware of, and will observe, all applicable provisions of the FSMA in respect of anything done by it in relation to the Loans in, from or otherwise involving, the United Kingdom.

9.     This Assignment is being delivered to the Administrative Agent together with any further documentation required to be delivered by the Assignee under the Agreement, duly completed and executed by the Assignee.

10.     This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

LO\347428.9

Details of Assignment

Assignee's contact details for notices under the Agreement are on file with the Administrative Agent.

Effective Date of Assignment ("**Transfer Date**"):                    [•]

Principal Amount Assigned

|  | Facility |
|---|---|
| Commitment Assigned: | € |
| Loans Assigned: | € |

[The interest in relation to the Assignor's Participation and pursuant to Section 8 (*Interest*) of the Agreement will accrue from [•] 2007 and will be for the account of the Assignee.]

The undersigned, intending to be legal bound, have executed and delivered this Assignment on the date first above written.

[ASSIGNOR], as Assignor

By:    _____
       Name:
       Title:

[ASSIGNEE], as Assignee

By:    _____
       Name:
       Title:

The undersigned consents to the above assignment:

**[ADMINISTRATIVE AGENT]**
as Administrative Agent,

By:    _____
       Name:
       Title:

LO\347428.9

**SCHEDULE 5**

**FORM OF ACCESSION AGREEMENT**

THIS AGREEMENT dated [        ], [        ] is supplemental to a PIK facility agreement (the "**PIK Loan Agreement**") dated March 23, 2007 between, amongst others, EB Holdings, Inc., as the Company, the Finance Parties and Credit Suisse, London Branch as the Administrative Agent.

Words and expressions defined in the PIK Loan Agreement have the same meaning when used in this Agreement.

[Name of Administrative Agent] hereby agrees with each other person who is or who becomes a party to the PIK Loan Agreement that with effect on and from the date hereof it will be bound by the PIK Loan Agreement as a[n] Administrative Agent] as if it had been party originally to the PIK Loan Agreement in that capacity and that it shall perform all of the undertakings and agreements set out in the PIK Loan Agreement and given by an Administrative Agent].

The address for notices of Administrative Agent for the purposes of Section 28 (*Notices*) of the PIK Loan Agreement is:

[        ].

This Agreement is governed by New York.

[Insert appropriate execution language]

LO\347428.9

**SCHEDULE 6**

**SUMMARY TERMS AND CONDITIONS OF EXCHANGE NOTES**

| | |
|---|---|
| Maturity | The Exchange Notes will mature on March 31, 2017. |
| Issuer | The Company shall issue the Exchange Notes. |
| Guarantors | None. |
| Interest Period | Six months. |
| Security | None. |
| <u>Ranking</u> | *Pari passu* with the Loan (to the extent the Loan remains outstanding). |
| Interest Rate | Each Exchange Note will bear interest at a fixed rate equal to [●]% per annum (excluding default interest). |
| Currency | Euro. |
| Denomination | €1 million; or, if less, the entire aggregate principal amount of its pro rata share of the Loan. |
| Listing | The Exchange Notes will be listed on a regulated or unregulated European stock exchange to be agreed between the Company and the Arrangers. |
| Optional Redemption | The Company may prepay the Exchange Notes at any time, in whole or in part, upon not less than three Business Days' (or such shorter time period as may be agreed with the Majority Noteholders) prior notice, at the redemption prices (expressed as percentages of principal amount) set forth below, plus accrued and unpaid interest thereon to the Redemption Date: |

| Redemption Period | Price |
|---|---|
| 1 February 2008 through 31 January 2009...................................................... | 100.0% |
| 1 February 2009 through 31 January 2010...................................................... | 102.0% |
| 1 February 2010 through 31 January 2011...................................................... | 101.0% |
| Thereafter................................................ | 100.0% |

| | |
|---|---|
| Defeasance Provisions | Customary. |
| Modification | Modification of the Exchange Note Indenture and the Exchange Notes may be made with the consent of Noteholders holding greater than 50% of the Exchange Notes then outstanding, except that certain modifications or changes may only be made with the consent of all the Holders or in certain other cases with the consent of the Holders holding 90% of the Exchange Notes. |
| Registration Rights | None. |

| | |
|---|---|
| Covenants | The Exchange Note Indenture will include covenants substantially consistent with those contained in Annex I (*Undertakings*). |
| | The Exchange Note Indenture will be fully executed and delivered on or before the 120 day following the first anniversary of the Funding Date or such later date as may be agreed among the Company and the Lenders (the "**Indenture Execution Date**"). If the Company and the Arrangers are unable to agree to the final form of Exchange Note Indenture by the Indenture Execution Date and such failure to agree was not a result of the absence of good faith on the part of the Arrangers, the Administrative Agent will be entitled to include within the Exchange Note Indenture such terms as it may reasonably request to the extent consistent with the terms set forth above and consistent with relevant precedent for European portfolio companies of similar sponsors for exchange note indentures for similar credits. |
| Events of Default | The Exchange Note Indenture will provide for events of default substantially consistent with those contained in Section 4.01 (*Events of Default*) of Annex I (*Undertakings*). |

LO\347428.9

EXEMPTION CERTIFICATE

Reference is made to the PIK Loan Agreement dated as of March 23, 2007 (the "Agreement"), among EB HOLDINGS, INC., a Delaware corporation (the "Company"), the Lenders (as defined in Schedule 1), CREDIT SUISSE INTERNATIONAL and CITIGROUP GLOBAL MARKETS LIMITED as Arrangers, CREDIT SUISSE, LONDON BRANCH, as administrative agent for the Lenders hereunder, and the other parties hereto from time to time.

Pursuant to Section 10.1(e) of the Agreement, the undersigned hereby certifies that:

1.      The undersigned is the sole record and beneficial owner of the interest in the Loans or Exchange Notes, as the case may be, (the "Interest") in respect of which it is providing this certificate and it shall remain the sole beneficial owner of the Interest at all times during which it is the record holder of such Interest.

2.      The undersigned is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.      The undersigned meets all of the requirements under Section 881(c) of the Code to be eligible for a complete exemption from withholding of Taxes on interest payments made to it under the Agreement, including without limitation, that it is not a 10-percent shareholder within the meaning of Section 871(h)(3)(B) of the Code. The Company is not a controlled foreign corporation within the meaning of Section 864(d)(4) of the Code.

4.      The undersigned shall promptly notify Company and the Administrative Agent if any of the representations and warranties made herein are no longer true and correct.

IN WITNESS WHEREOF, the undersigned has duly executed this certificate as of the ___ day of _____.

[Lender]

By:_____
    Name:
    Title:

**Original Lenders**

**CREDIT SUISSE INTERNATIONAL**

By:

Name: Ael

Title: M

By:

Name:

Title: M. CESTAR

MD

Address:      One Cabot Square
              London E14 4QJ

Fax number:

Telephone:
Attention:

E-mail:

(Signature Pages to the PIK Loan Agreement)

TO:339431.1

**Original Lenders**

**CITIBANK N.A., NEW YORK BRANCH**

By: _____
 Name:
 Title:

By: _____
 Name: PAUL SIMPKIN
 Title: MANAGING DIRECTOR

Address:


Fax number:


Telephone:
Attention:

E-mail:

(Signature Pages to the PIK Loan Agreement)

**Arrangers**

**CREDIT SUISSE INTERNATIONAL**

By: _____
     Name:
     Title:

By: _____
     Name:  M. AESTAR
     Title:   MD

Address:    One Cabot Square
               London E14 4QJ

Fax number:

Telephone:
Attention:

E-mail:

**Arrangers (cont.)**

**CITIGROUP GLOBAL MARKETS LIMITED**

By: _____
      Name:
      Title:

By: _____
      Name: PAUL SIMPKIN
      Title: MANAGING DIRECTOR

Address:



Fax number:

Attention:

(Signature Pages to the PIK Loan Agreement)

**Bookrunners**

**CREDIT SUISSE INTERNATIONAL**

By: _____
      Name:     AC1
      Title:     MD

By: _____
      Name:
      Title:     M. CESTRA
               MD

Address:     One Cabot Square
            London E14 4QJ

Fax number:

Telephone:
Attention:

E-mail:

LG349434.1

**Bookrunners (cont.)**

**CITIBANK N.A., NEW YORK BRANCH**

By: _____
      Name:
      Title:

By: _____
      Name: PAUL SIMPKIN
      Title: MANAGING DIRECTOR

Address:


Fax number:

Attention:

(Signature Pages to the PIK Loan Agreement)

LO 349439.1

**Administrative Agent**

**CREDIT SUISSE, LONDON BRANCH**

By: _____

    Name:

    Title:

M . CESAR

| | |
|---|---|
| Address: | One Cabot Square |
| | London E14 4QJ |

| | |
|---|---|
| Fax number: | +44 20 7888 8398 |

| | |
|---|---|
| Telephone: | +44 20 7888 8362 |
| Attention: | Desmond Yeo |

(Signature Pages to the PIK Loan Agreement)

[O:349434]

**Company**

**EB HOLDINGS, INC.**

By: ___Howard M Mey___

      Name: Howard M. Meyers

      Title: President

Address: 874 Walker Road, Suite C  Dover, DE 19904

Email: hmmeyers@quexco.com

Fax number: 214-630-5864

Attention: Howard M. Meyers

with a copy to:

Joe Dugger

VP & CFO

RSR Corporation

2777 Stemmons Frwy.

Suite 1800

Dallas, TX 75207

United States of America

Fax:    00 1 214 631 6146

Email:  jdugger@rsrcorp.com

(Signature Page to the PIK Loan Agreement)

*Executed Version*

**ANNEX 1**

**ARTICLE I**
**DEFINITIONS AND INCORPORATION**
**BY REFERENCE**

**SECTION 1.01.    Definitions.**

*"Acquired Debt"* means:

(1)    Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or is merged with or into the Company or a Restricted Subsidiary, or liquidated into any of them, or which is assumed in connection with the acquisition by the Company or a Restricted Subsidiary of any property or assets from another person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into the Company or a Restricted Subsidiary, or becoming a Restricted Subsidiary; and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by the Company or a Restricted Subsidiary.

*"Affiliate"* of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control.  For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

*"Agreement"* means the €600,000,000 PIK Loan Facility to which this Annex 1 is attached.  Unless the context otherwise requires, references to this Agreement include this Agreement and all schedules and annexes thereto.

*"Asset Sale"* means:

(1)    the sale, lease, conveyance or other disposition of any property, assets or rights (including by way of merger, consolidation, amalgamation, scheme of arrangement or otherwise) by the Company or any Restricted Subsidiary outside the ordinary course of business of the Company or such Restricted Subsidiary; *provided* that the sale, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by the provisions of Section 2.15 and/or the provisions of Article 3 and not by the provisions of Section 2.10; and

(2)    the issuance of Equity Interests by any of the Company's Restricted Subsidiaries or the sale of Equity Interests by the Company or any of its Restricted Subsidiaries

1

in any Restricted Subsidiaries (other than directors qualifying shares or similar shares required by law to be held by a Person other than the Company or a Restricted Subsidiary).

Notwithstanding the preceding, none of the following items shall be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets having a fair market value of less than £1,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof);

(2)     a transfer of assets between or among the Company and any of its Restricted Subsidiaries;

(3)     an issuance of Equity Interests by a Restricted Subsidiary of the Company to the Company or to a Restricted Subsidiary;

(4)     the sale or lease of equipment, inventory or accounts receivable in the ordinary course of business or under Capital Lease Obligations otherwise permitted;

(5)     the sale or other disposition of cash or Cash Equivalents;

(6)     a Restricted Payment or Permitted Investment that is permitted by Section 2.07;

(7)     sales or other dispositions of obsolete, worn out or otherwise unsuitable assets or excess equipment in the ordinary course of business;

(8)     Asset Swaps; and

(9)     a Qualified Redomestication Transaction.

*"Asset Swap"* means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Company or any of its Restricted Subsidiaries and another Person; *provided* that the Fair Market Value of the Related Business Assets and cash or Cash Equivalents sold or disposed of in such transaction is not less than the Fair Market Value of the Related Business Assets and cash and Cash Equivalents received by the Company and its Restricted Subsidiaries in such transaction; and *provided further* that any cash received must be applied in accordance with the provisions of Section 2.10.

*"Attributable Debt"* in respect of a sale and leaseback transaction means, at the time of determination, the present value of the obligation of the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction during the remaining initial term thereof, as determined in accordance with GAAP and discounted from the last date of such initial term to the date of determination at a rate per annum equal to an estimate of the Company's incremental borrowing rate for a loan of similar term and with the same security as is provided by the lease.  The net amount of rent committed to be paid under any such leases for any such period shall be the aggregate amount of rent payable by the lessee with respect to such period after excluding amounts required to be paid on account of insurance, taxes, assessments, utilities, rates, service charges, operating and labor costs and similar charges.  In the case of any lease which is terminable by the lessee upon the payment of penalty, such net amount shall also include the lesser of the amount of such penalty (in which case no rent shall be deemed committed to be paid under such lease subsequent to the first date

2

upon which it may be so terminated) or the rent which would otherwise be required to be paid if such lease is not so terminated.

*"Bankruptcy Law"* means (to the extent applicable) (i) Title 11 of the U.S. Code, , or (ii) any other law of the United States or United Kingdom any political subdivision thereof or any other jurisdiction relating to bankruptcy, insolvency, winding up, liquidation, reorganisation or relief of debtors; in each case, including any substitute or replacement as may become law from time to time.

*"Beneficial Owner"* has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the U.S. Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.  The terms "beneficially owns" and "beneficially owned" have a corresponding meaning.

*"Board of Directors"* means:

(1)     with respect to a corporation, the board of directors of the corporation or a committee of the corporation generally elected by shareholders to supervise the affairs of the corporation;

(2)     with respect to a partnership, the board of directors of the general partner of the partnership; and

(3)     with respect to any other Person, the board or committee of such Person serving a similar function.

*"Borrowing Base"* means, as of any date, an amount equal to:

(1)     80% of the face amount of all "trade debtors" and "other taxation recoverables," in each case, owned by the Company and its Restricted Subsidiaries as of the end of the most recent calendar month preceding such date that were not more than 90 days past due, provided that, with respect to "other taxation recoverables" attributable to amounts owed by Italy or any governmental authority within Italy, such time restriction shall not be applicable; *plus*

(2)     60% of the book value of all inventory owned by the Company and its Restricted Subsidiaries as of the end of the most recent calendar month preceding such date.

*"Capital Lease Obligation"* means, at the time any determination is to be made, the amount of the liability in respect of a lease that would be required to be classified and accounted for as a capital lease or a finance lease and capitalized on a balance sheet in accordance with GAAP.

*"Cash Equivalents"* means:

(1)     direct obligations (or certificates representing an interest in such obligations) issued by, or unconditionally guaranteed by, the government of a member state of the European Union (including any agency or instrumentality thereof) or of the United States of America (including any agency or instrumentality thereof), or with respect to cash generated

3

by the operations of the South African Group only, South Africa (including any agency or instrumentality thereof) as the case may be, the payment of which is backed by the full faith and credit of the relevant member state of the European Union or the United States of America or South Africa, as the case may be;

(2)      time deposit accounts, certificates of deposit and money market deposits with maturities of 12 months or less from the date of acquisition issued by a bank or trust company which is organized under the laws of a member state of the European Union or of the United States of America or any state thereof, or, with respect to cash generated by the operations of the South African Group only, South Africa; *provided* that such bank or trust company has capital, surplus and undivided profits aggregating in excess of €500,000,000 (or the foreign currency equivalent thereof as of the date of such investment) and whose long-term debt is rated "A-3" or higher by Moody's Investors Service, Inc. or "A-" or higher by Standard and Poor's Ratings Services or the equivalent rating category or another internationally recognized rating agency;

(3)      repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (1) and (2) above entered into with any financial institution meeting the qualifications specified in clause (2) above;

(4)      commercial paper having a rating of "A-1" or higher from Moody's Investors Service, Inc. or "P-1" or higher from Standard & Poor's Rating Services and in each case maturing within 90 days after the date of acquisition;

(5)      securities with maturities of less than 12 months from the date of acquisition issued or fully guaranteed by any member state of the European Union or by any political subdivision or taxing authority thereof, or by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated "A-3" or higher by Moody's Investors Service, Inc. "A-" or higher by Standard & Poor's Rating Services;

(6)      money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (5) of this definition; and

(7)      interests in any French societe d'investissement a capital variable (SICAV) monetaire (a) managed by any bank or financial institution that issues time deposits, demand deposits, certificates of deposit or bankers acceptances maturing within one year rated as set forth in clause (2) above organized under the laws of a member state of the European Union or the United States of America and (b) that has its assets continuously invested in the types of investments referred to in clauses (1), (2), (3), (4) and (5) above, provided that, in the case of investments referred to in clause (4), the rating may be P-2 by Moody's Investor Service, Inc. or A-2 by Standard & Poor's Rating Services or carry an equivalent rating by an internationally recognized rating agency selected by the Company if both of the two named rating agencies cease to publish ratings of investments or do not rate institutions in the subject country.

*"Change of Control"* means the occurrence of any of the following:

(1)      the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation), in one or a series of related transactions, of all or substantially all of the business, properties, assets and undertaking of the Company

and its Restricted Subsidiaries taken as a whole to any Person or Persons other than to the Principal or his Related Parties;

(2)    the adoption of a plan relating to the liquidation or dissolution of the Company;

(3)    the consummation of any transaction (including, without limitation, any merger, amalgamation or consolidation) the result of which is that any Person, other than the Principal and his Related Parties, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company or Quexco Incorporated, measured by voting power rather than number of shares;

(4)    the consummation of the first transaction (including, without limitation, any merger or consolidation) the result of which is that (a) any Person becomes the Beneficial Owner, directly or indirectly, of more of the Voting Stock of the Company or Quexco Incorporated (measured by voting power rather than number of shares) than is at the time Beneficially Owned by the Principal and his Related Parties in the aggregate, and (b) the Principal no longer has the power to vote for or the right to designate a majority of the members of the Board of Directors of the Company or Quexco Incorporated; or

(5)    the first day following a registered public offering of the Share Capital of the Company on which a majority of the members of the Board of Directors of the Company or Quexco Incorporated are not Continuing Directors; or

(6)    the Company fails to own directly or indirectly at least 80% of the issued and outstanding Share Capital (excluding Preference Shares) of Eco-Bat Technologies, excluding (A) treasury shares and (B) directors' qualifying shares.

*"Company"* means EB Holdings, Inc., a Delaware corporation.

*"Company Request"* means a written request or order signed in the name of the Company by any Officer of the Company and delivered to the Administrative Agent or other specified Person.

*"Consolidated Cash Flow"* means, with respect to any specified Person for any period, the Consolidated Net Income of such Person for such period *plus*:

(1)    an amount equal to any extraordinary or exceptional loss plus any net loss realized by such Person or any of its Restricted Subsidiaries in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income, *plus*

(2)    (A) if such Person is a pass-through or disregarded entity for U.S. federal income tax purposes, the amount of all Permitted Quarterly Tax Distributions for such period with respect to such Person (whether or not such Permitted Quarterly Tax Distributions have actually been distributed), as adjusted for any True-up Amount determined for such period, plus any provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was included in computing such Consolidated Net Income, and (B) if such Person is not pass-through or disregarded entity for U.S. federal income tax purposes, any provision for taxes based on income or profits of such Person and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was included in computing such Consolidated Net Income, *plus*

(3)      consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation, amortization of original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Hedging Obligations related to the hedging of obligations in respect of borrowed money, but excluding amortization of debt issuance costs), to the extent that any such expense was deducted in computing such Consolidated Net Income, *plus*

(4)      depreciation, amortization (including amortization of goodwill and other intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash expenses (excluding any such non-cash expense to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense that was paid in a prior period) of such Person and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash expenses were deducted in computing such Consolidated Net Income, *minus*

(5)      non-cash items increasing Consolidated Net Income for such period to the extent included in Consolidated Net Income, other than the accrual of revenue in the ordinary course of business and any other non-cash item to the extent that it represents an accrual to be received in cash in future periods;

in each case, on a consolidated basis and determined in accordance with GAAP.

*"Consolidated Net Income"* means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, calculated on a consolidated basis, determined in accordance with GAAP and reduced by the amount of Permitted Quarterly Tax Distributions for such period with respect to such Person (whether or not such Permitted Quarterly Tax Distributions have actually been distributed), as adjusted for any True-up Amount determined for such period; *provided* that:

(1)      the Net Income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or distributions paid in cash to the specified Person or Restricted Subsidiary of the Person; *provided, however*, that the amount of dividends or distributions paid to a Restricted Subsidiary which is not a Wholly Owned Restricted Subsidiary will be net of any amounts paid to minority interests;

(2)      the Net Income of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter, certificate or other organization document or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation (other than applicable statutes, rules or governmental regulations attributable to a deficit in distributable reserves) applicable to that Restricted Subsidiary or its shareholders;

(3)      the Net Income of any Person acquired in a pooling of interests transaction for any period prior to the date of such acquisition will be excluded;

6

(4)      the cumulative effect of a change in accounting principles will be excluded; and

(5)      non-cash gains and losses arising as a consequence of FRS 17 (and any successor reporting standard) will be excluded.

*"Continuing Directors"* means, as of any date of determination, any member of the Board of Directors of the Company or Quexco Incorporated, as the case may be, who:

(1)      was a member of such Board of Directors on the Funding Date; or

(2)      was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election was nominated for election or elected to such Board of Directors in accordance with the charter documents of the Company or Quexco Incorporated, as the case may be.

*"Credit Facilities"* means debt facilities or commercial paper facilities, in each case with banks or other institutional lenders, together with all related documents and security in relation thereto, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables) or, bills, bonds, overdrafts, hedging, letters of credit and similar instruments thereunder, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time, and any agreements (and related documents) governing Indebtedness incurred to refinance or replace, in whole or in part, outstanding Indebtedness or commitments under such Credit Facility or such refinancing or replacement thereof, in each case, whether by the same or a new lender or agent or group of lenders or agents.

*"Default"* means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

*"Disqualified Stock"* means any Share Capital that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder of the Share Capital), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Share Capital, in whole or in part, on or prior to the date that is 181 days after the date on which the Loans mature. Notwithstanding the preceding sentence, any Share Capital that would constitute Disqualified Stock solely because the holders of the Share Capital have the right to require the Company to repurchase such Share Capital upon the occurrence of a Change of Control or an Asset Sale will not constitute Disqualified Stock if the terms of such Share Capital provide that the Company may not repurchase or redeem any such Share Capital pursuant to such provisions unless such repurchase or redemption complies with Section 2.07.

*"Eco-Bat Technologies"* means Eco-Bat Technologies Limited, a private limited company organized under the laws of England and Wales with registered number 2901883.

*"Equity Interests"* means Share Capital and all warrants, options or other rights to acquire Share Capital (but excluding any debt security that is convertible into, or exchangeable for, Share Capital).

7

*"Estimation Period"* means the period for which a holder of Equity Interests who is an individual is required to estimate for U.S. federal income tax purposes his allocation of taxable income from a calendar year in connection with determining his estimated U.S. federal income tax liability for such period.

*"euro"* or *"€"* means the currency introduced at the start of the third stage of the European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union.

*"European Union"* means the European Union, including the countries of Austria, Belgium, Denmark, France, Finland, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, but not including any country which becomes a member of the European Union after the Funding Date.

*"Existing Indebtedness"* means Indebtedness of the Company and its Restricted Subsidiaries (other than Indebtedness under Credit Facilities) in existence on the Funding Date, until such amounts are repaid.

*"Fair Market Value"* means the price that would be paid in an arm's length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy. "Fair Market Value" shall be determined in good faith by the Board of Directors of the Company, whose determination shall be conclusive, and to the extent such Fair Market Value shall be determined to be in excess of £1,000,000, shall be evidenced by a resolution of the Board of Directors of the Company delivered to the Administrative Agent.

*"Finance Subsidiary"* means a Wholly-Owned Restricted Subsidiary of Eco-Bat Technologies established solely for the purpose of, and engaged exclusively in the business of, issuing debt securities that are guaranteed by Eco-Bat Technologies and loaning the proceeds thereof to Eco-Bat Technologies or to another Restricted Subsidiary of Eco-Bat Technologies.

*"Fixed Charges"* means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of original issue discount, non-cash interest payments (other than Specified Non-Cash Interest), the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, imputed interest with respect to Attributable Debt, commissions, discounts and other fees and charges incurred in respect of bankers' acceptance financings, and net of the effect of all payments made, received or accrued pursuant to Hedging Obligations related to the hedging obligations in respect of borrowed money, but excluding amortization of debt issuance costs and finance expenses in relation to pensions, preference share dividends and Hedging Obligations, in each case that are not in respect of borrowed money; *plus*

(2)     the consolidated interest of such Person and its Restricted Subsidiaries that was capitalized during such period (other than Specified Non-Cash Interest); *plus*

(3)      any interest expense on Indebtedness of another Person that is guaranteed by such Person or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such guarantee or Lien is called upon; *plus*

(4)      the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock or Preference Shares of such Person or any of its Restricted Subsidiaries that constitute Disqualified Stock, other than dividends on Equity Interests payable solely in Equity Interests of the Company (other than Disqualified Stock) or to the Company or a Restricted Subsidiary of the Company, *multiplied* by (b) a fraction, the numerator of which is one and the denominator of which is one *minus* the then current combined national, federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, on a consolidated basis and in accordance with GAAP,

*excluding, however*, any such amount attributable to any Restricted Subsidiary if the Net Income of such Restricted Subsidiary is excluded from the calculation of Consolidated Net Income pursuant to clause (2) of the definition thereof (but only in the same proportion as the Net Income of such Restricted Subsidiary is excluded from the calculation of Consolidated Net Income pursuant to clause (2) of the definition thereof).

*"Fixed Charge Coverage Ratio"* means with respect to any specified Person for any period, the ratio of the Consolidated Cash Flow of such Person and its Restricted Subsidiaries for such period to the Fixed Charges of such Person for such period. In the event that the specified Person or any of its Restricted Subsidiaries incurs, assumes, guarantees, repays, repurchases or redeems any Indebtedness (other than borrowings under Credit Facilities and Hedging Obligations in the ordinary course of business) or issues, repurchases or redeems preferred stock or Preference Shares subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is made (the *"Calculation Date"*), then the Fixed Charge Coverage Ratio will be calculated giving pro forma effect to such incurrence, assumption, guarantee, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of preferred stock or Preference Shares, and the use of the proceeds therefrom as if the same had occurred on the first day of the applicable four-quarter reference period.

In addition, for purposes of calculating the Fixed Charge Coverage Ratio:

(1)      acquisitions of property or assets other than in the ordinary course of business that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations and Investments by a Person or any of its Restricted Subsidiaries in any Person which becomes a Restricted Subsidiary including, in each case, any related financing transactions, during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date shall be given pro forma effect as if they had occurred on the first day of the four-quarter reference period and Consolidated Cash Flow for such reference period shall be calculated on a pro forma basis in accordance with GAAP, but without giving effect to clause (3) of the proviso set forth in the definition of Consolidated Net Income;

(2)      the Consolidated Cash Flow attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses disposed of prior to the Calculation Date, shall be excluded; and

9

(3)      the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses disposed of prior to the Calculation Date, shall be excluded, but only to the extent that the obligations giving rise to such Fixed Charges shall not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date.

*"Government Securities"* means direct obligations of, obligations fully guaranteed by, or participations in pools consisting solely of obligations of or obligations guaranteed by, the full faith and credit of any country of the European Union that uses the Euro as its currency and that participated in the third stage of the European economic and monetary union, and which are not callable or redeemable at the option of the issuer thereof.

*"guarantee"* means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing in any manner all or any part of Indebtedness of any other Person, provided that "guarantee" shall not include the endorsement of negotiable instruments for collection in the ordinary course of business.

*"Hedging Obligations"* means, with respect to any specified Person, the obligations of such Person under interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, foreign currency exchange agreements, commodity price protection agreements and other agreements or arrangements designed to protect such Person against fluctuations in interest rates, foreign currency exchange rates and commodity prices.

*"Indebtedness"* means, with respect to any specified Person without duplication:

(1)      all obligations of such Person in respect of borrowed money;

(2)      all obligations of such Person evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(3)      all obligations of such Person in respect of banker's acceptances;

(4)      Capital Lease Obligations;

(5)      all obligations of such Person to pay the deferred and unpaid purchase price of any property which purchase price is due more than six months after the date of taking delivery and title to such property, except (a) any such balance that constitutes an accrued expense or trade payable and (b) any deferred compensation payable to Shell Ventures U.K. Limited pursuant to that certain Agreement for the acquisition of the entire issued share capital of H.J. Enthoven Limited and Le Plomb Francais S.A., dated 22 March 1994, by and among Shell Ventures U.K. Limited, Quexco Limited and H.J. Enthoven Limited; or

(6)      net exposure under Hedging Obligations, calculated on a marked to market basis,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP.  In addition, the term "Indebtedness" includes all Indebtedness of other Persons secured by a Lien on any asset of the specified Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such asset or the amount of Indebtedness so secured (whether or not such Indebtedness is assumed by the

10

specified Person) and, to the extent not otherwise included, the guarantee by the specified Person of any indebtedness of any other Person.

The amount of any Indebtedness outstanding as of any date shall be:

(1)     in the case of any Indebtedness issued with original issue discount, the face amount of the Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with GAAP;

(2)     in the case of any other Indebtedness, the principal amount of the Indebtedness, together with any interest on the Indebtedness that is more than 30 days past due;

(3)     Indebtedness shall not include any liability for the accrual of income or corporation tax, taxes withheld or deducted, VAT (other than irrevocable VAT) and other taxes or any liability that appears on the Company's balance sheet (excluding footnote disclosure) solely as a consequence of FRS 19 or IAS 12; *provided* that Indebtedness shall include any liability for any such taxes arising under any agreement with tax authorities to defer payments of past-due taxes.

*"Interest Payment Date"* means the stated maturity of an installment of interest on the Loans.

*"Investments"* means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), capital contributions, purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.  If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Company, the Company shall be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Subsidiary that were not sold or disposed of in an amount determined as provided in Section 2.07(g).  The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person shall be deemed to be an Investment by the Company or such Restricted Subsidiary in such third Person in an amount equal to the portion (pro rata to the Company's equity interest in such Restricted Subsidiary) of the Fair Market Value of the Investments held by the acquired Person in such third Person, calculated without duplication, in an amount determined as provided Section 2.07(g).

*"Letters of Credit"* means any letters of credit other than such letters of credit constituting Permitted Debt pursuant to Section 2.09(b)(ix).

*"Lien"* means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or

give a security interest in and any filing of or agreement to give any financing statement under the laws of any jurisdiction.

*"Net Income"* means, with respect to any specified Person, the profit (loss) of such Person for the relevant period, determined in accordance with GAAP and before any reduction in respect of dividends on preferred stock or Preference Shares, excluding, however:

(1)      any gain (but not loss), together with any related provision for taxes on such gain (but not loss), realized in connection with: (a) any Asset Sale; or (b) the disposition of any securities by such Person or any of its Restricted Subsidiaries or the extinguishment of any Indebtedness of such Person or any of its Restricted Subsidiaries; and

(2)      any extraordinary or exceptional gain (but not loss), together with any related provision for Taxes on such extraordinary or exceptional gain (but not loss).

*"Net Proceeds"* means (a) with respect to any Asset Sale, the aggregate proceeds in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries in respect of such Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Asset Sale), net of the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses incurred as a result of the Asset Sale, taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness, and net of any reserve for any purchase price adjustment in respect of the sale price of such asset or assets established in accordance with GAAP, and (b) with respect to any issuance or sale of Equity Interests, the proceeds of such issuance or sale in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof), net of attorneys' fees, accountants' fees, underwriters or placements agents' fees, discounts or commissions and brokerage, consultant and other fees incurred in connection with such issuance or sale and net of taxes paid or payable as a result of such issuance or sale.

*"Non-Recourse Debt"* means Indebtedness:

(1)      as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otherwise, or (c) constitutes the lender;

(2)      no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcement action against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness (other than the Loans) of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the payment of the Indebtedness to be accelerated or payable prior to its Stated Maturity.

*"Officer"* means, with respect to any Person, the Chairman, the Deputy Chairman, the Chief Executive Officer, the President, the Managing Director, the Chief Operating Officer,

the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Person.

*"Officer's Certificate"* means a certificate signed on behalf of the Company by an Officer of such entity  and is delivered to the Administrative Agent.

*"Opinion of Counsel"* means an opinion from legal counsel who is reasonably acceptable to the Administrative Agent, that is delivered to the Administrative Agent.  The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Administrative Agent.

*"Participant"* means a Person who has an account with Euroclear or Clearstream Banking.

*"Pass-Through Restricted Subsidiary"* means any Restricted Subsidiary of the Company that is treated as a pass-through or disregarded entity for U.S. federal income tax purposes and is not owned, directly or indirectly, by any Subsidiary of Eco-Bat Technologies that is not a pass-through or disregarded entity for U.S. federal income tax purposes.

*"Permitted Business"* means any business in which the Company or any of its Restricted Subsidiaries are engaged in as of the Funding Date and any business related, ancillary or complementary to any such business in which the Company or any of its Restricted Subsidiaries was engaged in as of the Funding Date.

*"Permitted Investments"* means:

(1)     any Investment in a Restricted Subsidiary;

(2)     any Investment in cash or Cash Equivalents;

(3)     any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment: (a) such Person becomes a Restricted Subsidiary of the Company; or (b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 2.10;

(5)     any Investment in assets solely in exchange for the issuance of Equity Interests (other than Disqualified Stock) of the Company;

(6)     any Investments in trade creditors or customers received in compromise of obligations of such persons incurred in the ordinary course of business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any such trade creditor or customer;

(7)     Hedging Obligations and guarantees otherwise permitted to be incurred pursuant to Section 2.09;

(8)     receivables owing to the Company or any Restricted Subsidiary of the Company if created or acquired in the ordinary course of business;

13

(9)     commission, payroll, travel and similar advances to cover matters that are expected at the time of such advances to be treated as expenses in accordance with GAAP;

(10)    duty deferment, development, bid, performance, completion, surety or appeal bonds or similar instruments, arising in the ordinary course of business;

(11)    investments in prepaid expenses, negotiable instruments held for collection or deposit and lease, utility, rate and workers compensation, performance and similar deposits entered into in the ordinary course of business of the Company and its Restricted Subsidiaries;

(12)    any Investments in the form of intercompany loans made to a Restricted Subsidiary or by a Restricted Subsidiary to the Company if made in compliance with Section 2.07(b)(vi); and

(13)    other Investments in any Person having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding not to exceed £2,500,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof).

*"Permitted Liens"* means:

(1)     Liens securing Indebtedness of Eco-Bat Technologies or any of its Restricted Subsidiaries;

(2)     Liens in favor of the Company or any Restricted Subsidiary;

(3)     Liens on property of a Person existing at the time such Person is merged with or into or consolidated with Eco-Bat Technologies or any Restricted Subsidiary of Eco-Bat Technologies; *provided* that such Liens were in existence prior to the contemplation of such merger or consolidation and do not extend to any assets other than those of the Person merged into or consolidated with Eco-Bat Technologies or the Restricted Subsidiary;

(4)     Liens on property existing at the time of acquisition of the property by Eco-Bat Technologies or any Subsidiary of Eco-Bat Technologies, *provided* that such Liens were in existence prior to the contemplation of such acquisition;

(5)     Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature incurred in the ordinary course of business;

(6)     Liens to secure Indebtedness (including Capital Lease Obligations) permitted by clause (iv) of Section 2.09(b) covering only the assets acquired with such Indebtedness;

(7)     Liens existing on the Funding Date (including the extension, re-issuance or renewal of such Liens in connection with Permitted Refinancing Indebtedness);

(8)     Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded, *provided* that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

(9)      Liens with respect to any interest or title of a lessor under any Capital Lease Obligations permitted to be incurred under this Agreement; *provided*, that such Liens do not apply to any property or assets which is not leased property subject to such Capital Lease Obligation.

(10)      Liens arising from a retention of title over goods delivered to Eco-Bat Technologies or a Restricted Subsidiary of Eco-Bat Technologies where that retention of title arises under the standard business terms of business of the supplier of goods;

(11)      Liens incurred in the ordinary course of business of Eco-Bat Technologies or any Restricted Subsidiary of Eco-Bat Technologies with respect to obligations that do not exceed £2,500,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof) at any one time outstanding;

(12)      Liens on assets of Unrestricted Subsidiaries that secure Non-Recourse Debt of Unrestricted Subsidiaries; and

(13)      Liens securing all of the Loans.

*"Permitted Quarterly Tax Distributions"* means quarterly distributions of Tax Amounts determined by a Tax Accountant on the basis of the estimated taxable income of the U.S. Pass-Through Restricted Subsidiaries for the related Estimation Period, *provided however,* that prior to any distributions of Tax Amounts the Company shall deliver an Officer's Certificate certifying that the Tax Amounts to be distributed were determined pursuant to the terms of this Agreement and stating to the effect that the Company, Eco-Bat Technologies and its U.S. Restricted Subsidiaries as set forth on such certification qualify as qualified subchapter S subsidiaries, pass-through or disregarded entities for US federal income tax purposes.

*"Permitted Refinancing Indebtedness"* means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)      the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, refinanced, renewed, replaced, defeased or refunded (*plus* all accrued interest on the Indebtedness and the amount of all expenses and premiums incurred in connection therewith);

(2)      such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded;

(3)      if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of payment to the Loans, such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and is subordinated in right of payment to, the Loans on terms at least as favorable to the Lenders as those

contained in the documentation governing the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded; and

(4) such Indebtedness is incurred either by the Company or by the Restricted Subsidiary who is the obligor on the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

*"Person"* means any individual, group, corporation, company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or governmental or other entity.

*"Preference Shares"* means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's preferred or preference equity, whether now outstanding or issued after the Funding Date, including, without limitation, all series and classes of such preferred shares or preference shares.

*"Principal"* means Howard M. Meyers.

*"Proceeds Distribution"* means the dividend, loans, distribution, loan repayment or other payment to the shareholders of the Company out of the proceeds of the Loans made on the Funding Date .

*"Qualified Redomestication Transaction"* means any transaction or series of related transactions, whether effected by way of merger, consolidation, amalgamation, share exchange, sale of assets, or otherwise, which is undertaken by the Company in order to change its jurisdiction of incorporation, formation, or domicile.

*"Related Business Assets"* means assets (other than cash or Cash Equivalents) used or useful in a Permitted Business; *provided* that any assets received by Eco-Bat Technologies or a Restricted Subsidiary in exchange for assets transferred by Eco-Bat Technologies or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

*"Related Party"* means:

(1) any controlling shareholder, 80% (or more) owned Subsidiary, or immediate family member (in the case of an individual) of the Principal;

(2) any trust, corporation, partnership or other entity, the beneficiaries, shareholders, partners, owners or Persons beneficially holding 80% or more interest consisting of the Principal and/or such other Persons referred to in the immediately preceding clause (1); or

(3) the executor, administrator, testamentary trustee, heir, legatee or beneficiary of the Principal and/or such other Persons referred to in clause (1) of this definition.

*"Responsible Officer,"* when used with respect to the Administrative Agent, means any officer within the  Administrative Agent (or any successor group of the Administrative Agent) or any other officer of the Administrative Agent customarily performing functions similar to those performed by any of the above designated officers and also means any other

16

officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

*"Restricted Investment"* means an Investment other than a Permitted Investment.

*"Restricted Subsidiary"* of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

*"SEC"* means the United States Securities and Exchange Commission.

*"Senior Notes"* means the 10⅛% Senior Notes due 2013 of Eco-Bat Finance PLC.

*"Share Capital"* means:

(1)     in the case of a corporation, any and all shares, interest, rights to purchase, warrants, options, participations, or other equivalent (however designated and whether or not voting) of, or interests in, share capital or capital stock (including Preference Shares);

(2)     in the case of an association or business entity, any and all shares, interests, rights to purchase, warrants, options, participations, rights or other equivalents (however designated) of share capital or capital stock;

(3)     in the case of a partnership or limited liability company, rights to purchase, warrants, options, partnership, participation or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

*"Significant Subsidiary"* means any Subsidiary which meets any of the following conditions:

(1)     the Company and its Restricted Subsidiaries' investments in and advances to such Subsidiary exceed ten percent (10%) of the total consolidated assets of the Company as of the end of the most recently completed financial year; or

(2)     the Company and its Restricted Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of such Subsidiary exceeds ten percent (10%) of the total consolidated assets of the Company as of the end of the most recently completed financial year; or

(3)     the Company and its Restricted Subsidiaries' equity in the consolidated income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle of such Subsidiary exceeds ten percent (10%) of such consolidated income of the Company for the most recently completed financial year.

*"South African Group"* means those direct or indirect Subsidiaries of Eco-Bat Technologies primarily operating in South Africa, which as of the Funding Date include Zimco Group (Pty) Ltd, Fry's Metals (Pty) Ltd, Castle Leadworks (Transvaal) (Pty) Ltd, Zinchem (Pty) Ltd, Zimco Minerals & Chemicals (Pty) Ltd, African Zinc Mills (Pty) Ltd, Associated Additives (Pty) Ltd, Zimco Aluminium Company (Pty) Ltd, Dutton Plastics Engineering (Pty) Ltd, Zinc Process (Pty) Ltd, Zimco Metals (Pty) Ltd, G&W Base &

17

Industrial Minerals (Pty) Ltd, Lantern Trust (Pty) Ltd, G&W Minerals Mozambique Limtada, G&W Minerals Namibia (Pty) Limited, Orniz Plastic (Pty) Ltd, Orniz Rubber (Pty) Ltd, South African Ferrous and Non-Ferrous Company (Pty) Ltd, Dwaalboom Mining (Pty) Ltd, Matsopa Minerals (Pty) Ltd, Taai Sands Properties (Pty) Ltd, Masala Mining (Pty) Ltd, Bendeplaas Mining (Pty) Ltd, Mioxide Mining (Pty) Ltd, Sondor Industries (Pty) Ltd, Resillo (Pty) Ltd, Sondor Properties (Pty) Ltd, Sondor Manufacturing (Pty) Ltd, Allan McKinnon and Associates (Pty) Ltd, Leehock Properties (Pty) Ltd, Darmag Limited and Sondor Industries Zimbabwe (Pty) Ltd.

*"Specified Non-Cash Interest"* means any non-cash interest payable (and then paid in non-cash) and amortization of any original issue discount, if any, on the Loans.

*"Stated Maturity"* means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the payment of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and shall not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

*"Subsidiary"* means, with respect to any specified Person:

(1)     any corporation or company, association or other business entity of which more than 50% of the total voting power of shares of Share Capital entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of such Person or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

*"Tax"* means any tax, duty, levy, impost, assessment or other governmental charge (including penalties and interest related thereto). "*Taxes*" and "*Taxation*" shall be construed accordingly.

*"Tax Amounts"* with respect to any taxable period shall not exceed an amount equal to (1) the product of (a) the U.S. federal taxable income of the U.S. Pass-Through Restricted Subsidiaries for such period reduced by any tax losses arising in any prior taxable period, or portion thereof, commencing on or after the Funding Date and not yet taken into account, as determined by the Tax Accountant and computed as if such U.S. Pass-Through Restricted Subsidiaries were members of a consolidated group for U.S. federal income tax purposes, and (b) the Tax Percentage, reduced by (2) the aggregate of (a) any tax credits of the U.S. Pass-Through Restricted Subsidiaries arising in any prior taxable period, or portion thereof, commencing on or after the Funding Date and not yet taken into account and (b) any state, local or franchise tax liabilities imposed upon the Company or the U.S. Pass-Through Restricted Subsidiaries.

*"Tax Accountant"* means a nationally recognized certified public accounting firm in the U.S.

"*Tax Percentage*" means, for a particular taxable period, the weighted average combined tax rate that would have applied if the U.S. Pass-Through Restricted Subsidiaries were taxed as corporations for U.S. federal, state and local income and franchise tax purposes.

"*True-up Amount*" means, in respect of a particular taxable year, an amount determined by the Tax Accountant equal to the difference between (i) the aggregate Permitted Quarterly Tax Distributions actually distributed in respect of such taxable year and (ii) the actual Tax Amounts for such year.  The amount equal to the excess, if any, of the amount described in clause (i) over the amount described in clause (ii) above shall be referred to as the "True-up Amount due to the Company" and the excess, if any, of the amount described in clause (ii) over the amount described in clause (i) above shall be referred to as the "True-up Amount due to the holders of Equity Interests."

"*True-up Determination Date*" means the date on which the Tax Accountant delivers a statement to the Administrative Agent indicating the True-up Amount.

"*Unrestricted Subsidiary*" means any Subsidiary of the Company that is designated by the Board of Directors of the Company as an Unrestricted Subsidiary pursuant to a resolution of the Board of Directors of the Company, but only to the extent that such Subsidiary:

(1)      has no Indebtedness other than Non-Recourse Debt, unless at the time of such designation or subsequently, the aggregate principal amount of such Non-Recourse Debt is deemed to be a Restricted Investment made in accordance with Section 2.07;

(2)      is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidiary of the Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3)      is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results;

(4)      does not guarantee or otherwise directly or indirectly provide credit support for any Indebtedness of the Company or any of its Restricted Subsidiaries; and

(5)      has at least one director on its Board of Directors that is not a director or executive officer of the Company or any of its Restricted Subsidiaries and has at least one executive officer that is not a director or executive officer of the Company or any of its Restricted Subsidiaries.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the preceding conditions and was permitted by Section 2.07.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it

shall thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness of such Subsidiary shall be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be incurred as of such date under Section 2.09, the Company shall be in default of such covenant.  The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that such designation shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary and such designation shall only be permitted if (1) such Indebtedness is permitted under Section 2.09, calculated on a pro forma basis as if such designation had occurred at the beginning of the four-quarter reference period and (2) no Default or Event of Default would be in existence following such designation.

*"U.S. Exchange Act"* means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

*"U.S. GAAP"* means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Funding Date.

*"U.S. Pass-Through Restricted Subsidiaries"* means U.S. Restricted Subsidiaries that qualify as pass-through or disregarded entities for U.S. federal income tax purposes.

*"U.S. Restricted Subsidiaries"* means Restricted Subsidiaries of the Company created or organized in the United States or under the law of the United States or of any State of the United States.

*"U.S. Securities Act"* means the U.S. Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder, as amended.

*"Voting Stock"* of any Person as of any date means the Share Capital of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

*"Weighted Average Life to Maturity"* means, when applied to any Indebtedness at any date, the number of years obtained by *dividing*:

(1)      the sum of the products obtained by *multiplying* (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2)      the then outstanding principal amount of such Indebtedness.

*"Wholly-Owned Restricted Subsidiary"* of any specified Person means a Restricted Subsidiary of such Person all of the outstanding Share Capital or other ownership interests of which (other than directors' qualifying shares) will at the time be owned by such Person or by one or more Wholly-Owned Restricted Subsidiaries of such Person and one or more Wholly-Owned Restricted Subsidiaries of such Person.

20

**SECTION 1.02.        Other Definitions**

| Term | Section |
|------|---------|
| *"Affiliate Transaction"* | 2.11 |
| *"Asset Sale Offer"* | 2.10 |
| *"Change of Control Offer"* | 2.15 |
| *"Change of Control Payment"* | 2.15 |
| *"Change of Control Payment Date"* | 2.15 |
| *"Event of Default"* | 4.01 |
| *"Excess Proceeds"* | 2.10 |
| *"Excluded Tax"* | 2.20 |
| *"incur"* | 2.09 |
| *"Offer Amount"* | 2.10 |
| *"Offer Period"* | 2.10 |
| *"Payer"* | 2.20 |
| *"Payment Default"* | 4.01 |
| *"Permitted Debt"* | 2.09 |
| *"Purchase Date"* | 2.10 |
| *"Relevant Taxing Jurisdiction"* | 2.20 |
| *"Restricted Payments"* | 2.07 |
| *"Surviving Entity"* | 3.01 |

Capitalized terms used in this Annex 1 and not otherwise defined herein shall have the same meaning ascribed to such terms in this Agreement.

In this Annex 1, unless indicated otherwise, references to Articles, Sections, or Subsections, are to Articles, Sections or Subsections of this Annex 1.

**ARTICLE II**
**COVENANTS**

**SECTION 2.01.**        [Reserved].

**SECTION 2.02.**         [Reserved]

**SECTION 2.03.**        Reports.

(a)        So long as the Loan is outstanding, the Company shall furnish to the Lenders and the Administrative Agent and make available to potential investors:

(i)        within 120 days after the end of each financial year of Eco-Bat Technologies, (A) information substantially similar to that which would be required to be included by Eco-Bat Technologies in an Annual Report on Form 20-F under the U.S. Exchange Act by a foreign private issuer; *provided,* that the report shall not be required to include any reconciliation of any line items to U.S. GAAP; (B) a report stating the number of shares of Share Capital of Eco-Bat Technologies outstanding and the number of such shares held by the Company; (C) a report stating the aggregate principal amount of Loans outstanding as of the end of such financial year; and (D) if the Company is required by regulation or rules of any exchange on which its securities are then listed to prepare financial statements or reports, copies of all such financial statements or reports;

(ii)        within 60 days after the end of each of the first three financial quarters in each financial year of Eco-Bat Technologies, all quarterly financial statements that would be required by Form 10-Q under the U.S. Exchange Act if Eco-Bat Technologies were required to prepare and file such form; provided, that the report shall not be required to include any reconciliation of any line items to U.S. GAAP, together with the information in relation to Eco-Bat Technologies described in Item 5 of Form 20-F under the U.S. Exchange Act (i.e., Management's Discussion and Analysis of Financial Condition and Results of Operations) with respect to such period; and

(iii)        within 10 business days and in accordance with the general instructions to Form 8-K under the U.S. Exchange Act, all information that would be required by Form 8-K if Eco-Bat Technologies were required to prepare and file such form.

(b)        If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries and such Subsidiaries are Significant Subsidiaries of Eco-Bat Technologies, then the quarterly and annual financial information required by the preceding paragraph shall include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of Eco-Bat Technologies and its Restricted Subsidiaries separate from the financial condition and results of operations of the Unrestricted Subsidiaries.

22

**SECTION 2.04.        Compliance Certificate.**

(a)    The Company shall deliver to the Administrative Agent, within 90 days after the end of each fiscal year, an Officer's Certificate stating that a review of the activities of such entity and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Agreement, and further stating, as to the Officer signing Officer's Certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Agreement and is not in default in the performance or observance of any of the terms, provisions and conditions of this Agreement (or, if a Default or Event of Default shall have occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Loans is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)    The year-end financial statements delivered pursuant to Section 2.03(a) above shall be accompanied by a written statement of the Company's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that the Company or its Restricted Subsidiaries has violated any provisions of Article 2 or Article 3 hereof or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable directly or indirectly to any Person for any failure to obtain knowledge of any such violation. It is hereby acknowledged by the Administrative Agent that, in connection with the delivery of the aforementioned written statements, it, and any other addressee of such written statements may be required by the Company's independent public accountants to execute an engagement letter or similar instrument, which engagement letter or instrument may include customary limitations on the liability of the Company's accountants in connection with such statements.

(c)    The Company shall, so long as any of the Loans are  outstanding, deliver to the Administrative Agent, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

**SECTION 2.05.        Taxes.**

Eco-Bat Technologies shall pay, and shall cause each of its Restricted Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Lenders.

**SECTION 2.06.        Stay, Extension and Usury Laws.**

The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and the

LO\347440.6

Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Administrative Agent, but shall suffer and permit the execution of every such power as though no such law has been enacted.

**SECTION 2.07.      Restricted Payments.**

(a)      The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly (all such payments and other actions set forth in the immediately following clauses (i) through (iv) below being collectively referred to as *"Restricted Payments"*):

(i)      declare or pay any dividend or make any other payment or distribution on account of the Company's Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or dividends or distributions payable to the Company or a Restricted Subsidiary of the Company),

(ii)      purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company,

(iii)      make any prepayment of principal on, or purchase, redeem, defease or otherwise acquire or retire for value, in each case prior to the Stated Maturity thereof, any Indebtedness that is subordinated in right of payment to the Loans (excluding prepayments of intercompany Indebtedness to the extent such payments are paid to the Company and any of its Restricted Subsidiaries), or

(iv)      make any Restricted Investment.

(b)      Notwithstanding the foregoing, the Company or any Restricted Subsidiary may make a Restricted Investment (other than an Investment in any parent company of the Company) if at the time of, and after giving effect to, such Restricted Investment:

(i)      no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Investment; and

(ii)      the Company would, at the time of such Restricted Investment and after giving pro forma effect thereto as if such Restricted Investment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least £1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.09(a); and

(iii) such Restricted Investment, together with the aggregate amount of all other Restricted Investments made by the Company and its Restricted Subsidiaries after the Funding Date (excluding Restricted Payments permitted by clauses (ii), (iv) and (vi) of Section 2.07(c)), is less than the sum, without duplication, of:

(A) 50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from January 1, 2007 to the end of the Company's most recently ended financial quarter for which financial statements are available to Lenders at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit); *plus*

(B) 100% of the aggregate net cash proceeds received by the Company since the Funding Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Company that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Company); *plus*

(C) to the extent that any Restricted Investment that was made after the Funding Date is sold for cash or otherwise liquidated or repaid for cash, the lesser of (i) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any, including any Taxes payable as a result of such disposition) and (ii) the initial amount of such Restricted Investment; *plus*

(D) 50% of any cash dividends received after the Funding Date by the Company or a Restricted Subsidiary of the Company from an Unrestricted Subsidiary of the Company, to the extent that such dividends are not otherwise included in Consolidated Net Income of the Company for such period; *plus*

(E) to the extent that any Unrestricted Subsidiary of the Company that is designated as an Unrestricted Subsidiary after the Funding Date is redesignated as a Restricted Subsidiary after the Funding Date, the lesser of (i) the Fair Market Value of the Company's Investment in such Subsidiary as of the date of redesignation or (ii) such Fair Market Value as of the date on which such Subsidiary was originally

25

designated as an Unrestricted Subsidiary plus the amount of any subsequent Investments of the Company in such Subsidiary prior to redesignation; *plus*

(F)    £8,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof).

(c)    So long as no Default has occurred and is continuing or would be caused thereby (except for clauses (iv) and (v) below, as to which such requirement shall not apply), the preceding provisions will not prohibit:

(i)    the voluntary prepayment, redemption, repurchase, retirement, defeasance or other acquisition or retirement for value of any Equity Interests of the Company in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than Disqualified Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such voluntary prepayment, redemption, repurchase, retirement, defeasance or other acquisition will be excluded from Section 2.07(b)(iii)(B);

(ii)    the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of the Company or any Subsidiary of the Company held by any employee or director of the Company or any of its Subsidiaries pursuant to any management equity subscription agreement, stock option agreement, employment agreement or similar agreement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed £250,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof) in any twelve-month period;

(iii)    Investments made out of net cash proceeds of the substantially concurrent issuance or sale of, or made by conversion into or exchange for, Equity Interests of the Company (other than Disqualified Stock and other than Equity Interests of the Company sold to a Subsidiary of the Company) or a substantially concurrent contribution to the equity capital (other than Disqualified Stock) of the Company from one or more of its shareholders); *provided* that the amount of any such net cash proceeds that are utilized for any such Investment will be excluded from Section 2.07(b)(iii)(B);

(iv)    the repayment of all amounts outstanding under and pursuant to the 10% Senior PIK Notes due 2015 (including any associated early repayment premium, accrued interest and any other fees outstanding thereunder) and making the Proceeds Distribution within 10 Business Days of the Funding Date; and

(v)    the payment of Permitted Quarterly Tax Distributions to the holders of Equity Interests in the Company as described in Sections 2.07(d), (e) and (f).

(d)    If the Company is a qualified subchapter S subsidiary, pass-through or disregarded entity for U.S. federal income tax purposes and any of its Restricted Subsidiaries

is a U.S. Pass-Through Restricted Subsidiary and, in each case, there is an Opinion of Counsel or an opinion of a Tax Accountant to such effect, a copy of which has been delivered to the Administrative Agent, the Company may make distributions to holders of its Equity Interests during each Quarterly Payment Period, in an aggregate amount not to exceed the Permitted Quarterly Tax Distribution with respect to the Company and any U.S. Pass-Through Restricted Subsidiary in respect of the related Estimation Period. If any portion of a Permitted Quarterly Tax Distribution is not distributed during such Quarterly Payment Period, subsequent Permitted Quarterly Tax Distributions shall be increased by such undistributed portion.

(e)　　　Notwithstanding the foregoing, Permitted Quarterly Tax Distributions permitted under clause (v) above may be made regardless of whether a Default has occurred and is continuing or would occur as a consequence of such payment.

(f)　　　Within 30 days following the filing by Eco-Bat Technologies with the U.S. Internal Revenue Service of Form 1065 or other comparable form for the immediately preceding taxable year, the Tax Accountant shall file with the Administrative Agent a written statement indicating in reasonable detail the calculation of the True-up Amount. In the case of a True-up Amount due to holders of Equity Interests, the Permitted Quarterly Tax Distribution payable during the immediately following Quarterly Payment Period shall be increased by such True-up Amount.  In the case of a True-up Amount due to the Company, the Permitted Quarterly Tax Distribution payable during the immediately following Quarterly Payment Period shall be reduced by such True-up Amount and the excess, if any, of such True-up Amount over such Permitted Quarterly Tax Distribution shall be applied to reduce the immediately following Permitted Quarterly Tax Distributions until such True-up Amount is entirely offset.

(g)　　　The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the assets or securities proposed to be transferred or issued by the Company or such Subsidiary, as the case may be, pursuant to the Restricted Payment.  The Board of Directors' determination must be based upon an opinion or appraisal issued by an accounting, appraisal or investment banking firm of national standing if the Fair Market Value exceeds £5,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof).  Not later than the date of making any Restricted Payment, the Company shall deliver to the Administrative Agent an Officer's Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by Section 2.07 were computed, together with a copy of any fairness opinion or appraisal required by this Agreement.

## SECTION 2.08.　　　Dividend and Other Payment Restrictions Affecting Subsidiaries

(a)　　　The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)　　　pay dividends or make any other distributions on its Share Capital to the Company or any of its Restricted Subsidiaries, or pay any indebtedness owed to the Company or any of its Restricted Subsidiaries;

(ii)　　　make loans or advances to the Company or any of its Restricted Subsidiaries; or

(iii)    transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries.

(b)    However, the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of:

(i)    agreements governing Existing Indebtedness (including the Senior Notes) and Credit Facilities as in effect on the Funding Date and any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of those agreements, *provided* that the amendments, modifications, restatements, renewals, increases, supplements, refundings, replacement or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Funding Date;

(ii)    agreements governing Indebtedness and Credit Facilities not in effect on the Funding Date and incurred pursuant to clause (1) of the second paragraph of the covenant "Incurrence of Indebtedness and Issuance of Preferred Stock," *provided* that the Board of Directors of the Company determines in good faith that the encumbrances or restrictions under, or by reason of, such agreements are not materially more restrictive, taken as a whole, than the encumbrances and restrictions contained in agreements governing Indebtedness and Credit Facilities as in effect on the issue date of the Senior Notes, such determination to be evidenced by a resolution of the Board of Directors of the Company and delivered to the Administrative Agent;

(iii)    this Agreement and the indenture governing the Exchange Notes;

(iv)    applicable law;

(v)    any instrument governing Indebtedness or Share Capital of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Share Capital was incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired, *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Agreement to be incurred;

(vi)    customary non-assignment provisions in leases entered into in the ordinary course of business and consistent with past practices;

(vii)    purchase money obligations for property acquired in the ordinary course of business that impose restrictions on that property of the nature described in clause (iii) of Section 2.08(a);

(viii)    any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending its sale or other disposition;

(ix)    Permitted Refinancing Indebtedness, *provided* that the restrictions contained in the agreements governing such Permitted Refinancing Indebtedness are no more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced;

(x)    Liens securing Indebtedness otherwise permitted to be incurred under the provisions of Section 2.12 that limit the right of the debtor to dispose of the assets subject to such Liens;

(xi)    provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agreements (including any escrow arrangements entered into in connection therewith), stock sale agreements and other similar agreements entered into in the ordinary course of business or not otherwise prohibited by the terms of this Agreement;

(xii)    restrictions on cash or other deposits or net worth imposed by leases or by customers under contracts entered into in the ordinary course of business; and

(xiii)    any encumbrances or restrictions required by any governmental, local or regulatory authority having jurisdiction over the Company or any of its Restricted Subsidiaries or any of their businesses in connection with any development grant made or other assistance provided to the Company or any of its Restricted Subsidiaries by such governmental authority.

**SECTION 2.09.    Incurrence of Indebtedness and Issuance of Preferred Stock.**

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, *"incur"*) any Indebtedness (including Acquired Debt), and the Company shall not issue any Disqualified Stock and shall not permit any of its Restricted Subsidiaries to issue any shares of preferred stock or Preference Shares; *provided, however*, that Eco-Bat Technologies and its Restricted Subsidiaries and Finance Subsidiaries may incur Indebtedness (including Acquired Debt) or issue Disqualified Stock, if the Fixed Charge Coverage Ratio for the Company's most recently ended four full financial quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock is issued would have been at least 2.5 to 1, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or the Disqualified Stock had been issued, as the case may be, at the beginning of such four-quarter period (and assuming the redemption in full of all of the outstanding 10% PIK Senior Notes due 2015 if such redemption has occurred or if an irrecovable notice of redemption has then been sent).

(b)    Section 2.09(a) will not prohibit the incurrence of any of the following items of Indebtedness (collectively, *"Permitted Debt"*):

(i)    the incurrence by Eco-Bat Technologies and any of its Restricted Subsidiaries (other than the Company or Finance Subsidiaries) of

Indebtedness and Letters of Credit under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (i) (with Letters of Credit being deemed to have a principal amount equal to the maximum potential liability of Eco-Bat Technologies and its Subsidiaries thereunder) not to exceed the greater of (x) £125,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof), *less* the aggregate amount of all Net Proceeds of Asset Sales applied by Eco-Bat Technologies or any of its Restricted Subsidiaries since the Funding Date to repay any term Indebtedness under a Credit Facility or to repay any revolving credit Indebtedness under a Credit Facility and effect a corresponding commitment reduction thereunder pursuant to Section 2.10; or (y) the amount of the Borrowing Base as of the date of such incurrence;

(ii)     the incurrence by Eco-Bat Technologies and its Restricted Subsidiaries of the Existing Indebtedness (including the Senior Notes);

(iii)     the incurrence by the Company of Indebtedness represented by the Loans to be issued on the Funding Date and the incurrence of Indebtedness represented by accrued interest on such Loans and the issuance of any Exchange Notes in exchange therefor and the incurrence of Indebtedness represented by accrued interest on such Exchange Notes;

(iv)     the incurrence by Eco-Bat Technologies or any of its Restricted Subsidiaries (other than Finance Subsidiaries) of Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property, plant or equipment used in the business of Eco-Bat Technologies or such Restricted Subsidiary, in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Indebtedness incurred pursuant to this clause (iv), not to exceed, at any time outstanding, the sum of (A) £5,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof) and (B) the aggregate principal amount of all such Indebtedness outstanding as of the Funding Date;

(v)     the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to refund, refinance or replace Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be incurred under Section 2.09(a) or under clause (ii) (other than Existing Indebtedness represented by Capital Lease Obligations, mortgage financings or purchase money obligations) or clause (iii) of Section 2.09(b);

(vi)     the incurrence by Eco-Bat Technologies or any of its Restricted Subsidiaries (other than any Finance Subsidiary) of intercompany Indebtedness between or among Eco-Bat Technologies and any of its Restricted Subsidiaries; *provided, however*, that any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than Eco-Bat Technologies or such a Restricted Subsidiary, and (y) any sale or other transfer of any such Indebtedness to a Person that is not either Eco-Bat Technologies or such a Restricted Subsidiary; shall be deemed,

LO\347440.6

in each case, to constitute an incurrence of such Indebtedness by Eco-Bat Technologies or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (vi);

(vii)    any Hedging Obligations of Eco-Bat Technologies or any of its Restricted Subsidiaries (other any Finance Subsidiary) entered into in the ordinary course of business to hedge or mitigate risks to which Eco-Bat Technologies or any such of its Restricted Subsidiaries is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes;

(viii)    the guarantee by Eco-Bat Technologies or any of the Restricted Subsidiaries of Indebtedness of Eco-Bat Technologies or a Restricted Subsidiary of Eco-Bat Technologies that was permitted to be incurred by another provision of this covenant;

(ix)    the incurrence by Eco-Bat Technologies or any of its Restricted Subsidiaries (other than any Finance Subsidiary) of Indebtedness of Eco-Bat Technologies or a Restricted Subsidiary of Eco-Bat Technologies arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business, or arising from financial assurance maintenance requirements in governmental permits and authorisations, or tender, bid, performance (including environmental bonds), government contract, surety or appeal bonds, trade letters of credit or documentary letters of credit, in each case, to the extent incurred in the ordinary course of business of Eco-Bat Technologies or such Restricted Subsidiary; and

(x)    the incurrence by Eco-Bat Technologies or any of its Restricted Subsidiaries (other than any Finance Subsidiary) of additional Indebtedness in an aggregate principal amount (or accreted value, as applicable) at any time outstanding, not to exceed £10,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof).

(c)    The accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, and the payment of dividends on Disqualified Stock in the form of additional shares of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified Stock for purposes of this covenant; *provided*, in each such case, that the amount thereof is included in Fixed Charges of Eco-Bat Technologies as accrued.

(d)    For purposes of determining compliance with this Section 2.09, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) though (x) of Section 2.09(b), or is entitled to be incurred pursuant to Section 2.09(a), the Company will be permitted to classify such item of Indebtedness on the date of its incurrence or on subsequent dates in any manner that complies with this Section 2.09. Notwithstanding the foregoing, Indebtedness under Credit Facilities outstanding on the Funding Date will be deemed to have been incurred on such date in reliance on the exception provided by clause (i) of Section 2.09(b).

**SECTION 2.10.    Asset Sales.**

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(i)    The Company or the Restricted Subsidiary, as the case may be, receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests issued or sold or otherwise disposed of; and

(ii)    at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash. For purposes of this provision, each of the following will be deemed to be cash:

(A)    any liabilities, as shown on the Company's or such Restricted Subsidiary's most recent consolidated balance sheet, of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Loans) that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Company or such Restricted Subsidiary from further liability; and

(B)    any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transferee that within 30 days are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents, to the extent of the cash or Cash Equivalents received in that conversion.

(b)    Within 360 days after the receipt of any Net Proceeds from an Asset Sale, the Company or its Restricted Subsidiaries may apply those Net Proceeds at its option:

(i)    to repay Indebtedness of its Restricted Subsidiaries and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto;

(ii)    to acquire all or substantially all of the assets of, or a majority of the Voting Stock of, another Permitted Business that, upon consummation of such acquisition, becomes a Restricted Subsidiary;

(iii)    to make a capital expenditure; or

(iv)    to acquire other long-term assets that are used or useful in a Permitted Business.

(c)    Pending the final application of any Net Proceeds, the Company may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Agreement.

(d)    Any Net Proceeds from Asset Sales that are not applied or invested as provided in Section 2.10(b) will constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds £5,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof), the Company shall make an offer (an *"Asset Sale Offer"*) to all Lenders and all holders of other Indebtedness that is *pari passu* with the Loans containing provisions similar to those set forth in this Agreement with respect to offers to purchase or redeem with the proceeds of sales of assets to purchase the maximum principal amount of Loans and such other *pari passu* Indebtedness that may be purchased out of the Excess Proceeds. The offer price in any Asset Sale Offer shall be equal to 100% of principal amount plus accrued and unpaid interest thereon, if any, to the date of repayment, and will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Agreement. If the aggregate principal amount of the Loans and other *pari passu* Indebtedness electing to accept such Asset Sale Offer exceeds the amount of Excess Proceeds, the Loans and such other *pari passu* Indebtedness electing to accept such offer shall be repaid on a pro rata basis. Upon completion of each Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

(e)    The Asset Sale Offer shall remain open for a period of 20 Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the *"Offer Period"*). No later than five Business Days after the termination of the Offer Period (the *"Purchase Date"*), the Company shall repay the principal amount of the Loans required to be repaid pursuant to this Section 2.10 hereof (the *"Offer Amount"*) or, if less than the Offer Amount has elected to be repaid, all Loans so electing in the Asset Sale Offer. Repayment of any Loans shall be made in the same manner as interest payments are made.

(f)    Upon the commencement of an Asset Sale Offer, the Company shall give notice thereof to the Administrative Agent.

(g)    The notice described in Section 2.10(g) shall contain all instructions and materials necessary to enable Lenders to elect to have the Loan repaid pursuant to the Asset Sale Offer. The Asset Sale Offer shall be made to all Lenders. The notice, which shall govern the terms of the Asset Sale Offer, shall state:

(i)    that the Asset Sale Offer is being made pursuant to this Section 2.10 hereof and the length of time the Asset Sale Offer shall remain open;

(ii)    the Offer Amount, the purchase price and the Purchase Date;

(iii)    that any Loan whose Lender does not elect repurchase or repayment shall continue to accrete or accrue interest; and

(iv)    that, unless the Company defaults in making such payment, any Loan accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest after the Purchase Date;

**SECTION 2.11.    Transactions with Affiliates.**

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its

properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate (each, an *"Affiliate Transaction"*), unless:

        (i)     the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person;

        (ii)     the Company delivers to the Administrative Agent with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of £1,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof), a resolution of the Board of Directors of the Company set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with this covenant and that such Affiliate Transaction has been approved by a majority of the members of the Board of Directors of the Company; and an opinion as to the fairness to the Company and its Restricted Subsidiaries of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of national standing.

      (b)     The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisions of Section 2.11(a):

        (i)     any employment agreement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business and consistent with the past practice of the Company or such Restricted Subsidiary, including any indemnity and similar arrangements provided on behalf of directors, officers and employees of the Company or its Restricted Subsidiaries;

        (ii)     transactions between or among the Company and/or its Restricted Subsidiaries;

        (iii)     transactions with a Person that is an Affiliate of the Company or a Restricted Subsidiary solely because the Company or a Restricted Subsidiary owns an Equity Interest in, or controls, such Person;

        (iv)     payment of reasonable directors fees to Persons who are not otherwise Affiliates of the Company;

        (v)     sales of Equity Interests (other than Disqualified Stock) to Affiliates of the Company;

        (vi)     Permitted Investments and Restricted Payments that are permitted by Section 2.07; and

        (vii)     transactions pursuant to agreements in effect on the Funding Date and transactions pursuant to any amendment, modification or extension to such agreements, so long as such amendment, modification or extension is not materially more disadvantageous to the Lenders, as determined in good

faith by the Board of Directors of the Company, than the original agreements in effect on the Funding Date;

(viii)    any issuance of securities and options, or other payments, awards or grants in cash, securities or otherwise, in each case pursuant to service agreements, employment agreements, share option plans, share ownership plans or other similar benefit plans;

(ix)    payment of any Taxes required as a result of being a member of a group filing a consolidated or combined return for the purpose of the payment of such Taxes;

(x)    any purchases or sales, or other acquisitions or dispositions, of goods or services in the ordinary course of business and consistent with past practice which are on terms no less favorable as might reasonably have been obtained at such time from an unaffiliated party, in each case, in the reasonable determination of the Board of Directors of the Company;

(xi)    consummation of the Proceeds Distribution and any other payment made in connection with the Loan on the Funding Date and the use of proceeds therefrom, including but not limited to the payment of all fees, expenses and other amounts paid or to be paid in connection therewith; and

(xii)    the repayment or redemption or repurchase of the Preference Shares of Eco-Bat Technologies in accordance with their terms.

**SECTION 2.12.    Liens.**

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, create, incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind in respect of borrowed money (other than Permitted Liens) upon any of their property or assets, now owned or hereafter acquired, unless all payments due under this Agreement and the Loans are (1) secured on an equal and ratable basis with the obligations so secured, or (2) with respect to any such Lien securing Indebtedness subordinated in right of payment due under this Agreement and the Loans, secured on a senior or first priority basis with the obligations so secured, in each case, until such time as such obligations are no longer secured by a Lien.

**SECTION 2.13.    Business Activities.**

The Company shall not, and shall not permit any Restricted Subsidiary to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

**SECTION 2.14.    Corporate Existence.**

Subject to Article 3 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) its corporate existence, and the corporate, partnership or other existence of each of its Restricted Subsidiaries, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Restricted Subsidiary; and (ii) the rights (charter and

statutory), licenses and franchises of the Company and its Restricted Subsidiaries; *provided, however,* that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Restricted Subsidiaries, if the Board of Directors of the Company shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Lenders.

**SECTION 2.15.        Change of Control.**

(a)        If a Change of Control occurs, the Company must offer (a *"Change of Control Offer"*) to repay the entire amount of the Loans for cash at a price equal to 101% (or, with respect to the Change of Control set forth in clause (6) of the definition of "Change of Control", 100%) of the aggregate principal amount of Loans repaid plus accrued and unpaid interest on the Loan repaid, to the date of purchase. Within 60 days following any Change of Control, the Company shall mail a notice to each Lender describing the transaction or transactions that constitute the Change of Control (including information with respect to pro forma historical income, cash flow and capitalization, in each case, after giving effect to such Change of Control) and offering to repay the Loans on the Change of Control payment date specified in the notice (the *"Change of Control Payment Date"*), which date shall be no earlier than 30 days and no later than 60 days from the date such notice is given to Lenders, pursuant to the procedures required by this Agreement and described in such notice.

(b)        [Reserved]

(c)        Upon the commencement of a Change of Control Offer, the Company shall give notice thereof to the Administrative Agent.

(d)        The notice shall contain all instructions and materials necessary to enable such Lenders to  have their Loans repaid pursuant to the Change of Control Offer. The notice, which shall govern the terms of the Change of Control Offer, shall:

(i)        state that the Change of Control Offer is being made pursuant to this Section 2.15 hereof and the length of time the Change of Control Offer shall remain open;

(ii)        describe the transaction or transactions that constitute the Change of Control and the relevant facts regarding the Change of Control (including information with respect to pro forma historical income, cash flow and capitalization, in each case, after giving effect to such Change of Control);

(iii)        state the price and the date of repayment; and

(iv)        state that, unless the Company defaults in making such payment, any Loan accepted for payment pursuant to the Change of Control Offer shall cease to accrete or accrue interest after the date of repayment.

(e)        The Company will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements of this Section 2.15 applicable to a Change of Control Offer made by the Company.

LO\347440.6

**SECTION 2.16.**     **Limitation on Sale and Leaseback Transactions**

(a)     The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any sale and leaseback transaction with a Person other than the Company or one of its Restricted Subsidiaries; *provided* that the Company or any Restricted Subsidiary may enter into a sale and leaseback transaction with a Person other than the Company or one of its Restricted Subsidiaries if:

(i)     the Company or that Restricted Subsidiary, as applicable, could have incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction under Section 2.09;

(ii)     the gross cash proceeds of any sale and leaseback transaction in excess of £1,000,000 are at least equal to the Fair Market Value, as set forth in an Officer's Certificate delivered to the Administrative Agent, of the property that is the subject of that sale and leaseback transaction; and

(iii)     the transfer of assets in that sale and leaseback transaction is permitted by, and the Company applies the proceeds of such transaction in compliance with, Section 2.10.

**SECTION 2.17.**     **The Company**

Notwithstanding anything contained in this Agreement to the contrary, the Company shall not engage in any business activity or undertake any other activity, except any activity (i) relating to the incurrence of Indebtedness represented by the Loans, the redemption of the 10% PIK Senior Notes due 2015, the offering and issuance of the Exchange Notes, the making of the Proceeds Distribution to shareholders of the Company and distributing, lending or otherwise advancing funds to Eco-Bat Technologies or any of its other Subsidiaries and any other activities in connection therewith, (ii) undertaken with the purpose of fulfilling any other obligations under the Loan, the Exchange Notes or this Agreement or (iii) directly related to the establishment and/or maintenance of the Company' corporate existence.

**SECTION 2.18.**     **[Reserved]**

**SECTION 2.19.**     **Payments for Consent**

The Company shall not, and shall not permit any of its Subsidiaries or Affiliates to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Lender for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Agreement or the Loans unless such consideration is offered to be paid and is paid to all Lenders that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

**SECTION 2.20.**     **Designation of Restricted and Unrestricted Subsidiaries.**

The Board of Directors of the Company may designate any Restricted Subsidiary (other than a Finance Subsidiary) to be an Unrestricted Subsidiary if that designation would not cause a Default. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary properly designated will be deemed to be an

Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 2.07(b) or Permitted Investments, as determined by the Company. That designation will only be permitted pursuant to this Agreement if the Investment would be permitted at that time and if the Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. The Board of Directors may redesignate any Unrestricted Subsidiary to be a Restricted Subsidiary if the redesignation would not cause a Default. The Company may not designate a Restricted Subsidiary to be an Unrestricted Subsidiary unless it concurrently designated all Subsidiaries of such Restricted Subsidiary as Unrestricted Subsidiaries under this provision.

**SECTION 2.21.**      **Limitation on Issuances of Guarantees of Indebtedness**

The Company will not permit any of its Restricted Subsidiaries, directly or indirectly, to guarantee the payment of any other Indebtedness of the Company unless such Restricted Subsidiary simultaneously executes and delivers a supplemental instrument providing for the guarantee of the payment of the Loans by such Restricted Subsidiary, which guarantee will be senior to or *pari passu* with such Restricted Subsidiary's guarantee of such other Indebtedness.

The guarantee of a guarantor will automatically and unconditionally be released under the same conditions and circumstances under which the guarantee of other Indebtedness of the Company will be released.


# ARTICLE III
# SUCCESSORS

**SECTION 3.01.**      **Merger, Consolidation, or Sale of Assets.**

(a)      The Company may not, directly or indirectly: consolidate, merge, or amalgamate with or into another Person (whether or not the Company is the surviving corporation); or sell, assign, transfer, convey or otherwise dispose (whether by scheme of arrangement or otherwise) of all or substantially all of the business, undertaking, properties and assets of the Company and its Restricted Subsidiaries taken as a whole, in one or more related transactions, to another Person; unless:

(i)      either: (x) the Company is the surviving corporation; or (y) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation organized or existing under the laws of any member state of the European Union or any state of the United States or the District of Columbia, the Netherlands Antilles, Bermuda or the Cayman Islands (the *"Surviving Entity"*);

(ii)      immediately following such transaction, the Surviving Entity (if other than the Company) assumes all the obligations of the Company under the Loans and this Agreement pursuant to agreements reasonably satisfactory to the Administrative Agent;

      (iii)     if the Surviving Entity is the Company, the Company shall have delivered a written instrument in form satisfactory to the Administrative Agent confirming its obligations under this Agreement;

      (iv)     immediately after such transaction, no Default or Event of Default exists; and

      (v)     the Company or the Surviving Entity (if other than the Company), as the case may be, shall, on the date of such transaction after giving pro forma effect thereto and any related financing transactions as if the same had occurred on the first day of the applicable four-quarter period, be permitted to incur at least £1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 2.09(a).

      (b)     In addition, the Company may not, directly or indirectly, lease all or substantially all of its properties or assets, in one or more related transactions, to any other Person. Clause (v) of this "Merger, Consolidation or Sale of Assets" covenant will not apply to (i) a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company or any of its Restricted Subsidiaries or (ii) a Qualified Redomestication Transaction.

**SECTION 3.02.**      **Successor Corporation Substituted.**

      Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Company in accordance with Section 3.01 hereof, the successor corporation formed by such consolidation or into or with which  the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Company" shall refer instead to the successor Person of such entity), and may exercise every right and power of the Company under this Agreement with the same effect as if such successor Person had been named as the Company herein; *provided, however*, that the predecessor shall not be relieved from the obligation to pay the principal of and interest on the Loans except in the case of a sale, assignment, transfer, conveyance or other disposition of all of the Company's assets that meets the requirements of Section 3.01 hereof.

## ARTICLE IV
## DEFAULTS AND REMEDIES

**SECTION 4.01.**      **Events of Default.**

      An "*Event of Default*" occurs if:

      (a)     the Company defaults in the payment when due of interest on the Loans  and such default continues for a period of 30 days;

      (b)     the Company defaults in the payment when due of principal of or premium, if any, on the Loans when the same becomes due and payable on the Final Maturity Date, upon redemption (including in connection with an offer to purchase) or otherwise;

(c)    the Company or any of its Subsidiaries fail to comply with any of the provisions of Section 2.15 or Article 3 hereof;

(d)    the Company or any of its Subsidiaries fail to observe or perform any other covenant, representation, warranty or other agreement in this Agreement or the Loans for 60 days after notice to the Company by the Administrative Agent or the Lenders of at least 25% in principal amount of the Loans then outstanding voting as a single class to comply with certain other agreements of this Agreement;

(e)    a default occurs under any mortgage, indenture, trust deed, charge, pledge or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries) whether such Indebtedness or guarantee now exists, or is created after the Funding Date, if:

(i)    that default is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness prior to the expiration of the grace period provided in such Indebtedness on the date of such default (a *"Payment Default"*), or

(ii)    results in the acceleration of such Indebtedness prior to its Stated Maturity;

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates £15,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof) or more;

(f)    the Company or any of its Restricted Subsidiaries fails to satisfy final non-appealable judgments (not covered by insurance) for the payment of money aggregating in excess of £15,000,000 (or, to the extent non-Sterling denominated, the Sterling equivalent thereof) for all such final judgments (treating any deductibles, self-insurance or retention as not so covered) which judgments are not paid or discharged and there shall be any period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments outstanding and not paid or discharged to exceed £15,000,000 during which a stay of enforcement of such final judgment shall not be in effect; or

(g)    any of the following occurs:

(i)    the Company or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would be a Significant Subsidiary (other than Subsidiaries in the South African Group), becomes insolvent or ceases or suspends generally payment of its debts or announces an intention to do so or is (or is deemed for the purposes of any law applicable to it to be) unable to pay its debts as they fall due;

(ii)    an administrator or liquidator of the Company or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would be a Significant Subsidiary (other than

40

Subsidiaries in the South African Group), or the whole or any substantial part of the undertaking, assets and revenues of the Company or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would be a Significant Subsidiary (other than Subsidiaries in the South African Group), is appointed (or application for any such appointment is made);

     (iii)     an order is made or an effective resolution is passed for the winding up, liquidation, dissolution or for the protection from creditors of the Company or any Restricted Subsidiary that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together, would be a Significant Subsidiary (other than Subsidiaries in the South African Group);

     (iv)     any lender or creditor commences the enforcement under or pursuant to any pledge, assignment or collateral agreement of, or other security interest in, the Equity Interests of the Company or of any of its Restricted Subsidiaries; or

     (v)     any event occurs which under the laws of any relevant jurisdiction has an analogous effect to any of the events referred to in (i) to (and including) (vi) above.

**SECTION 4.02.**     **Acceleration.**

If any Event of Default (other than an Event of Default specified in clause (f) or (g) of Section 4.01 hereof) occurs and is continuing, the Administrative Agent or the Lenders of at least 25% in principal amount of the Loans then outstanding may declare the entire amount of the Loans then outstanding to be due and payable immediately. Upon any such declaration, the Loans shall become due and payable immediately. Notwithstanding the foregoing, if an Event of Default specified in clause (f) or (g) of Section 4.01 hereof occurs with respect to the Company or any Restricted Subsidiary, the entire amount of the Loans then outstanding shall be due and payable immediately without further action or notice. The Lenders of a majority in aggregate principal amount of Loan then outstanding by written notice to the Administrative Agent may on behalf of all of the Lenders rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium that has become due solely because of the acceleration) have been cured or waived.

**SECTION 4.03.**     **Other Remedies.**

If an Event of Default occurs and is continuing, the Administrative Agent may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Loans or to enforce the performance of any provision of this Agreement.

The Administrative Agent may maintain a proceeding even if it does not possess any interest in the Loan. A delay or omission by the Administrative Agent or any Lender in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

**SECTION 4.04.        Waiver of Past Defaults.**

Lenders of not less than a majority in aggregate principal amount of the Loan then outstanding by notice to the Administrative Agent may on behalf of the Lenders waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, or interest payable in cash on, the Loans (including in connection with an offer to purchase) (provided, however, that the Lenders of a majority in aggregate principal amount of the Loan then outstanding may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration). Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Agreement; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

**SECTION 4.05.        Control by Majority.**

Lenders of a majority in principal amount of the Loan then outstanding may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Administrative Agent or exercising any trust or power conferred on it.  However, the Administrative Agent may refuse to follow any direction that conflicts with law or this Agreement, that the Administrative Agent reasonably determines may be unduly prejudicial to the rights of other Lenders, that requires the Administrative Agent to incur any liability or that is not covered adequately by security and indemnity satisfactory to the Administrative Agent against any loss, liability or expense.

**SECTION 4.06.        Limitation on Suits.**

A Lender may pursue a remedy with respect to this Agreement only if:

(a)      such Lender gives to the Administrative Agent written notice of a continuing Event of Default;

(b)      the Lenders of at least 25% in principal amount of the Loan then outstanding make a written request to the Administrative Agent to pursue the remedy;

(c)      such Lender or Lenders  offer and, if requested, provide to the Administrative Agent, indemnity satisfactory to the Administrative Agent against any loss, liability or expense;

(d)      the Administrative Agent does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision, of indemnity; and

(e)      during such 60-day period the Lenders of a majority in principal amount of the Loan then outstanding do not give the Administrative Agent a direction inconsistent with the request.

A Lender may not use this Agreement to prejudice the rights of another Lender or to obtain a preference or priority over another Lender.

**SECTION 4.07.**         **[Reserved]**

**SECTION 4.08.**         **Collection Suit by Administrative Agent.**

If an Event of Default specified in Section 4.01(a) or (b) occurs and is continuing, the Administrative Agent is authorized to recover judgment in its own name and as an agent for the Lenders against the Company for the whole amount of principal of, premium and interest remaining unpaid on the Loans and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel.

**SECTION 4.09.**         **Administrative Agent May File Proofs of Claim.**

The Administrative Agent is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel) and the Lenders allowed in any judicial proceedings relative to the Company (or any other obligor upon the Loans), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent, and in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under Sections 19 and 20 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Administrative Agent, its agents and counsel, and any other amounts due the Administrative Agent under Sections 18, 19 and 20 of this Agreement hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Loan or the rights of any Lender, or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**SECTION 4.10.**         **Priorities.**

If the Administrative Agent collects any money pursuant to this Article, it shall pay out the money in the following order:

*First*:  to the Administrative Agent, its agents and counsel for amounts due under Sections 18, 19 and 20 of this Agreement, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Administrative Agent, its agents and counsel and the costs and expenses of collection;

*Second*:         to Lenders of Loans for amounts due and unpaid on the Loan for principal, premium and interest, ratably, without preference or priority of any

kind, according to the amounts due and payable on the Loans for principal, premium and interest, respectively; and

*Third*:  to the Company or to such party as a court of competent jurisdiction shall direct.

The Administrative Agent may fix a record date and payment date for any payment to Lenders pursuant to this Section 4.10.

## ARTICLE VAMENDMENT, SUPPLEMENT AND WAIVER

### SECTION 5.01.    **Without Consent of Lenders.**

The Company and the Administrative Agent may amend or supplement this Agreement without the consent of any Lender:

(a)    to cure any ambiguity, defect, manifest error or inconsistency; or

(b)    to make any change that would provide any additional rights or benefits to the Lenders or that does not adversely affect the rights hereunder of any Lender.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended Agreement or supplement thereto, and the Administrative Agent may join with the Company in the execution of any amended or supplemental Agreement authorized or permitted by the terms of this Agreement and to make any further appropriate agreements and stipulations that may be therein contained, but the Administrative Agent shall not be obligated to enter into such amended or supplemental Agreement that affects its own rights, duties or immunities under this Agreement or otherwise.

### SECTION 5.02.    **With Consent of Lenders.**

The Company and the Administrative Agent may amend this Agreement (including Sections 2.10 and 2.15)  or enter into supplemental instruments with respect thereto with the consent of the Lenders holding at least a majority in principal amount of the Loans then outstanding voting as a single class, and, subject to Section 4.04 hereof, any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of, premium, if any, or interest on the Loans, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Agreement may be waived with the consent of the Lenders of a majority in principal amount of the Loan then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange offer for, or repayment of, the Loans).

Upon the request of the Company accompanied by a resolution its Board of Directors authorizing the execution of any such amended or supplemental Agreement, and upon the filing with the Administrative Agent of evidence satisfactory to the Administrative Agent of the consent of the Lenders as aforesaid, and the Administrative Agent shall join with the Company in the execution of such amended Agreement or supplemental instrument unless such amended Agreement or supplemental instrument directly affects the Administrative Agent's own rights, duties or immunities under this Agreement or otherwise, in which case

44

the Administrative Agent may in its discretion, but shall not be obligated to, enter into such amended Agreement.

It shall not be necessary for the consent of the Lenders under this Section 5.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section becomes effective, the Administrative Agent shall mail to the Lenders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Administrative Agent to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended Agreement or supplemental instrument or waiver. Subject to Section 4.04 hereof, the Lenders holding a majority in aggregate principal amount of the Loan then outstanding voting as a single class may waive compliance in a particular instance by the Company with any provision of this Agreement. However, without the consent of holders of 90% of the outstanding principal amount of Loans then outstanding, an amendment or waiver under this Section 5.02 may not:

> (a)    reduce the principal amount of Loan whose Lenders must consent to an amendment, supplement or waiver;

> (b)    reduce the principal of or extend the Final Maturity Date or alter or waive any of the provisions with respect to the redemption or repayment of the Loans;

> (c)    reduce the rate of or change the time for payment of interest, including default interest, on any Loan;

> (d)    waive an Event of Default in the payment of principal of or premium or cash-pay interest on the Loans (except a rescission of acceleration of the Loans by the Lenders of at least a majority in aggregate principal amount of the Loan then outstanding and a waiver of the payment default that resulted from such acceleration);

> (e)    make any Loan payable in any currency other than that stated in this Agreement;

> (f)    make any change in the provisions of this Agreement relating to waivers of past Defaults or the rights of Lenders to receive payments of principal of, or interest, premium on the Loan;

> (g)    waive a redemption payment with respect to any Loan (other than a payment required by either Section 2.10 or 2.15 hereof); or

> (h)    make any change in Section 4.04 hereof or in the foregoing amendment and waiver provisions.

**SECTION 5.03.    Administrative Agent to Sign Amendments, etc.**

The Administrative Agent shall sign any amended Agreement or supplemental instrument authorized pursuant to this Article 5; provided that the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Administrative Agent. The Company may not sign an amendment to this Agreement or any supplemental instrument relating thereto until its Board of Directors approves it. In executing any amended

LO\347440.6

agreement or supplemental instrument, the Administrative Agent shall be entitled to receive shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended agreement or supplemental instrument is authorized or permitted by this Agreement.

## **Exhibit B**

**BOATS Transfer Certificate**

**TRANSFER CERTIFICATE**

**IN THE FORM OF AN ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EB Holdings, Inc. €600,000,000 PIK Loan Agreement dated March 23, 2007**
**(as amended from time to time, the "Agreement")**

This Transfer Certificate in the form of an assignment and assumption agreement (this "**Assignment**") is entered into on January 15, 2013.

BETWEEN:

1.  **Credit Suisse International** (the "**Assignor**"); and

2.  **BOATS Investments (Netherlands) B.V.** (with its seat (*zetel*) in Amsterdam, the Netherlands) (the "**Assignee**").

The Assignor and the Assignee agree as follows:

3.  Unless otherwise defined in this Assignment, terms defined in the Agreement are used in this Assignment with the same meanings given to them in the Agreement, and the rules of construction of the Agreement apply to this Assignment.

4.  The Assignor sells and assigns, without recourse, to the Assignee, and the Assignee purchases and assumes, without recourse, from the Assignor, effective as of the Transfer Date set forth below, all of the interests, right and title (collectively, the "**Assigned Interest**") in the Assignor's rights and obligations under the Agreement, including the interests set forth below in the Commitment of the Assignor on the Transfer Date and the Loans owing to the Assignor which are outstanding on the Transfer Date. To the extent that the Assigned Interest is not all of a particular Commitment or Loan, the Assigned Interest is a pro rata interest in all of the Assignor's Commitments or Loans which are subject to this Assignment.

5.  The Assignee acknowledges receipt of a copy of the Agreement and the other Finance Documents.

6.  From and after the Transfer Date:

    (a)  the Assignee shall be a party to and be bound by the provisions of the Agreement and, to the extent of the Assigned Interest have the rights and obligations of a Lender; and

    (b)  the Assignor shall, to the extent of the Assigned Interest, relinquish its rights and be released from its obligations under the Agreement.

7.  The Assignee represents, warrants, covenants and agrees to and with the Assignor that it is a non U.S. person (and is not acting or acquiring the Loans for the account or benefit of a U.S. person) and is making the Loans in an offshore transaction pursuant to Regulation S of the U.S. Securities Act, as amended.

8.  The Assignee represents, warrants, covenants and agrees to and with the Assignor that:

    (a)  It is:

        (1)  (i) a person in a member state of the European Economic Area and who "qualified investor" within the meaning of Article 21(1) of the Prospectus Directive (Directive 2003/71/EC) and (ii) if the Assignee is in the United Kingdom, it is a qualified investor within the meaning of Section 86(7) of

1

the Financial Services and Markets Act 2000 (the "**FSMA**") or, otherwise, is acquiring the Loans in circumstances which do not require a prospectus to be made available to the public in the United Kingdom within the meaning of section 85(1) of the FSMA; or

(2)    it is not a person in a member state of the European Economic Area;

(b)    if the Assignee is in the United Kingdom, it acknowledges that any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) in connection with, or relating to, the Loans may only be communicated or caused to be communicated in circumstances in which Section 21(1) of the FSMA does not apply to the Company; and

(c)    if the Assignee is in the United Kingdom, it confirms that it is aware of, and will observe, all applicable provisions of the FSMA in respect of anything done by it in relation to the Loans in, from or otherwise involving, the United Kingdom.

9.    This Assignment is being delivered to the Administrative Agent together with any further documentation required to be delivered by the Assignee under the Agreement, duly completed and executed by the Assignee.

10.    By executing this Assignment, the Assignee confirms to the Administrative Agent and the Company, for the purposes of Section 22.2(e) (*Requirements for assignments by Lenders*) of the Agreement, that it is bound by obligations to the other Finance Parties under the Agreement equivalent to those it would have been under if it were an Original Lender.

11.    This Assignment shall be governed by and construed in accordance with the laws of the State of New York.

**Details of Assignment**

Assignee's contact details for notices and payments under the Agreement are as follows:

*For notices:*

| | | |
|---|---|---|
| Facility Office address | : | Prins Bernhardplein 200<br>1097 JB Amsterdam<br>The Netherlands |
| Fax number | : | +31 (0) 20 521 4832 |
| Attention details | : | The Managing Director (Ref: PIK Loan Facility for EB Holdings, Inc. (Series 97 Notes)) |

*For payments:*

| | | |
|---|---|---|
| Correspondent Bank | : | The Bank of New York Mellon |
| Correspondent BIC | : | DEUTDEFF |
| Beneficiary Bank | : | The Bank of New York Mellon |
| BIC Code | : | IRVTBEBB |
| Account No | : | 922129200 |

2

For further credit to      :    6611609780

Ref                        :    Corporate Trust, ISIN: XS0288291833
                                Boats Investments (Netherlands) B.V. Series 97

Effective Date of Assignment ("**Transfer Date**"):  January 15, 2013

**Principal Amount Assigned**

|  | Facility |
|---|---|
| Commitment Assigned: | €600,000,000 |
| Loans Assigned: | €1,089,424,586.47 |

The interest in relation to the Assigned Interests and pursuant to Section 8 (*Interest*) of the Agreement will be for the account of the Assignee.

The undersigned, intending to be legal bound, have executed and delivered this Assignment on the date first above written.

**CREDIT SUISSE INTERNATIONAL,**
as Assignor

By:
    Claire Dowling
    Authorised Signatory
    Name:
    Title:

       Ian Croft
    Assistant Vice President
       Operations

**BOATS INVESTMENTS (NETHERLANDS)**
**B.V., as Assignee**

By: _____

    Name:
    Title:

137

For further credit to         :   6611609780

Ref                           :   Corporate Trust, ISIN: XS0288291833
                                  Boats Investments (Netherlands) B.V. Series 97

Effective Date of Assignment ("**Transfer Date**"):  January 15, 2013

**Principal Amount Assigned**

|                        | Facility            |
|------------------------|---------------------|
| Commitment Assigned:   | €600,000,000        |
| Loans Assigned:        | €1,089,424,586.47   |

The interest in relation to the Assigned Interests and pursuant to Section 8 (*Interest*) of the Agreement will be for the account of the Assignee.

The undersigned, intending to be legal bound, have executed and delivered this Assignment on the date first above written.

CREDIT SUISSE INTERNATIONAL,
as Assignor

By: _____
      Name:
      Title:

BOATS INVESTMENTS (NETHERLANDS)
B.V., as Assignee

Intertrust (Netherlands) BV
Managing Director

By: _____
      Name: L.C. de Gunst-McDermott          P. Geerts
      Title:        Proxyholder                Proxyholder

3

138

The undersigned consents to the above assignment:

**CREDIT SUISSE AG, LONDON BRANCH**,
as Administrative Agent

By:

Name:

Title:

Ian Croft
**Assistant Vice President**
Operations

4

139

## **Exhibit C**

**August Proposal Cleansing Materials**

EB Holdings II, Inc., a Nevada corporation ("EBH II"), reports the following information in connection with its EUR 600m PIK Loan Agreement due March 2017 (the "Loan"):

1. On July 29, 2016, EBH II entered into a non-disclosure agreement with an ad hoc committee of certain holders of the Loan, consisting of funds affiliated with each of Alcentra Limited, Fortress Investment Group / Mount Kellet Capital Management, GoldenTree Asset Management, HIG International Advisors LLP / Bayside Capital, Sound Point Capital Management, LP, and Värde Partners Europe Limited (the "Committee").

2. On August 9, 2016, EBH II furnished to the Committee's advisors, Houlihan Lokey Capital, Inc. and Kirkland & Ellis LLP, the following email and term sheet:

From: Howard M Meyers
Sent: Tuesday, August 09, 2016 11:24 AM
Subject: EB Holdings II, Inc. Confidential

Ladies and Gentlemen,

As requested and on behalf of EB Holdings II, Inc., attached is a non-binding, confidential restructuring proposal, in an attempt to reach a consensual agreement with EB Holdings II's Noteholders. We request and you are authorized to furnish a copy of the proposal to those members of the Noteholders Committee who are parties to the NDA with EB Holdings II, Inc.

Best regards,
Howard M. Meyers
EB Holdings II, Inc.

*Confidential*
*For Settlement Purposes Only*
*Subject to FRE 408*
*August 9, 2016*

## RESTRUCTURING TERM SHEET

*Summary of Key Restructuring Terms*

**The Restructuring:**

All holders ("PIK Holders") of PIK Notes due March 2017 (the "Existing Notes") to exchange their Existing Notes for (i) new senior secured notes aggregating €500 million in principal amount (the "Notes") issued by EB Holdings II, Inc., a Nevada corporation ("HoldCo"), and (ii) cash in the amount of €50 million.

HoldCo to arrange for €50 million to be contributed to capital by Quexco Incorporated, a Delaware corporation ("Quexco"), or its affiliates, to fund the cash portion of the exchange. HoldCo also to arrange to have Quexco or its affiliates pledge collateral (as described below).

Expressly conditioned upon the exchange of 100% of the Existing Notes for the Notes.

Parties to execute a restructuring support agreement, with customary terms and conditions and a target signing date on or prior to September 15, 2016.

The closing of the restructuring would occur as soon as practicable thereafter.

**The Notes:**

Interest. Interest to be payable in cash semi-annually at 6.0% per annum. If on any interest payment date, HoldCo does not have cash on hand sufficient to make a cash interest payment in full because OpCo has been unable to pay a cash dividend to HoldCo solely because of the restricted payment covenants in its credit agreements or applicable English law, HoldCo may instead pay in kind (PIK) the amount of any such insufficiency at a rate equal to 200 basis points in excess of the applicable cash interest rate.

Maturity. 10 years

Collateral. The Notes to be secured by first priority liens on (a) HoldCo's approximately 87% equity interests in Eco-Bat Technologies Limited, a UK company ("OpCo"), and (b) 100% equity interests in each of the Affiliated Companies (as defined below), subject to the terms specified below.

HoldCo to arrange for (a) HoldCo's affiliate, Quexco, to pledge 100 % of the equity in each of RSR Corporation, a Delaware corporation (the "Management Company"), Environmental Service Insurance Company, a Vermont corporation (the "Captive Insurance Company"), and RSR Technologies, Inc., a Delaware corporation (the "R&D Company"), and (b) Management Company to pledge 100% of the equity in Quemetco Metals Limited, Inc., a Texas corporation ("QML", and together with the Management Company, the Captive Insurance Company, and the R&D Company, the "Affiliated Companies"), in each case to secure the obligations of HoldCo under the Notes. The Affiliated Companies own, directly or indirectly, certain assets (the "Eco-Bat Related Assets") relevant to the operations of OpCo, including management and personnel arrangements, services agreements with OpCo and various permits, licenses and other intellectual property rights and interests.

The Affiliated Companies to be permitted at any time (i) to make dividends or other distributions in respect of all assets, other than the Eco-Bat Related Assets, including, without limitation, (A) the Management Company's subsidiary that manufactures lubricants used in the drilling industry and its related intellectual property rights and interests and (B) land held for investment purposes in Dallas, Texas (collectively, the "Excluded Assets") and (ii) to sell, assign or otherwise transfer all or any portion of the Excluded Assets to any person and distribute the sale proceeds thereof to Quexco. The Excluded Assets (and proceeds therefrom) would not in any event be available as collateral for the Notes and will remain beneficially the property of Quexco in the event of a foreclosure.

Furthermore, Quexco may at any time sell, assign or otherwise transfer the equity in any of the Affiliated Companies and/or some or all of the assets and/or liabilities of any of the Affiliated Companies, including Eco-Bat Assets, to OpCo or any wholly-owned subsidiary of OpCo, and the pledge thereon would be released.

2

<u>Other Terms</u>. The covenants, events of default and other terms regarding the Notes would be set forth in an amendment to the existing PIK Loan Agreement entered into by the requisite Holders that would address the restructuring terms and otherwise would remain in effect on substantially the same existing terms and conditions.

**Miscellaneous:**

<u>Structuring</u>. It is understood that this term sheet does not represent all of the key terms of any potential restructuring and requires continued development by the parties, as well as adjustments to reflect tax, financing, accounting, and legal considerations. Any potential restructuring would contain full, unconditional terms and conditions appropriate to a transaction of this nature.

<u>Expenses</u>. The parties will bear their own expenses in connection with the consideration, negotiation, execution, and consummation of any potential restructuring, except that subject to and upon the Closing, HoldCo would reimburse the PIK Holders for the reasonable out-of-pocket expenses of Houlihan Lokey and Kirkland & Ellis in connection with the restructuring up to $8.5 million in the aggregate.

<u>Nature of this Term Sheet</u>. This term sheet is non-binding and may be withdrawn at any time by HoldCo in its sole and absolute discretion. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation.

3. On August 18, 2016, the Committee sent EBH II the following letter:

To: EB Holdings II, Inc.
Attn.: Howard M. Meyers

August 18, 2016

Dear Sirs

**Termination of Confidentiality Agreement**

Reference is made to the confidentiality agreement (the "Confidentiality Agreement"), dated as of July 29, 2016, entered into among EB Holdings II, Inc. (the "Company") and the Recipients (as defined therein). Capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Confidentiality Agreement.

The undersigned Requisite Holders hereby notify the Company that they unanimously desire to terminate the Confidentiality Agreement effective immediately today on August 18, 2016 (the "Termination Date") pursuant to paragraph 9.1 of the Confidentiality Agreement. The Recipients expect to be cleansed, by public disclosure of the term sheet delivered to Kirkland & Ellis LLP and Houlihan Lokey Capital, Inc. on August 9, 2016, promptly after the Termination Date but in any case no later than by 9:00 a.m., New York City time, on the fourth Business Day after the occurrence of the Termination Date.

3

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

Yours faithfully,

[*signed by all Committee members*]

4

**<u>Exhibit D</u>**

**April Proposal Cleansing Materials**

May we use cookies to track your activities? We take your privacy very seriously. Please see our privacy policy for details and any questions.Yes No

**Business Wire**
A Berkshire Hathaway Company

# EB Holdings II, Inc. Informational Report

**May 01, 2017 12:14 PM Eastern Daylight Time**

DALLAS--(BUSINESS WIRE)--EB Holdings II, Inc., a Nevada corporation ("EBH II"), reports the following information in connection with its EUR 600m PIK Loan Agreement dated March 23, 2007 (the "Loan"):

1. On March 29, 2017, EBH II, through its advisors, furnished on a confidential basis to Kirkland & Ellis LLP ("Kirkland"), legal advisors to an ad hoc committee of certain purported holders of the Loan consisting of funds affiliated with each of Alcentra Limited, Fortress Investment Group/Mount Kellet Capital Management, GoldenTree Asset Management LP, HIG Capital International Advisors LLP/Bayside Capital, Sound Point Capital Management, LP and Varde Partners Europe Limited (the "Committee"), the following term sheet relating to a proposed restructuring of the Loan:

*HIGHLY CONFIDENTIAL*
*For Settlement Purposes Only*
*March 29, 2017*

**EB HOLDINGS II, INC.**

**Summary of Key Restructuring Terms**

THIS TERM SHEET (THIS "TERM SHEET") CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "RESTRUCTURING") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION (THE "COMPANY"), (B) HOWARD M. MEYERS ("MEYERS") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT MANAGERS OR ADVISORS FOR THE BENEFICIAL OWNERS) OF THE COMPANY'S PIK LOAN FACILITY (THE "PIK LOAN") IN THE ORIGINAL PRINCIPAL AMOUNT OF 600,000,000 EUROS WHO BECOME A PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT (AS DESCRIBED BELOW) (THE "CONSENTING PIK HOLDERS").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

**Restructuring:** The Exchange: All holders of the PIK Loan would exchange (the "Exchange") their respective interests (including principal and accrued interest) in the PIK Loan for cash in the aggregate amount of 535 million euros (the "Exchange Amount").

The Acquisition: Simultaneously with and in order to fund the Exchange, a newly-formed company ("Newco") to be organized by Meyers would purchase from the Company (the "Acquisition") all of the shares it owns in Eco-Bat Technologies Limited, a U.K. company ("EBT"), for an aggregate purchase price, payable in cash, equal to the Exchange Amount.

Financing: The Acquisition would be financed through a combination of equity and debt. Simultaneously with the execution of the Restructuring Support Agreement, Meyers would provide an equity commitment in the aggregate amount of 235 million euros. (Newco would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the transaction). Meyers has had discussions with debt financing providers including those who have previously led or participated in financings for the Company and for EBT. Based on these discussions, Newco intends to raise approximately 300 million euros of debt financing to finance the Acquisition. Newco will provide debt financing term sheets and indications of interest for at least 300 million euros to the Consenting PIK Holders within 30 days of execution of the Restructuring Support Agreement.

Releases: Subject to and upon the consummation of the Restructuring, the existing litigation involving the parties would be dismissed with prejudice, and the Company, Meyers, the Consenting PIK Holders, and their respective employees, directors, partners, advisors, representatives and affiliates would all be granted full and unconditional releases. A release by all parties in the litigation, EBT, and the holders of at least 95% of the principal amount of the PIK Loan would be a condition to the consummation of the Restructuring; provided, however, that Meyers and the Company would have the right, in their discretion, to reduce such 95% requirement.

As an alternative approach, if so desired by the Consenting PIK Holders, such dismissal of the litigation and releases would instead become effective at the time of the signing of the Restructuring Support Agreement, in consideration of Meyers and the Company agreeing to a consensual transfer of the EBT shares held by the Company if Newco does not complete the Acquisition as a result of its material breach or failure to obtain the required debt financing (and the other conditions to the closing have been satisfied). In connection with that transfer, Meyers would be available if so desired to continue for up to a year to assist in the transition, and would cause RSR Corporation to transfer the agreements relevant to EBT.

No Involuntary Bankruptcy Filing: This Term Sheet and the Restructuring proposed herein are expressly conditioned on there being no involuntary bankruptcy filing as to the Company by any person, including, without limitation, any of the PIK Holders. The

Company believes that an involuntary bankruptcy would likely result in damage to EBT, which could have a material adverse effect on the value of the shares of EBT held by the Company and Newco's ability to obtain debt financing for the transaction.

**Form of Transaction:**   The PIK Loan Agreement provides that the Company and PIK Holders owning at least 90% in principal amount of the PIK Loan may amend the PIK Loan Agreement in any respect, including reducing principal or interest with respect to all PIK Holders. Accordingly, subject to confirmation by legal counsel, the Restructuring (including the Exchange) would be consummated "out of court" without the necessity of a bankruptcy filing if the holders of at least 90% of the outstanding amount of the PIK Loan, all PIK Holders party to the litigation, the Company and Meyers agree. In the event, however, that this is not practicable, then the Restructuring would be accomplished through a "pre-packaged" Chapter 11 bankruptcy.

**Transaction Documents:**   The transaction documents would include a Restructuring Support Agreement, Acquisition Agreement, and Loan Modification/Exchange Agreement. If the Restructuring is to be accomplished through a pre-packaged bankruptcy, those agreements would be executed prior to the filing of any Chapter 11 petition. The Restructuring Support Agreement must in any event be signed by Consenting PIK Holders constituting at least 66-2/3% in principal amount of the PIK Loan and a majority in number of the PIK Holders, as well as all parties to the existing litigation.

The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the closing is subject to obtaining the requisite debt financing.

There would be no purchase price adjustments. Newco would not be entitled to any indemnification from the Company in respect of the Acquisition.

The transaction documents would be negotiated and executed as soon as practicable. In the event of an out of court Restructuring, the outside date (subject to customary extensions and exceptions) for the closing of the Restructuring would be 90 days from the execution of the transaction documents by all requisite parties. In the event of a pre-packaged bankruptcy, the closing would occur as soon as practicable following approval by the court.

**Miscellaneous**: Securities. It is understood that this Term Sheet does not represent all of the key terms of any potential Restructuring and requires continued development by the parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations.

**Expenses**: Subject to and upon consummation of the transaction, the Company would reimburse the PIK Holders for the reasonable, documented out-of-pocket expenses for the negotiation, documentation and consummation of the Restructuring, up to $8.5 million in the aggregate.

**Nature of this Term Sheet**: This Term Sheet is non-binding and may be withdrawn at any time. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

********

2. On March 30, 2017, EBH II, through its advisors, furnished to Kirkland the following alternative term sheet relating to a proposed restructuring of the Loan:

*HIGHLY CONFIDENTIAL*
*For Settlement Purposes Only*
*March 30, 2017*

**EB HOLDINGS II, INC.**

**Summary of Key Restructuring Terms**

THIS TERM SHEET (THIS "TERM SHEET") CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "RESTRUCTURING") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION (THE "COMPANY"), (B) HOWARD M. MEYERS ("MEYERS") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT MANAGERS OR ADVISORS FOR THE BENEFICIAL OWNERS) OF THE COMPANY'S PIK LOAN FACILITY (THE "PIK LOAN") IN THE ORIGINAL PRINCIPAL AMOUNT OF 600,000,000 EUROS WHO BECOME A PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT (AS DESCRIBED BELOW) (THE "CONSENTING PIK HOLDERS").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

**Restructuring.** The Exchange: All holders (the "PIK Holders") of the PIK Loan would exchange (the "Exchange") their respective interests (including principal and accrued interest) in the PIK Loan for cash in the aggregate amount of 535 million euros (the "Exchange Amount").

The Acquisition: Simultaneously with and in order to fund the Exchange, a newly-formed company ("Newco") to be organized by Meyers would purchase from the Company (the "Acquisition") all of the shares it owns in Eco-Bat Technologies Limited, a U.K. company ("EBT"), for an aggregate purchase price, payable in cash, equal to the Exchange Amount.

Financing: The Acquisition would be financed through a combination of equity and debt. Simultaneously with the execution of the Restructuring Support Agreement, Meyers would provide an equity commitment in the aggregate amount of 235 million euros. (Newco would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the transaction). Meyers has had discussions with debt financing providers including those who have previously led or participated in financings for the Company and for EBT. Based on these discussions, Newco intends to raise approximately 300 million euros of debt financing to finance the Acquisition. Newco will provide debt financing term sheets and indications of interest for at least 300 million euros to the Consenting PIK Holders within 30 days of execution of the Restructuring Support Agreement.

Go-Shop: The definitive agreement for the Acquisition would contain a go-shop provision (or if the transaction occurs in a pre-packaged bankruptcy, a stalking horse provision), whereby the Company would offer the shares to any qualified person, pursuant to a process conducted by an independent investment banking firm acceptable to the Consenting PIK Holders. The Company would sell the shares to the bidder who makes the highest and best offer in the opinion of such investment banker (and subject to such other provisions as are required in a bankruptcy proceeding, if applicable). To facilitate this process, Meyers would cause RSR Corporation to transfer the agreements relevant to EBT. Additionally, if desired, Meyers would be available to assist in the transition for a period of up to a year. If the shares are sold to a higher bidder, Newco would be entitled to (a) a break-up (stalking horse) fee of 5% of the purchase price and (b) reimbursement of reasonable, documented out-of-pocket expenses in connection with the transaction, up to $8.5 million in the aggregate.

Consensual Transfer: If Newco remains the highest bidder but does not complete the Acquisition as a result of its material breach or the failure to obtain the requisite debt financing (and the other conditions to the Acquisition have been satisfied), the Company would transfer the EBT shares consensually for the benefit of the PIK Holders. Meyers would cause RSR to transfer the agreements relevant to EBT. Also, if so desired, Meyers would be available to assist in the transition for up to a year.

Releases: Effective at the time of the signing of the Restructuring Support Agreement, the existing litigation involving the parties would be dismissed with prejudice, and the Company, Meyers, the Consenting PIK Holders, and their respective employees, directors, partners, advisors, representatives and affiliates would all be granted full and unconditional releases. A release by all parties in the litigation, EBT, and the holders of at least 95% of the principal amount of the PIK Loan would be required; provided, however, that Meyers and the Company would have the right, in their discretion, to reduce such 95% requirement.

No Involuntary Bankruptcy Filing: This Term Sheet and the Restructuring proposed herein are expressly conditioned on there being no involuntary bankruptcy filing as to the Company by any person, including, without limitation, any of the PIK Holders. The Company believes that an involuntary bankruptcy would likely result in damage to EBT, which could have a material adverse effect on the value of the shares of EBT held by the Company and Newco's ability to obtain debt financing for the transaction.

**Form of Transaction:** The PIK Loan Agreement provides that the Company and PIK Holders owning at least 90% in principal amount of the PIK Loan may amend the PIK Loan Agreement in any respect, including reducing principal or interest with respect to all PIK Holders. Accordingly, subject to confirmation by legal counsel, the Restructuring (including the Exchange) would be consummated "out of court" without the necessity of a bankruptcy filing if the holders of at least 90% of the outstanding amount of the PIK Loan, all PIK Holders party to the litigation, the Company and Meyers agree. In the event, however, that this is not practicable, then the Restructuring would be accomplished through a "pre-packaged" Chapter 11 bankruptcy.

**Transaction Documents:** The transaction documents would include a Restructuring Support Agreement, Acquisition Agreement, and Loan Modification/Exchange Agreement. If the Restructuring is to be accomplished through a pre-packaged bankruptcy, those agreements would be executed prior to the filing of any Chapter 11 petition. The Restructuring Support Agreement must in any event be signed by Consenting PIK Holders constituting at least 66-2/3% in principal amount of the PIK Loan and a majority in number of the PIK Holders, as well as all parties to the existing litigation.

The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the closing is subject to obtaining the requisite debt financing.

There would be no purchase price adjustments. Newco would not be entitled to any indemnification from the Company in respect of the Acquisition.

The transaction documents would be negotiated and executed as soon as practicable. In the event of an out of court Restructuring, the outside date (subject to customary extensions and exceptions) for the closing of the Restructuring would be 90 days from the execution of the transaction documents by all requisite parties. In the event of a pre-packaged bankruptcy, the closing would occur as soon as practicable following approval by the court.

**Miscellaneous:**    <u>Structuring</u>: It is understood that this Term Sheet does not represent all of the key terms of any potential Restructuring and requires continued development by the parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations.

<u>Expenses</u>: Subject to and upon consummation of the transaction, the Company would reimburse the PIK Holders for the reasonable, documented out-of-pocket expenses for the negotiation, documentation and consummation of the Restructuring, up to $8.5 million in the aggregate.

<u>Nature of this Term Sheet</u>: This Term Sheet is non-binding and may be withdrawn at any time. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

*******

3. On April 6, 2017, EBH II entered into a confidentiality and standstill agreement (the "<u>Confidentiality Agreement</u>") with the Committee, pursuant to which EBH II's proposals of March 29, 2017 and March 30, 2017 were shared with the Committee.

4. On April 13, 2017, the Committee sent EBH II, through their respective advisors, the following term sheet counter proposal:

*K&E Comments*
*HIGHLY CONFIDENTIAL*
*For Settlement Purposes Only*
*April 13, 2017*

**EB HOLDINGS II, INC.**

**<u>Summary of Key Restructuring Terms</u>**

THIS TERM SHEET (THIS "<u>TERM SHEET</u>") CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "<u>RESTRUCTURING</u>") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION (THE "<u>COMPANY</u>"), (B) HOWARD M. MEYERS ("<u>MEYERS</u>") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT MANAGERS OR ADVISORS FOR THE BENEFICIAL OWNERS) OF THE COMPANY'S PIK LOAN FACILITY (THE "<u>PIK LOAN</u>") IN

THE ORIGINAL PRINCIPAL AMOUNT OF $660,000,000 OF THE COMPANY, WHO ARE PARTIES TO A RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RESTRUCTURING SUPPORT AGREEMENT</u>") (AS DESCRIBED BELOW) (COLLECTIVELY, THE "<u>CONSENTING PIK HOLDERS</u>").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

**Restructuring.** The Exchange: All Holders (the "PIK Holders") of the PIK Loan would exchange (the "Exchange") their respective interests (including principal and accrued interest) in the PIK Loan for cash in the aggregate amount of 700 million euros (the "Exchange Amount"). For the avoidance of doubt, 100% of the Exchange Amount will be paid to the PIK Holders on account of their interests in the PIK Loan, and no portion of the Exchange Amount will be paid to any non-PIK Holder.

The Acquisition: Simultaneous with, and as a condition to, the consummation of the Exchange (whether through an out-of-court exchange offer and consent solicitation process, a pre-packaged chapter 11 case, or an alternative restructuring method, in each case such method being acceptable to the ad hoc committee of PIK Holders ("PIK Lender Committee")) a newly-formed company ("Newco") to be organized by Meyers would purchase from the Company (the "Acquisition") all of the shares it owns in Eco-Bat Technologies Limited, a U.K. company ("EBT"), for an aggregate purchase price, payable in cash, equal to the Exchange Amount.[1] Company/Meyers to provide additional details about Newco/Acquisition (e.g., where Newco sits in relation to the Company and EBT). The date that the Exchange is consummated pursuant to its terms shall be the "Exchange Effective Date").

Financing. The Acquisition would be financed through a combination of equity and debt.

Simultaneous with, and as a condition to, the effectiveness of the Restructuring Support Agreement (the "RSA Effective Date"), (i) Newco and Meyers will provide the PIK Lender Committee with an equity commitment letter in an aggregate amount of not less than [235][2] Amount to be adjusted in light of debt financing amount available, discussed below (combined amount of debt and equity financing shall equal 700 million euros). million euros (the "Equity Contribution") to finance the Exchange, and (ii) Newco and Meyers will undertake to provide the PIK Lender Committee, within 30 days of the RSA Effective Date, with binding and finalized debt commitment letters in an aggregate amount of not less than [465][3] Amount to be adjusted in light of equity contribution, discussed above. (combined amount of debt and equity financing shall equal 700 million euros) million euros (the "Debt Contribution") to finance the Exchange. In each case, the letters provided to the PIK Lender Committee in (i) and (ii) above must be in form and substance reasonably acceptable to the PIK Lender Committee, in its sole discretion.

In respect of the Equity Contribution, Newco would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the Acquisition.

The Company and Meyers will hold weekly conference calls (or more frequently if requested by the PIK Lender Committee), commencing on the date hereof, to provide updates to the PIK Lender Committee on the progress of the financing process and the Restructuring.

The Equity Contribution and the Debt Contribution must have closed, and the Exchange consummated, within 60 days from the RSA Effective Date; provided that if the Exchange is consummated pursuant to a chapter 11 prepackaged plan of reorganization, this deadline shall be extended an additional 45 days so long as the chapter 11 cases are consummated within 60 days of the RSA Effective Date (subject to adjustment by the PIK Lender Committee, in its sole discretion, to account for implementation mechanics).

<u>Releases</u>: As of the Exchange Effective Date (including, for the avoidance of doubt, the settlement date, in the case the Exchange is implemented through an exchange offer and consent solicitation, and the effective date, in the case the Exchange is implemented through a chapter 11 plan) (i) any existing litigation involving the PIK Holders, the Company, Meyers, EBT and each of their respective affiliates, would be dismissed with prejudice, and (ii) the PIK Holders, the Company, Meyers, EBT and each of their respective employees, directors, partners, advisors, representatives and affiliates would be granted full and unconditional mutual releases as set forth in the Restructuring Support Agreement, which unconditional mutual releases shall be effective as of the Exchange Effective Date. A release by all parties in the litigation, EBT, and the holders of at least 90% of the principal amount of the PIK Loan would be required; <u>provided</u>, <u>however</u>, that Meyers and the Company would have the right, in their discretion, to reduce such 90% requirement.

For the avoidance of doubt, any litigation between the parties will continue (unless stayed by court order) until the consummation of the Exchange Effective Date.

<u>No Bankruptcy Filing/Consent to Filing</u>: Subject to the existing standstill agreement between the PIK Lender Committee and the Company (the "<u>Standstill Agreement</u>"), which shall govern prior to the RSA Effective Date, the Restructuring Support Agreement shall provide that neither the Consenting PIK Lenders, nor the Company, shall commence or support a chapter 11 case in respect of the Company, other than a case to implement the terms of the Exchange; <u>provided</u>, <u>however</u>, that if the Restructuring Support Agreement terminates by its terms (for example, if the Debt Contribution and/or the Equity Contribution cannot be obtained within the timelines or is terminated provided in the Restructuring Support Agreement), then either (a) the Company will (and Meyers will cause the Company to), within 5 business days of such termination, commence a voluntary chapter 11 case, or (b) the Company will (and Meyers will cause the Company to) consent to the commencement of an involuntary chapter 11 case by the Consenting PIK Lenders and the Company and Meyers will not seek to dismiss or otherwise challenge any such involuntary chapter 11 case after it has been commenced (or support any such in having such involuntary chapter 11 case be dismissed or challenged). The Restructuring Support Agreement will provide that the Company shall finance any chapter 11 case through a dividend paid to the Company not later prior to the commencement of the chapter 11 case to be arranged by Meyers and/or EBT in an amount satisfactory to the Consenting PIK Holders and set forth in the Restructuring Support Agreement.

**Form of Transaction**:

The PIK Loan Agreement provides that the Company and PIK Holders owning at least 90% in principal amount of the PIK Loan may amend the PIK Loan Agreement in any respect, including reducing principal or interest with respect to all PIK Holders. The Exchange will be consummated "out of court" (e.g., through an exchange offer and consent solicitation process) without the necessity of a bankruptcy filing if the holders of at least 90% of the outstanding amount of the PIK Loan, all PIK Holders party to the litigation, the Company and Meyers agree. In the event, however, that this is not practicable, then the Exchange would be accomplished through a "pre-packaged" chapter 11 bankruptcy.

**Transaction Documents**:

The transaction documents would include the Restructuring Support Agreement, an acquisition agreement, and a loan modification/exchange agreement and such other agreements as are necessary to implement the Exchange.[4] TBD if exchange offer memorandum and consent solicitation statement is necessary, and if so, timeline to implement. If the Exchange is to be accomplished through a pre-packaged bankruptcy, those agreements would be executed prior to the filing of any Chapter 11 petition. The Restructuring Support Agreement must in any event be signed by Consenting PIK Holders constituting at least 66-2/3% in principal amount of the PIK Loan and a majority in number of the PIK Holders, as well as all parties to the existing litigation.

The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the closing is subject to obtaining the Equity Contribution and Debt Contribution.

There would be no purchase price adjustments. Newco would not be entitled to any indemnification from the Company in respect of the Acquisition.

The transaction documents would be negotiated and executed as soon as practicable. The outside date for the closing of the Exchange would be 30 days from the RSA Effective Date.

**Miscellaneous**:

Structuring: It is understood that this Term Sheet does not represent all of the key terms of any potential Restructuring and requires continued development by the parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations.

Standstill Termination: The Company agrees to waive the three business day termination notice provision in the Standstill Agreement.

Fees/Expenses: The Company will reimburse the PIK Holders for the reasonable and documented fees and out-of-pocket expenses of the PIK Holders and their advisors relating to the negotiation, documentation and consummation of the Restructuring, including "on the clock" amounts as of the date hereof. Payments of any outstanding fees and expenses will be made on the RSA Effective Date (for all pre-RSA Effective Date fees and expenses) and on the Exchange Effective Date (for any and all unpaid pre-Exchange Effective Date fees and expenses).

Nature of this Term Sheet: This Term Sheet is non-binding and may be withdrawn at any time. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

---

[1] Company/Meyers to provide additional details about Newco/Acquisition (e.g., where Newco sits in relation to the Company and EBT).

[2] Amount to be adjusted in light of debt financing amount available, discussed below (combined amount of debt and equity financing shall equal 700 million euros).

[3] Amount to be adjusted in light of equity contribution, discussed above. (combined amount of debt and equity financing shall equal 700 million euros)

[4] TBD if exchange offer memorandum and consent solicitation statement is necessary, and if so, timeline to implement.

********

5. On April 20, 2017, EBH II furnished to the Committee, through their respective advisors, the following two alternative term sheet proposals:

*HIGHLY CONFIDENTIAL*
*For Settlement Purposes Only*
*April 20, 2017*

**EB HOLDINGS II, INC.**

**Summary of Key Restructuring Terms**

**(Proposal A)**

THIS TERM SHEET (THIS "TERM SHEET" CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "RESTRUCTURING") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION ("THE "COMPANY"), (B) HOWARD M. MEYERS ("MEYERS") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT

MANAGE[...] THE B[...]AL C[...]OAN[...]") IN THE ORIGINAL PRINCIPAL AMOUNT OF 600,000,000 EUROS WHO BECOME A PARTY TO A RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RESTRUCTURING SUPPORT AGREEMENT</u>") (AS DESCRIBED BELOW) (COLLECTIVELY, THE "<u>CONSENTING PIK HOLDERS</u>").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

Restructuring: The Loan Settlement" the Company would retire the entire PIK Loan (the "Loan

Settlement") for cash in the aggregate amount equal to 600 million euros (the "Settlement Amount"). For the avoidance of doubt, 100% of the Settlement Amount will be paid to the holders of the PIK Loan (the "PIK Holders") on account of their interests in the PIK Loan, and no portion of the Settlement Amount will be paid to any non-PIK Holder.

The Plan: The Loan Settlement would be accomplished through a pre-packaged bankruptcy plan (the "Plan") under chapter 11 of the United States Bankruptcy Code. Upon confirmation of the Plan by the Bankruptcy Court (the "Plan Effective Date"), the outstanding shares of the Company would be cancelled and 100% of the new equity of the reorganized company would be issued to Meyers or a newly-formed company organized by Meyers (in either case, the "Plan Sponsor"). As soon as practicable, the parties would enter into the Restructuring Support Agreement setting forth the terms contained herein and otherwise in form and substance satisfactory to the parties.

Plan Funding: The Plan would be financed through a combination of equity and debt (the "Plan Funding"). The Plan Sponsor would provide up to 235 million euros in equity (the "Equity Contribution") and would seek third-party debt financing for the balance of the funds necessary to consummate the Plan (the "Debt Financing").

Simultaneous with, and as a condition to, the effectiveness of the Restructuring Support Agreement (the "RSA Effective Date"), (i) the Plan Sponsor will provide the ad hoc committee of PIK Holders (the "PIK Lender Committee") with an equity commitment letter for the Equity Contribution and (ii) the Plan Sponsor will undertake to seek to provide the PIK Lender Committee, within 90 days of the RSA Effective Date, with binding and finalized debt commitment letters in an aggregate amount of not less than 365 million euros for the Debt Financing. In each case, the letters provided to the PIK Lender Committee in (i) and (ii) above must be in form and substance reasonably acceptable to the PIK Lender Committee, the Company and Meyers, in their sole discretion.

In respect of the Equity Contribution, the Plan Sponsor would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the Plan or the Loan Settlement.

Subject to the execution of a mutually satisfactory NDA/standstill agreement, the Company and Meyers will hold weekly conference calls, to provide updates to the PIK Lender Committee on the progress of the financing process and the Restructuring.

Plan Effective Date: The effective date of the Plan must occur within 120 days from the filing of a chapter 11 case (subject to extension by the PIK Lender Committee, in its sole discretion, to account for implementation mechanics or the satisfaction of the conditions to the confirmation of the Plan set forth below).

Releases: On the Release Effective Date, (i) any litigation involving the PIK Holders, the Company, Meyers and each of their respective affiliates, would be dismissed with prejudice, and (ii) the PIK Holders, the Company, Meyers and each of their respective employees, directors, partners, advisors, representatives and affiliates would be granted full, unconditional and irrevocable mutual releases as set forth in the Restructuring Support Agreement, which shall be effective upon the Release Effective Date. A release by all parties in the litigation and their respective affiliates and the holders of at least 95% of the principal amount of the PIK Loan would be required; provided, however, that Meyers and the Company would have the right, in their discretion, to reduce such 95% requirement. The "Release Effective Date" will be the date that is not later than 10 days following the delivery of the commitment(s) for the Debt Financing in accordance with the Restructuring Support Agreement.

For the avoidance of doubt, litigation among the parties will continue (unless stayed by court order) until the occurrence of the Release Effective Date; provided, however, that no party may seek to enjoin or challenge the restructuring transactions, including the Restructuring Support Agreement, set forth in this Term Sheet, and the releases provided for above shall continue to be binding and encompass any such litigation regardless of any developments once the Restructuring Support Agreement is executed.

No Bankruptcy Filing/No Consent to Filing: Subject to the existing standstill agreement between the PIK Lender Committee and the Company (the "Standstill Agreement"), which shall govern prior to the RSA Effective Date, the Restructuring Support Agreement shall provide that neither the Consenting PIK Lenders, nor the Company, shall commence or support a chapter 11 case in respect of the Company, other than a case to implement the terms of the Plan. Nothing set forth herein or in the Restructuring Support Agreement, except as expressly forth therein, will require the Company (or any other party) (a) following such termination to commence a voluntary chapter 11 case, (b) to consent to the commencement of an involuntary chapter 11 case by the Consenting PIK Lenders or (c) to not seek to dismiss or otherwise challenge any such involuntary chapter 11 case after it has been commenced (or not support any such involuntary chapter 11 case be dismissed or challenged). For avoidance of doubt, in no event will the Company be required to commence or consent to any bankruptcy filing in the absence of obtaining prior to such filing the releases and for the litigation to be dismissed with prejudice, each as provided for above.

**Conditions to the Plan**: The Plan Funding, and the consideration contemplated herein would be expressly conditioned upon: (i) confirmation of a chapter 11 plan ("Confirmation") incorporating the terms of the Restructuring Support Agreement; and (ii) a final, non-appealable ruling by the bankruptcy court pursuant to 11 U.S.C. 505, contemporaneous with or prior to Confirmation, holding that there will be no increase in the Company's U.S. federal corporate income taxes under section 988 of the Internal Revenue Code (relating to foreign currency gain) from the Loan Settlement. For the avoidance of doubt, in the event the Restructuring Support Agreement is terminated in accordance with its terms without the Plan Funding, Loan Settlement or Plan Confirmation having occurred thereunder, then unless otherwise expressly provided in the Restructuring Support Agreement and subject to the releases and dismissal of litigation provided above, the parties will be released from their obligations thereunder and free to prosecute their respective positions in the bankruptcy case.

**Transaction Documents**: The transaction documents would include the Restructuring Support Agreement, an acquisition agreement, and a loan modification/exchange agreement and such other agreements as are necessary to implement the Plan. Those agreements would be executed prior to the filing of any chapter 11 petition. The Restructuring Support Agreement must, unless otherwise agreed by the Company and Meyers, in any event be signed prior to the RSA Effective Date by Consenting PIK Holders constituting at least 90% in principal amount of the PIK Loan and a majority in number of the PIK Holders, as well as all members of the PIK Lender Committee and all parties to the existing litigation.

The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the Plan is subject to obtaining the Plan Funding.

There would be no adjustments in respect of the Settlement Amount.

The transaction documents would be negotiated and executed as soon as practicable.

**Miscellaneous: Structuring:** It is understood that this Term Sheet does not represent all of the key terms of any potential Restructuring and requires continued development by the parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations.

<u>Fees/Expense</u>s: Subject to and simultaneously with the Release Effective Date, the Company would reimburse the PIK Holders for the reasonable and documented fees and out-of-pocket expenses of the PIK Holders and their advisors relating to the negotiation, documentation and consummation of the Restructuring, including "on the clock" amounts as of the date hereof, and would thereafter reimburse the PIK Holders for such amount, subject to a cap of $8.5 million.

<u>Nature of this Term Sheet</u>: This Term Sheet is non-binding and may be withdrawn at any time. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

********

HIGHLY CONFIDENTIAL
*For Settlement Purposes Only*
*April 20, 2017*

**EB HOLDINGS II, INC.**

**Summary of Key Restructuring Terms**

**(Proposal B)**

THIS TERM SHEET (THIS "<u>TERM SHEET</u>" CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "<u>RESTRUCTURING</u>") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION (THE "<u>COMPANY</u>"), (B) HOWARD M. MEYERS ("<u>MEYERS</u>") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT MANAGERS OR ADVISORS FOR THE BENEFICIAL OWNERS) OF THE COMPANY'S PIK LOAN FACILITY (THE "<u>PIK LOAN</u>") IN THE ORIGINAL PRINCIPAL AMOUNT OF 600,000,000 EUROS WHO BECOME A PARTY TO A RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RESTRUCTURING SUPPORT AGREEMENT</u>") (AS DESCRIBED BELOW) (COLLECTIVELY, THE "<u>CONSENTING PIK HOLDERS</u>").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

Settlement") for cash in the aggregate amount equal to 600 million euros (the "Settlement Amount"). For the avoidance of doubt, 100% of the Settlement Amount will be paid to the holders of the PIK Loan (the "PIK Holders") on account of their interests in the PIK Loan, and no portion of the Settlement Amount will be paid to any non-PIK Holder.

The Plan: The Loan Settlement would be accomplished through a pre-packaged bankruptcy plan (the "Plan") under chapter 11 of the United States Bankruptcy Code. Upon confirmation of the Plan by the Bankruptcy Court (the "Plan Effective Date"), the outstanding shares of the Company would be cancelled and 100% of the new equity of the reorganized company would be issued to Meyers or a newly-formed company organized by Meyers (in either case, the "Plan Sponsor"). As soon as practicable, the parties would enter into the Restructuring Support Agreement setting forth the terms contained herein and otherwise in form and substance satisfactory to the parties.

Plan Funding: The Plan would be financed through a combination of equity and debt (the "Plan Funding"). The Plan Sponsor would provide up to 235 million euros in equity (the "Equity Contribution") and would seek third-party debt financing for the balance of the funds necessary to consummate the Plan (the "Debt Financing").

Simultaneous with, and as a condition to, the effectiveness of the Restructuring Support Agreement (the "RSA Effective Date"), (i) the Plan Sponsor will provide the ad hoc committee of PIK Holders (the "PIK Lender Committee") with an equity commitment letter for the Equity Contribution and (ii) the Plan Sponsor will undertake to seek to provide the PIK Lender Committee, within 90 days of the RSA Effective Date, with binding and finalized debt commitment letters in an aggregate amount of not less than 365 million euros for the Debt Financing. In each case, the letters provided to the PIK Lender Committee in (i) and (ii) above must be in form and substance reasonably acceptable to the PIK Lender Committee, the Company and Meyers, in their sole discretion.

In respect of the Equity Contribution, the Plan Sponsor would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the Plan or the Loan Settlement.

Subject to the execution of a mutually satisfactory NDA/standstill agreement, the Company and Meyers will hold weekly conference calls, to provide updates to the PIK Lender Committee on the progress of the financing process and the Restructuring.

Plan Effective Date: The Plan Effective Date must occur within 120 days from the filing of a chapter 11 case (subject to extension by the PIK Lender Committee, in its sole discretion, to account for implementation mechanics or the satisfaction of the conditions to the confirmation of the Plan set forth below)

Releases: Immediately upon the execution of the Restructuring Support Agreement (the "RSA Effective Date"), (i) any litigation involving the PIK Holders, the Company, Meyers, Eco-Bat Technologies Limited ("EBT") and each of their respective affiliates, would be dismissed with prejudice, and (ii) the PIK Holders, the Company, Meyers and each of their respective employees, directors, partners, advisors, representatives and affiliates would be granted full, unconditional and irrevocable mutual releases as set forth in the Restructuring Support Agreement, which shall be effective upon the RSA Effective Date. A release by all parties in the litigation and their respective affiliates and the holders of at least 95% of the principal amount of the PIK Loan would be required; provided, however, that Meyers and the Company would have the right, in their discretion, to reduce such 95% requirement.

Optional Stalking Horse Bid: If the PIK Lender Committee so determines in its discretion, the definitive agreements with respect to the Plan Funding would contain a stalking horse provision, whereby the Company would offer the shares of the Company to any qualified person, pursuant to a process conducted by an independent investment banking firm acceptable to the Consenting PIK Holders. The Company would sell the shares to the bidder who makes the highest and best offer in the opinion of such investment banker (and subject to such other provisions as are required in a bankruptcy proceeding, if applicable). To facilitate this process, Meyers would cause RSR Corporation ("RSR") to transfer the agreements relevant to EBT. Additionally, if desired, Meyers would be available to assist in the transition for a period of up to a year. If the shares are sold to a higher bidder, the Plan Sponsor would be entitled to (a) a stalking horse fee of 5% of the purchase price and (b) reimbursement of reasonable, documented out-of-pocket expenses in connection with the transaction, up to $8.5 million in the aggregate.

Consensual Transfer: If the Plan Sponsor remains the highest bidder but does not complete the Plan Funding as a result of its material breach or the failure to obtain the requisite debt financing (and the other conditions to the Plan Funding have been satisfied), the Company would transfer the Company shares consensually for the benefit of the PIK Holders, subject to appropriate releases. Meyers would cause RSR to transfer the agreements relevant to EBT. Also, if so desired, Meyers would be available to assist in the transition for up to a year.

Bankruptcy Filing: Subject to the existing standstill agreement between the PIK Lender Committee and the Company (the "Standstill Agreement"), which shall govern prior to the RSA Effective Date, the Restructuring Support Agreement shall provide that neither the Consenting PIK Lenders, nor the Company, shall commence or support a chapter 11 case in respect of the Company, other than a case to implement the terms of the Plan. If the Restructuring does not occur in accordance with the Restructuring Support Agreement, as the same may be amended from time to time, the parties would be released of their obligations to proceed and the Company would promptly, upon the request of the PIK Lender Committee, file for bankruptcy under chapter 11 and would not contest such a filing if initiated by the PIK Holders.

| | |
|---|---|
| **Conditions to the Plan**: | The Plan Funding, and the consideration contemplated, herein would be expressly conditioned upon: (i) confirmation of a chapter 11 plan ("Confirmation") incorporating the terms of the Restructuring Support Agreement; and (ii) a final, non-appealable ruling by the bankruptcy court pursuant to 11 U.S.C. 505, contemporaneous with or prior to Confirmation, holding that there will be no increase in the Company's U.S. federal corporate income taxes under section 988 of the Internal Revenue Code (relating to foreign currency gain) from the Loan Settlement. For the avoidance of doubt, in the event the Restructuring Support Agreement is terminated in accordance with its terms without the Plan Funding, Loan Settlement or Plan Confirmation having occurred thereunder, then unless otherwise expressly provided in the Restructuring Support Agreement and subject to the releases and dismissal of litigation provided above, the parties will be released from their obligations thereunder and free to prosecute their respective positions in the bankruptcy case. |
| **Transaction Documents**: | The transaction documents would include the Restructuring Support Agreement, an acquisition agreement, and a loan modification/exchange agreement and such other agreements as are necessary to implement the Plan. Those agreements would be executed prior to the filing of any chapter 11 petition. The Restructuring Support Agreement must, unless otherwise agreed by the Company and Meyers, in any event be signed prior to the RSA Effective Date by Consenting PIK Holders constituting at least 90% in principal amount of the PIK Loan and a majority in number of the PIK Holders, as well as all members of the PIK Lender Committee and all parties to the existing litigation. |
| | The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the Plan is subject to obtaining the Plan Funding. |
| | There would be no adjustments in respect of the Settlement Amount. |
| | The transaction documents would be negotiated and executed as soon as practicable. |
| **Miscellaneous**: | Structuring: It is understood that this Term Sheet does not represent all of the key terms of any potential Restructuring and requires continued development by the parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations. |
| | Fees/Expenses: Commencing upon the RSA Effective Date and continuing thereafter, the Company would reimburse the PIK Holders for the reasonable and documented fees and out-of-pocket expenses of the PIK Holders and their advisors relating to the negotiation, documentation and consummation of the Restructuring, including "on the clock" amounts as of the date hereof, subject to a cap of $8.5 million. |

Nature of this Term Sheet: This Term Sheet is non-binding and may be withdrawn at any time. No party participating in these discussions is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

********

6. On April 24, 2017, the Committee sent EBH II, through their respective advisors, the following term sheet counter proposal:

*HIGHLY CONFIDENTIAL*
*For Settlement Purposes Only*
*April 24, 2017*

**EB HOLDINGS II, INC.**

**<u>Summary of Key Restructuring Terms</u>**

THIS TERM SHEET (THIS "<u>TERM SHEET</u>" CONTAINS THE PRINCIPAL TERMS AND CONDITIONS OF A POTENTIAL RESTRUCTURING TRANSACTION (THE "<u>RESTRUCTURING</u>") AMONG (A) EB HOLDINGS II, INC., A NEVADA CORPORATION (THE "<u>COMPANY</u>"), (B) HOWARD M. MEYERS ("<u>MEYERS</u>") AND (C) EACH OF THE BENEFICIAL OWNERS (OR INVESTMENT MANAGERS OR ADVISORS FOR THE BENEFICIAL OWNERS) OF THE COMPANY'S PIK LOAN FACILITY (THE "<u>PIK LOAN</u>") IN THE ORIGINAL PRINCIPAL AMOUNT OF 600,000,000 EUROS WHO BECOME A PARTY TO A RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RSA</u>"), AS DESCRIBED BELOW (COLLECTIVELY, THE "<u>CONSENTING PIK HOLDERS</u>").

THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY. THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY LOAN INSTRUMENTS OR SECURITIES OF THE COMPANY. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE LAWS.

Restructuring: The "Parties" hereto are (i) the Company, (ii) Meyers, and (iii) those certain

holders of the PIK Loan (the "PIK Holders") who are managed accounts and/or affiliates of GoldenTree Asset Management LP, Alcentra Limited, Fortress Investment Group/Mount Kellet Capital Management, HIG Capital International Advisors LLP/Bayside Capital, Sound Point Capital Management, LP, and Värde Partners Europe Limited (such PIK Holders, the "PIK Lender Committee"). Collectively, the PIK Lender Committee holds approximately 76% of the PIK Loan.

The Loan Settlement: The Company would retire the entire PIK Loan (the "Loan Settlement") for cash in the aggregate amount equal to [690][5] [To be discussed.] million euros (the "Settlement Amount"). For the avoidance of doubt, 100% of the Settlement Amount will be paid to the PIK Holders on account of their interests in the PIK Loan, and no portion of the Settlement Amount will be paid to any non-PIK Holder.

RSA: As soon as practicable, but not later than fourteen days from the date of this Term Sheet (unless extended with the express written consent of the Parties), the Company, Meyers, and the Consenting PIK Holders would enter into the RSA setting forth, among other things, the terms contained this Term Sheet and the remaining material terms of the Restructuring. The effective date of the RSA would be the "RSA Effective Date."

The RSA must be (i) in form and substance satisfactory to the Company, Meyers, and the Consenting PIK Holders and (ii) signed, prior to the RSA Effective Date, by Consenting PIK Holders constituting at least (x) 66.67% in principal amount then outstanding of the PIK Loan and (y) a majority in number of the PIK Holders, which Consenting PIK Holders must include all PIK Holders (and their affiliates) that are parties to the pending litigation between, among others, the Parties (the "Litigation").

The Plan and the Chapter 11 Case: The Loan Settlement would be accomplished through a pre-arranged bankruptcy plan that would incorporate the terms of the RSA (the "Plan"), as part of a case to be commenced by the Company under chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Case"), which Chapter 11 Case would be filed within thirty days of the RSA Effective Date (unless extended with the consent of the Consenting PIK Holders) (such filing date, the "Petition Date"), provided, however, that for the avoidance of doubt, the RSA Effective Date shall, in all circumstances, be at least five business days prior to the Petition Date, unless such period is waived by the Consenting PIK Holders, the Company, and Meyers. As soon as practicable after the confirmation of the Plan by the bankruptcy court (the "Plan Effective Date"), the Settlement Amount would be paid and the outstanding shares of the Company would be cancelled and 100% of the new equity of the reorganized company would be issued to Meyers or a newly-formed company organized by Meyers (in either case, the "Plan Sponsor").

The RSA would provide that the Company is to finance the Chapter 11 Case through a dividend paid to the Company (and arranged by Meyers and/or EBT) not later than the Petition Date, in an amount to be set forth in the RSA.

<u>Plan Funding</u>: The Plan would be financed through a combination of equity and debt (the "<u>Plan Funding</u>"). The Plan Sponsor would provide not less than 235 million euros in equity (the "<u>Equity Contribution</u>") and would seek third-party debt financing of [455][6] [To be discussed, as per footnote 1 above.] million euros (the "<u>Debt Financing</u>") to finance the Settlement Amount and to consummate the Plan.

Simultaneous with, and as a condition to, the RSA Effective Date, the Plan Sponsor will: (i) provide the Consenting PIK Holders with (a) an irrevocable and nonrefundable cash payment of not less than 20 million euros, which amount would be credited towards the Equity Contribution (the "<u>Nonrefundable Payment</u>"), and (b) an equity commitment letter for the remainder of the Equity Contribution (i.e., not less than 215 million euros) to be paid, pursuant to the Plan, no later than the Plan Effective Date; and (ii) undertake to seek to provide the Consenting PIK Holders, within forty-five days of the RSA Effective Date, final and binding commitment letters in respect of the Debt Financing, to be funded, pursuant to the Plan, no later than the Plan Effective Date. The letters to be provided to the Consenting PIK Holders in (i) and (ii) above must be in form and substance reasonably acceptable to the Consenting PIK Holders, the Company, and Meyers.

In respect of the Equity Contribution, the Plan Sponsor would retain the right to include one or more equity owners in addition to Meyers, but that will not be a condition to the Plan or the Loan Settlement.

Subject to the execution of a mutually satisfactory NDA/standstill agreement, which may be incorporated into the RSA, the Company and Meyers will hold weekly conference calls, to provide updates to the Consenting PIK Holders on the progress of the Plan Funding process and the Restructuring.

<u>Plan Effective Date</u>: The RSA would provide that the Plan Effective Date must occur within sixty-five days of the Petition Date (unless extended with the consent of the Consenting PIK Holders).

<u>Releases</u>: On the Plan Effective Date, and as part of the Plan, (i) the Litigation would be dismissed with prejudice, and (ii) the PIK Holders, the Company, Meyers and each of their respective employees, directors, partners, advisors, representatives and affiliates would be granted full, unconditional and irrevocable mutual releases ((i) and (ii), together, the "<u>Mutual Release</u>"). For the avoidance of doubt, the Mutual Release would require the release by (x) all parties to the Litigation and (y) PIK Holders representing at least 95% of the principal amount then outstanding of the PIK Loan; <u>provided</u>, <u>however</u>, that Meyers and the Company would have the right, in their discretion, to reduce such 95% requirement.

for so long as the RSA is effective, no Party may seek to enjoin or challenge the Restructuring, including the RSA. For the avoidance of doubt, the Litigation will continue (unless stayed by court order or otherwise agreed by the Parties) until the Plan Effective Date.

<u>No Bankruptcy Filing/No Consent to Filing</u>: Subject to the existing standstill agreement between the PIK Lender Committee and the Company (the "<u>Standstill Agreement</u>"), which Standstill Agreement would govern from the date of this Term Sheet until the RSA Effective Date, the RSA would provide that: (i) for so long as the RSA is effective, neither the Consenting PIK Lenders nor the Company would commence or support a chapter 11 case in respect of the Company other than the Chapter 11 Case to implement the Plan, and (ii) if the RSA terminates by its terms at any time after the RSA Effective Date and prior to the Petition Date, the Company and Meyers would either (a) commence a voluntary chapter 11 case or (b) consent to an involuntary chapter 11 case commenced by three or more of the Consenting PIK Holders.

For the avoidance of doubt, nothing in this Term Sheet prevents the termination of the Standstill Agreement according to its terms at any time prior to the RSA Effective Date.

|  |  |
|---|---|
| **Conditions to the Plan**: | The Plan Funding (other than the Nonrefundable Payment), and the consideration contemplated in this Term Sheet would be expressly conditioned upon: (i) confirmation of the Plan ("<u>Confirmation</u>") and (ii) the entry of an order by the bankruptcy court pursuant to 11 U.S.C. § 505, contemporaneous with or prior to Confirmation, determining that the Nonrefundable Payment shall be treated as a payment of interest for purposes of the U.S. federal income tax purposes related to AHYDO instruments (the "<u>Section 505 Order</u>"); <u>provided</u>, <u>however</u>, that the Company may, in its sole discretion, waive the condition set forth in (ii), above. The RSA would provide that the Company will file a motion seeking the Section 505 Order on the Petition Date; <u>provided further</u>, that such motion, and all related filings, shall be provided to tax and bankruptcy counsel for the Consenting PIK Lenders as soon as reasonably practicable prior to submission to the bankruptcy court (with such period to be no less than five business days prior to the Petition Date in the case of the initial motion seeking the Section 505 Order) for such counsel's review, comment, and consent. |

For the avoidance of doubt, if the RSA terminates in accordance with its terms prior to the Plan Effective Date (including because, among other things, the Company does not obtain the Plan Funding and/or the bankruptcy court does not enter the Section 505 Order (and such condition is not waived by the Company, as set forth in the proviso above)), the Parties will be released from their obligations under the RSA and be free to prosecute their respective positions in the Chapter 11 Case; <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, the Nonrefundable Payment shall not be returned in such circumstance.

**Transaction Documents**:
The transaction documents would include the RSA, an acquisition agreement, and a loan modification/exchange agreement and such other agreements as are necessary to implement the Plan. Unless specified otherwise in this Term Sheet and/or the RSA, the transaction documents would be executed (or be in agreed form) prior to the Petition Date.

The transaction documents would contain representations, covenants, closing conditions and such other terms as are customary for transactions of this type, including that the Plan is subject to the Company obtaining the Plan Funding.

There would be no adjustments in respect of the Settlement Amount.

**Miscellaneous**:
Structuring: It is understood that this Term Sheet does not represent all of the material terms of the Restructuring and requires continued development by the Parties, as well as adjustments that may be required to reflect tax, financing, accounting, and legal considerations.

Fees/Expenses: The Company will reimburse the Consenting PIK Holders for the reasonable and documented fees and out-of-pocket expenses of the Consenting PIK Holders and their advisors relating to the negotiation, documentation, and consummation of the Restructuring. Payments of such fees and expenses will be made on the RSA Effective Date (for all pre-RSA Effective Date fees and expenses) and on the Plan Effective Date (for any and all remaining unpaid fees and expenses). For the avoidance of doubt, the amounts to be paid on account of such fees and expenses would be separate from the Settlement Amount.

Nature of this Term Sheet: This Term Sheet is non-binding and may be withdrawn at any time. No Party is obligated to enter into or consummate any agreement. It is expressly understood that any restructuring or modification of existing agreements will require definitive written agreements executed by the Parties. No continued discussions, letters of intent, or other communications shall be deemed to create any such obligation. In no event shall this Term Sheet, the proposed terms of the Restructuring, the discussions with respect to this Term Sheet or any subsequent communications, letters of intent, draft documents or work product of the Parties or their respective employees, directors, affiliates or advisors or other representatives be used in any litigation, bankruptcy or other proceedings or constitute an admission of any kind.

Shared Confidential Information: This Term Sheet constitutes "Shared Confidential Information," as that term is defined in the Standstill Agreement.

---

[5] [To be discussed.]

[6] [To be discussed, as per footnote 1 above.]

********

7. On April 24, 2017, EBH II sent to the Committee, through their respective advisors, the following Confidentiality Agreement:

To: EB Holdings II, Inc.
Attn.: Howard M. Myers
2777 Stemmons Freeway
Suite 2000
Dallas, TX 75207
United States

April 24, 2017

Dear Sirs:

**Re: Termination Notice**

Reference is made to the confidentiality and standstill agreement (the "Confidentiality and Standstill Agreement"), dated as of April 6, 2017, entered into among EB Holdings II, Inc. (the "Company") and the Recipients (as defined therein). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in the Confidentiality and Standstill Agreement.

By this notice (this "Termination Notice"), the undersigned Recipients, as Requisite Holders, notify the Company, pursuant clause (iii) of paragraph 11.1 of the Confidentiality and Standstill Agreement, that they unanimously desire to terminate the Confidentiality and Standstill Agreement. Pursuant to clause (iii) of paragraph 11.1 of the Confidentiality and Standstill Agreement, the Termination Date shall be Friday, April 28, 2017. Pursuant to paragraph 11.2 of the Confidentiality and Standstill Agreement, the Public Disclosure Date for purposes of issuing the Cleansing Document to cleanse the Disclosure Information shall be Monday, May 1, 2017. As required by paragraph 11.3 of the Confidentiality and Standstill Agreement, please provide the Recipients with a draft of the Cleansing Document by no later than Thursday, April 27, 2017.

The Recipients hereby reserve the right, in their sole discretion, to revoke this Termination Notice at any time prior to the Termination Date, by giving written notice of such revocation to the Company.

*[SIGNATURE PAGES FOLLOW]*

[signed by all Committee members]

\*\*\*\*\*\*\*\*

8. On April 28, 2017, EBH II sent to the Committee, through their respective advisors, the following letter:

Paul Basta, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Paul.basta@kirkland.com

Neal Paul Donnelly, Esq.
Kirkland & Ellis LLP
30 St Mary Axe
London, EC3A 8AF
United Kingdom
Neal.donnelly@kirkland.com

Re: EB Holding II, Inc. ("EBH")

Dear Paul and Neal:

We are in receipt of your clients' April 24, 2017 notice of termination of the confidentiality/standstill agreement, a notice that was sent within hours of our receipt of your clients' most recent restructuring proposal. Based on the content of that proposal and the near-contemporaneous termination notice, it appears that negotiations are or may soon be at an impasse.

Since 2013, EBH has consistently tried to reach a consensual resolution of the PIK dispute and claims, including potentially, a voluntary bankruptcy) that would be consistent with the best interests of all stakeholders and would avoid years of costly litigation. To that end, EBH has made proposals in good faith both in process and substance for the benefit of its stakeholders. Unfortunately, rather than build on these efforts, your clients' actions have been counter-productive, as is exemplified by their latest proposal, which among other things fails to recognize the significant risk, amount, and priority of potential tax liability upon a repayment or exchange of the PIKs and, unlike EBH's proposals, is not designed to maximize financing probability. The latest proposal is neither acceptable nor constructive. As a result, EBH is withdrawing the proposals previously sent to you.

EBH has stood ready to pursue a consensual settlement if true good-faith negotiations could be convened. The continued threat to force EBH into an involuntary bankruptcy when the PIK debt itself is in dispute in the pending Nevada state court action is not productive. A contested bankruptcy proceeding, on top of the Nevada proceeding that your client commenced and that has now led to counterclaims that will go to trial, does not advance your client's interests nor help to lead to a resolution. These facts similarly make your clients ineligible to commence an involuntary bankruptcy and open up the door for additional litigation and damages available under 11 U.S.C. 303(i) which, as you know, include attorney's fees, proximate damages, and punitive damages.

Be assured, EBH remains hopeful that the parties can reach an agreement and continued discussions. However, further proposals reflecting the same unbalanced imposition of nearly all downside risk (specifically including the potentially significant tax liability that may occur upon any form of repayment of EBH's debt), are not productive to reaching a consensual agreement.

Sincerely,

GARMAN TURNER

GORDON LLP

GREGORY E.

GARMAN, ESQ.

cc: EB Holdings II, Inc.'s Board of Directors

\*\*\*\*\*\*\*\*

9. EBH II and the Committee agreed to include the following language in this release:

***Certain U.S. tax liabilities may arise if EBH II restructures the Loan.***

In connection with any potential restructuring of EBH II's indebtedness (whether out of court or in bankruptcy), there is a possibility that EBH II may realize material taxable income under certain U.S. federal income tax rules related to the treatment of foreign currency gains. Any such taxable income would arise because EBH II's functional currency is the U.S. dollar and the Loan is denominated in Euros. EBH II is a "C corporation" under the U.S. Internal Code; prior to January 1, 2013, EBH II was an "S corporation." Although not free from doubt, it is possible that such income may be partially or fully offset by tax attributes made available in connection with such restructuring. The foregoing statement does not constitute tax advice by EBH II, nor should it be relied upon by any person.

\*\*\*\*\*\*\*\*

For information contact: Teresa Zaidle at tzaidle@ebholdingsinc.com.

# Contacts
EB Holdings II, Inc.
Teresa Zaidle, tzaidle@ebholdingsinc.com

**Exhibit E**

**April Proposal Cleansing Materials Response**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, New York 10022

Paul M Basta, P.C.
To Call Writer Directly:                              (212) 446-4800                                    Facsimile:
(212) 446-4750                                                                                          (212) 446-4900
paul.basta@kirkland.com                            www.kirkland.com

May 1, 2017

Gregory E. Garman
Garman Turner Gordon
650 White Drive, Suite 100
Las Vegas, NV 89119
ggarman@gtg.legal

## VIA E-MAIL AND OVERNIGHT MAIL

Re: EB Holdings II, Inc. ("EBH")

Greg:

As you know, we represent holders representing over a majority in principal amount of EBH's PIK Loan Facility (the "PIK Lenders") and we are in receipt of your letter, dated April 27, 2017, acknowledging the PIK Lenders' termination of the confidentiality/standstill agreement.

The facts of the matter are that EBH currently owes the PIK Lenders approximately €1.8 billion and EBH has offered no path for repayment to date. The PIK Lenders reject the statement that EBH and Mr. Meyers have worked diligently since 2013 to achieve a consensual outcome. To the contrary, we believe Mr. Meyers has worked to shield himself from liability and to undermine EBH's creditors. It was only following repeated efforts by the PIK Lenders that EBH became willing to share the diligence information necessary for meaningful discussions to take place (and even that did not occur until a few weeks before the maturity of the PIK Loans). Notwithstanding the eleventh-hour nature of the recent discussions, the PIK Lenders have expended significant efforts and expense to engage in good faith negotiations with EBH and its advisors regarding alternatives to repayment and the PIK Lenders will continue to do so. We will act constructively even though EBH and its controlling shareholder, Mr. Meyers, are continuing a pattern of disregarding their fiduciary obligations and are actively pursuing a strategy designed to benefit Mr. Meyers personally at the expense of creditors expected to suffer massive losses.

# KIRKLAND & ELLIS LLP

May 1, 2017
Page 2

The failure of the board of EBH and Mr. Meyers to protect EBH from tax liability is just one example of this disturbing pattern. Not only was this possible liability incurred as a result of the action or inaction of Mr. Meyers and for the benefit of Mr. Meyers, but EBH and its directors and officers have exhibited a shocking level of carelessness in failing to inform themselves of such risk and protect EBH. Such carelessness is illustrated by such liability being disclosed to the PIK Lenders as a newly-discovered fact weeks after the PIK Loan Facility's maturity date. The PIK Lenders intend to hold Mr. Meyers personally liable for this potential tax liability and to suggest that the PIK Lenders should bear the potential price of such neglect of EBH's interests is simply unacceptable.

The position of your correspondence on the potential tax liability only serves to emphasize that these negotiations are challenged by the significant history of misconduct, the myriad conflicts present in the situation, and the continued failure on the part of EBH and its board to maximize the value of EBH's assets. It is extremely disappointing that, even after passing maturity without having paid one cent on the €1.8 billion EBH owes the PIK Lenders, Mr. Meyers is more interested in posturing than honoring his obligations. The PIK Lenders expect your assistance, as counsel to EBH, in overcoming these challenges and requiring Mr. Meyers to honor his debts and to contribute appropriately for his misdeeds (and those of his affiliates), which misdeeds have significantly impaired EBH's value and limited EBH's ability to repay the PIK Lenders what they are owed.

Your suggestion that an involuntary bankruptcy proceeding would somehow be improper is remarkable. There are €1.8 billion of debt and other obligations that remain unpaid now more than a month after maturity of the PIK Loans. The idea that a company would attempt to contest an involuntary bankruptcy proceeding in order to protect the interests of an out of the money shareholder with a pattern of significant unlawful conduct over the course of many years, at the direct expense of the company's other stakeholders, could itself be grounds for liability. The PIK Lenders are in this position because of Mr. Meyers' misdeeds and mismanagement, and my clients will take the steps necessary to protect their substantial interests.

It is unfortunate that the prospects of a value-maximizing solution appear so slim right now. Your help can change that. Be assured that while the PIK Lenders and their advisors hold out some hope for a drastic change of course from EBH and Mr. Meyers, we reserve all rights to take whatever actions are appropriate to preserve the value of EBH for the benefit of its stakeholders given that no other party involved in this situation appears willing to do so at this time.

## KIRKLAND & ELLIS LLP

May 1, 2017
Page 3

Sincerely,

Paul M Basta, P.C.

**<u>Exhibit F</u>**

**P. Basta Letter to the Debtor**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, New York 10022

Paul M Basta, P.C.
To Call Writer Directly:
(212) 446-4750
paul.basta@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

February 21, 2017

Gregory E. Garman
Garman Turner Gordon
650 White Drive, Suite 100
Las Vegas, NV 89119
ggarman@gtg.legal

**VIA E-MAIL AND OVERNIGHT MAIL**

> Re: EB Holdings II, Inc. ("EB Holdings") and Eco-Bat Technologies Limited ("Eco-Bat")

Mr. Gordon:

We represent holders representing over a majority in principal amount of EB Holding's €600 million PIK Loan Facility due in March of 2017 (the "PIK Lenders"). As you are aware, certain PIK Lenders are pursuing litigation in Nevada state court against Howard Meyers, Albert Lospinoso, EB Holdings, and QXH II for various contract and tort claims.

Separate and apart from the Nevada lawsuit, the PIK Lenders have organized and retained my firm given the impending maturity of the PIK Loan Facility. Absent a change in circumstances, EB Holdings appears headed towards a Chapter 11 proceeding in the near future. As you know, as a holding company, EB Holdings' value derives from its equity holdings in Eco-Bat, and hence it will be critical that Eco-Bat's value be preserved.

Given the history of conduct by certain managers of EB Holdings, as detailed in the Nevada lawsuit, the PIK Lenders are highly concerned that EB Holdings may attempt to dilute the value of Eco-Bat (and therefore EB Holdings as well) to the detriment of the PIK Lenders. To that end, the PIK Lenders reiterate their request that EB Holdings and its managers, consistent with their fiduciary duties and obligations, refrain from taking any action that would materially impact the assets or value of Eco-Bat in an adverse manner. Any action reducing the value of EB Holdings' equity in Eco-Bat would hinder, delay, impair or otherwise affect the

Beijing    Chicago    Hong Kong    Houston    London    Los Angeles    Munich    Palo Alto    San Francisco    Shanghai    Washington, D.C.

## KIRKLAND & ELLIS LLP

February 21, 2017
Page 2

rights of the PIK Lenders.  Please confirm that EB Holdings and its managers are not taking any action that materially impacts the assets or value of Eco-Bat.

Given the looming maturity of the PIK Notes, we are not aware of any prospects for a value-maximizing resolution to the current circumstances facing EB Holdings without the participation and agreement of the PIK Lenders.  As such, whether as part of a process to source any necessary debtor-in-possession financing or to commence the sharing of information required to negotiate any in-court or out-of-court restructuring, the PIK Lenders would expect that EB Holdings would be engaging with the PIK Lenders to start a meaningful dialogue given the limited amount of time before the maturity of the PIK Notes.  To date, there has been no such dialogue.

Nothing herein is or should be construed as an admission of any type, nor does anything in this letter, limit, restrict, waive or otherwise prejudice any claims, rights or remedies that the PIK Lenders have against EB Holdings, its managers, or any of its affiliates, or any other person or entity.

The PIK Lenders want to be part of a value-maximizing solution for EB Holdings and look forward to your response at the earliest convenience.

Sincerely,

Paul Basta

Paul M Basta, P.C.